UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------------X

UNIVERSITAS EDUCATION, LLC,                :

                Plaintiff,                :     Civil No. _____

         -against-                :

JACK E. ROBINSON, III a/k/a JACK E.      :     **COMPLAINT AND**
ROBINSON,                                              **JURY DEMAND**
                           :

           Defendant.                :

                           :

-------------------------------------------------------------X

## NATURE OF THE CASE

1.     Plaintiff Universitas Education, LLC ("Universitas"), an unsatisfied judgment creditor, through its attorneys, brings this action against Defendant Jack E. Robinson III, a/k/a Jack E. Robinson ("Robinson"), for knowingly and intentionally facilitating and participating in the theft of over $30.6 million in life insurance proceeds belonging to Universitas by judgment debtor Daniel E. Carpenter—a business associate, former law partner, and client of Robinson who is currently serving prison time in connection with a conviction in federal court for nineteen (19) counts of mail and wire fraud, and who separately faces twenty-four (24) counts of fraud, money laundering, and engaging in illegal transactions relating to his usurpation and intentionally fraudulent transfer of such insurance proceeds.  For aiding in this theft and in Carpenter's efforts to cover up evidence of the theft, Robinson also knowingly received $810,000.00 or more of the stolen insurance proceeds belonging to Universitas.  As such, Universitas brings claims for violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 et seq., aiding and abetting fraud, aiding and abetting breach of

fiduciary duty, civil conspiracy, conversion, unjust enrichment, statutory theft, negligent opinion, negligent misrepresentation, breach of fiduciary duty, and professional malpractice, and seeks compensatory damages, restitution, and treble damages.

## PARTIES

2.     Plaintiff Universitas is a limited liability company incorporated in Delaware with headquarters in New York, New York.   Universitas has two members, Donna Vassar and Sharon Siebert, each of whom lives and is domiciled in New York, New York.   Universitas is the beneficiary of the Charter Oak Trust Welfare Benefit Plan ("Charter Oak Trust") in relation to two life insurance policies placed into the Charter Oak Trust that, in May 2009, paid out approximately $30.6 million to the Charter Oak Trust for Universitas' benefit.    Robinson, however, facilitated and participated, either intentionally or negligently, in the fraudulent transfer of that money out of the Charter Oak Trust, and aided and abetted Carpenter (and others, such as his wife Molly Carpenter and his brother-in-law Wayne Bursey) in concealing the theft from Universitas and the arbitrator considering Universitas' claims and in preparing sham documents in an effort to cover up the defalcation, as detailed further below.   As a result, Universitas has received no money from the Charter Oak Trust, let alone the over $30 million it is currently entitled to.

3.     Defendant Robinson is an individual with a last known residence at 67 Bay Road, Duxbury, Plymouth County, Massachusetts.   Robinson is licensed to practice law in the Commonwealth of Massachusetts, and is actively engaged in the practice of law in Massachusetts as the sole Director, President, Treasurer, and Secretary of Leyden & Main Legal Group, Inc., which is located at 6 Main Street Extension, Post Office Square, Plymouth, Plymouth County, Massachusetts.

## JURISDICTION AND VENUE

4.     Personal jurisdiction exists over Robinson because his last known residence is in Massachusetts and, alternatively, because he is legally present in Massachusetts by virtue of the fact that he is actively operating his law business and engaged in the practice of law in Massachusetts.

5.     Subject matter jurisdiction exists under 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy exceeds $75,000, as well as under 28 U.S.C. §1331, as one of the claims arises under 18 U.S.C. § 1961 et seq.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), as Robinson resides within this judicial district.

## FACTUAL STATEMENT APPLICABLE TO ALL CLAIMS

### I.     The Carpenter Criminal Enterprise

7.     The criminal enterprise that orchestrated and carried out the looting of over $30 million belonging to Universitas, and of which Robinson is a central figure, was created by longtime Robinson crony and convicted fraudster Daniel E. Carpenter ("Carpenter").   This enterprise (the "Carpenter Criminal Enterprise") includes of a host of individuals and entities that were employed by or associated with the Carpenter Criminal Enterprise and who together with Carpenter carried out a massive fraud against Universitas (and other victims), including, among others, Robinson, Wayne Bursey ("Bursey"), Molly Carpenter, Kathy Kehoe, Amanda Rossi, Donald Trudeau ("Trudeau"), J. Edward Waesche IV ("Waesche"), the Charter Oak Trust, Nova Group, Inc. ("Nova"), Nova Benefit Plans LLC ("Nova Benefit Plans"), Benistar Admin Services, Inc. ("BASI"), Grist Mill Capital, LLC ("Grist Mill Capital"), Grist Mill Holdings, LLC ("Grist Mill Holdings"), Avon Capital, LLC ("Avon Capital"), Caroline Financial Group, Inc. ("Caroline Financial"), Carpenter Financial Group Inc. ("Carpenter Financial Group"), the

Grist Mill Trust Welfare Benefit Plan ("Grist Mill Trust"), Hanover Trust Company

("Hanover"), Moonstone Partners, LLC ("Moonstone"), Phoenix Capital Management, LLC

("Phoenix"), Benistar Ltd., ("Benistar"), and Boston Property Exchange Transfer Company,

formerly known as Benistar Property Exchange Trust Company, Inc. ("BPETCO").

8.     Many of the individuals and entities participating in this enterprise are, or have

been, the targets of federal grand jury investigations.  For example, the United States Attorney in

Connecticut has conducted an investigation into, among other persons, Carpenter, Robinson,

Trudeau, Waesche, Bursey, the Charter Oak Trust, Nova, BASI, Grist Mill Capital, Grist Mill

Holdings, Avon Capital, Caroline Financial, and all employees and business associates of those

organizations.  Attached as **Exhibit 1** is a true and correct copy of a stipulation executed by the

U.S. Attorneys' Office for the District of Connecticut listing those individuals and entities as

targets of the grand jury investigation.  Similarly, the Carpenter Criminal Enterprise has been the

subject of a grand jury investigation by the United States Attorney in Wisconsin, which has

subpoenaed records from Nova Benefit Plans regarding various welfare benefit plans, such as the

Charter Oak Trust, that are controlled and operated by the Carpenter Criminal Enterprise.

Attached as **Exhibit 2** is a true and correct copy of a grand jury subpoena dated April 13, 2010

issued out of the U.S. District Court for the Eastern District of Wisconsin to Nova Benefit Plans.

On information and belief, both of the above referenced investigations are still open

investigations.

9.     Carpenter is an insurance agent by profession.  Although also trained as a lawyer,

Carpenter has been unable to practice law since 2009, when he was disbarred.  In January 2005,

the Connecticut Statewide Grievance Committee found that Carpenter had committed fraud,

deceit, and misrepresentation in connection with his handling of client funds.  See Cahaly v.

4

Carpenter, Grievance Complaint No. 02-0600 (St. Grievance Cmte. Jan. 14, 2005). The misconduct described in that decision involved the unauthorized transfer and defalcation of client escrow funds from trust accounts into personal trading accounts. As a result, in January 2009, the Connecticut courts indefinitely suspended Carpenter's license to practice law.

10.     In 2004, Carpenter was indicted in the United States District Court for the District of Massachusetts for nineteen (19) counts of wire fraud and mail fraud in connection with his misappropriation and defalcation of millions of dollars in client escrow funds while offering, through a group of entities that he dominated and controlled, services as a qualified intermediary for tax-beneficial investment property exchanges, described in further detail below. Carpenter was found guilty in 2008, and was sentenced in 2014 to three (3) years in prison, and three (3) years' probation. See U.S. v. Carpenter, No. 04-CR-10029 (D. Mass.).

11.     Upon information and belief, Carpenter is currently an inmate at the high-security United States Penitentiary Canaan, in Waymart, Pennsylvania, where he is serving time in connection with his 2008 conviction.

12.     Carpenter has formed, or arranged for the formation of, scores, if not several hundred, companies, corporations and trusts, all of which he dominates and controls (with the help of his wife Molly Carpenter), most of which have been found to be his instrumentalities or to be shams, through which he has operated his criminal enterprise over the years, nearly all of which have operated out of, or have been closely connected to businesses that operated out of, an office complex located at 100 Grist Mill Road, Simsbury, Connecticut.

13.     Of particular relevance to this case, it has been judicially determined, in decisions issued by the United States District Court for the Southern District of New York, that Carpenter controls, directly or indirectly, the following businesses: the Charter Oak Trust, Nova, Avon

Capital, Caroline Financial, Carpenter Financial Group, Grist Mill Capital, Grist Mill Holdings, Grist Mill Trust, Hanover, Moonstone, Nova Benefit Plans and Phoenix.

14.    Among the other entities that Carpenter has formed, or directed the formation of, are:  Audit Risk Indemnity Association, LLC, the Sickness Accident Disability Indemnity Plan & Trust ("SADI Trust"), the SADI Trust 2005, Capital City Partners, LLC,  Benefit Concepts, Inc., Benefit Concepts Advisors, LLC, Benefit Concepts New York, Benefit Plan Advisors, LLC, Benistar 419 Plan Services, Benistar Client Services, Inc., Benistar Insurance Group, Benistar Insurance Group Holdings, LLC, BCNY Litigation Group, LLC, BPETCO Litigation Group, Birch Hill Partners, the Charter Oak Trust 2009, Nova Group Holdings, LLC, Nova Partners, TPG Group, Inc., U.S. Benefits Group, Inc., and Worthy Investments, LLC.,

15.    Additional entities have been found, by other courts and in other cases, also to be dominated and controlled by, and, specifically, to be *alter egos* of, Carpenter.  In a suit commenced in the Commonwealth of Massachusetts Trial Court, a decision has been entered by that Court finding that the following entities are also the *alter egos* of Carpenter:  Benistar, BASI, Benistar Employer Services Trust Corporation, Carpenter Financial Group, LLC, U.S. Property Exchange, and BPETCO.

16.    These entities, and numerous other entities controlled by Carpenter, have confusingly interwoven chains of ownership, and the Courts which have addressed the issue of such entities' ownership have consistently found that Carpenter dominates and pervasively controls, for his own individual purposes, the numerous entities which he and his cronies have formed.  For instance, a limited liability company might have two members, both of which are themselves companies or corporations, and each of which is owned by other companies or corporations.  Carpenter, for example, controls Grist Mill Capital through his control of Grist

Mill Capital's two members, Grist Mill Holdings and Caroline Financial Group; and he controls Avon Capital through his control of Grist Mill Capital, which manages Avon Capital. Similarly, Carpenter and the Carpenter Criminal Enterprise have endeavored to conceal these entities' chains of ownership. For example, Nova's own corporate designee has testified under oath that he does not know who owns Nova, and that no stock certificates ever issued for Nova, despite the entity having been operational and having conducted business through appointed corporate officers. As a further example, BASI is owned by an employee stock ownership plan, or "ESOP," but employees who participate in that plan have testified under oath that they have no idea who administers the plan or how the shares of BASI are valued. In short, virtually all of the companies operated by Carpenter and his cronies are formed and manipulated by them for their own personal interests and as part of the Carpenter Criminal Enterprise.

17.    Carpenter is not shy about his conduct. For instance, he has admitted under oath that Nova is a "shell corporation;" that Grist Mill Holdings is his "alter ego" for collecting insurance commissions; and that in an effort to avoid creditors, he arranged for one of his companies, Moonstone, to give a mortgage on property it owned to another one of his companies, Hanover, 15 months after the property was purchased.

18.    Carpenter has also admitted under oath that "anything that I invested in is either held in an LLC or it's held in a trust, you know, for either estate planning purposes or protection, you know, asset protection, you know, type purposes, so that if something happens on one property, people can only sue that property and they cannot sue other properties that are owned by different trusts or different LLCs."

## II.    Robinson's Relationship with Carpenter

19.    Robinson's association with Carpenter and his participation in Carpenter's enterprise dates back to the mid-1990s.

20.    In or about 1995, Robinson and Carpenter became business partners in an LLC that owned shares in a Caribbean wireless telecom holding company (which has since gone defunct and filed for bankruptcy in Connecticut). Robinson was the Managing Member of the LLC, while the other Member was Carpenter Financial Group, an entity controlled by Carpenter and from which Robinson later received a portion of the Universitas life insurance proceeds that Robinson helped steal, as detailed below.

21.    In or about 1996, Robinson and Carpenter became law partners and formed the Stamford, Connecticut-based law firm Carpenter & Robinson, LLP.

22.    In or about 1997, Robinson started working for BASI, an entity for which Carpenter's wife, Molly Carpenter, served as Chairman, and which provided administrative services for various employee welfare benefit plans and trusts controlled by Carpenter, including the Charter Oak Trust, discussed below. As noted above, BASI, which was the administrator of the Charter Oak Trust, has been found to be an *alter ego* of Carpenter in litigation pending in the Massachusetts Trial Court. At Molly Carpenter's direction, Robinson was appointed as General Counsel of BASI, and he actively served in that position from 1997 through at least 2012, during which time period Carpenter operated his criminal enterprise, with Robinson's assistance, as described herein. Robinson certainly knew, or at the very least should have known, of Carpenter's pervasive control of BASI by no later than September 23, 2003, when the Massachusetts Trial Court found that BASI was Carpenter's *alter ego*.

23.     Robinson also served as Carpenter's personal attorney in the District of Massachusetts criminal prosecution commenced in 2004, discussed further herein, and thus knew or should have known of the Massachusetts Trial Court proceedings, since the criminal prosecution was based on the subject matter of those proceedings.

24.     Between 2003 and 2006, Carpenter appointed Robinson as Manager of Grist Mill Capital, another entity dominated by Carpenter, which was to later become heavily involved in the defalcation of funds belonging to Universitas, both as a recipient and fraudulent transferor of $30.6 million of those funds while Robinson was serving as Manager and counsel.

25.     Starting in or about 2006, Robinson also performed substantial legal work for the Charter Oak Trust—an entity that was controlled by Carpenter at all relevant times, and which was at the center of the misappropriation of the Universitas funds. During all relevant times to this case, Robinson was part of Carpenter's inner circle for decision making, together with Carpenter cronies Wayne Bursey and Donald Trudeau.

26.     At various points from the mid-1990s through the present, and at Carpenter's behest, Robinson also worked for, represented, and/or acted on behalf of Wayne Bursey, Carpenter's brother-in-law and confederate, and on behalf of the numerous entities dominated and controlled by Carpenter. As Robinson has stated under oath, as of 2012, approximately 75% of his legal work was for entities controlled by and affiliated with Carpenter.

### III.    The Charter Oak Trust, Nova, and its Affiliates

27.     On or about October 1, 2006, Bursey executed a Declaration of Trust as President of Nova, thereby establishing the Charter Oak Trust. Robinson represented Charter Oak Trust in the drafting of the Declaration of Trust and was thus intricately familiar with the terms of that Trust.

28.    Bursey, as noted above, is Carpenter's brother-in-law. Bursey, who is recently deceased, acted not only as the President of Nova, but also acted as the individual Trustee to the Charter Oak Trust and as an officer and/or director of Nova Benefit Plans, another Carpenter-controlled entity.

29.    Nova purported to be the sponsor, co-administrator and corporate Trustee of the Charter Oak Trust and numerous other employee welfare benefit plans. Nova, however, is not currently, nor was it ever, a *bona-fide* corporation, but rather a judicially determined shell entity that was dominated and controlled by Carpenter, who was Nova's Chairman and operated the Charter Oak Trust through Nova and other sham companies from the office complex located at 100 Grist Mill Road. While Nova was designated as Plan Administrator, it had no employees, and all such administrative functions were in fact performed by BASI. As such, BASI was the de facto Plan Administrator for Charter Oak Trust.

30.    The Charter Oak Trust was masterminded by Carpenter, as part of his wide-ranging and long-operating criminal enterprise described herein. As Bursey has admitted in court proceedings, he and Carpenter co-managed the Charter Oak Trust and Carpenter created the Charter Oak Trust's structure, which Carpenter utilized to accomplish the theft of the insurance proceeds belonging to Universitas, as described herein.

31.    The Charter Oak Trust marketed and represented itself to be a multiple-employer welfare benefit plan under Section 419(e) of the Internal Revenue Code and was not subject to ERISA regulations. Instead, it was another front for the Carpenter Criminal Enterprise, which relied on attracting investors through the offering of purported tax shelter programs.

32.    As discussed below, the criminal enterprise operated by Carpenter and his cronies also used the Charter Oak Trust, from 2006 into 2009, as a front for a scheme to defraud

insurance companies, which led to an indictment by a Connecticut federal grand jury on thirty-two (32) counts of mail and wire fraud and one (1) count of conspiracy to commit mail and wire fraud.

33.     The Declaration of Trust for the Charter Oak Trust confirmed that "in no event shall any asset of the [Trust's] Fund be used for or diverted to purposes other than providing benefits … for Participants and their dependents and beneficiaries and defraying reasonable expenses of administering the … Trust."  As counsel for and an authorized representative of the Charter Oak Trust, and as a result of his participation in the drafting of the Declaration of Trust and other Charter Oak Trust documents, Robinson knew or should have known of the provisions of the Declaration of Trust.

34.     Starting at the time the Charter Oak Trust was created on or about October 1, 2006, Robinson was appointed as Nova's General Counsel and was therefore acting on behalf of the Charter Oak Trust.  Robinson has stated, under oath, that he was fully familiar with all of the Charter Oak Trust's operations, finances, bank accounts, assets and obligations, and thus was or should have been aware of all of the Charter Oak Trust's activities in connection with the Carpenter Criminal Enterprise.

35.     Nova, as the trustee and plan sponsor of the Charter Oak Trust, Bursey, as Nova's President, and Robinson, as Nova's general counsel, were all fiduciaries of the Trust.

36.     BASI, which Carpenter controlled, and for whom both Robinson and Molly Carpenter worked, provided all administrative services for the Charter Oak Trust and was, in fact, the Plan Administrator.  In that capacity, it too was a fiduciary of the Charter Oak Trust, as were Robinson and Ms. Carpenter.  As noted previously, BASI has been found by a court of competent jurisdiction to have been an *alter ego* of Carpenter.

11

37.    Because the Charter Oak Trust was established for the benefit of its participants and beneficiaries, Nova, Bursey, BASI, and Robinson each owed a fiduciary duty to the participants and to the beneficiaries of the Charter Oak Trust.

## IV.    The Sash Spencer Life Insurance Policies

38.    In or about late 2006, Bruce Mactas ("Mactas"), a licensed life insurance broker working on behalf of Sash A. Spencer ("Spencer"), then the CEO of Holding Capital Group, Inc., met with Trudeau, then-President of BASI (who was also the President of BASI when it was found to be Carpenter's *alter ego* in 2003), and Waesche, an insurance agent working on behalf of Carpenter and the Charter Oak Trust, to discuss Spencer's participation in the Trust.

39.    Upon information and belief, neither Waesche nor Trudeau disclosed Carpenter's connection to the Charter Oak Trust or his role in structuring and managing the Charter Oak Trust and its assets.

40.    On or about December 17, 2006, Spencer joined the Trust on behalf of Holding Capital Group, Inc.  Spencer named himself as the sole covered employee and indicated in the Trust documents that he would be acquiring a $10 million policy (the "2006 Plan Documents"). In his 2006 Plan Documents, Spencer named and designated Universitas as the sole beneficiary of his $10 million death benefit.

41.    The same day, Spencer, assisted by his broker Mactas, executed an application for a $10 million life insurance policy to be submitted to Lincoln National Life Insurance Company ("Lincoln Life").  In the life insurance application, Spencer was listed as the owner of the $10 million policy, Bursey signed the application as "Trustee" of the Trust, and the Trust was the policy's sole beneficiary.  Spencer indicated in his application that this designation was pursuant to the Charter Oak Trust, dated October 1, 2006.

42.    On or about December 29, 2006, Lincoln Life approved Spencer's application and issued a $10 million policy (Policy # 7305475), effective as of December 22, 2006.

43.    Around that time, Spencer decided to take out additional life insurance policies under the Charter Oak Trust with a $20 million corresponding death benefit.

44.    In or about March 2007, Lincoln Life issued a $20 million policy (#7320809), effective as of December 22, 2006 on Spencer's life.    Spencer executed additional documentation with the Charter Oak Trust for the new policy (the "2007 Plan Documents").  As he had done with the 2006 Plan Documents, Spencer designated Universitas as the sole beneficiary of any death benefit under the new policy.

45.    On or about April 4, 2008, Spencer decided that he wanted to amend his beneficiary designations to make Universitas the sole, **irrevocable** beneficiary of both the $10 million and $20 million policies.  To accomplish this, Mactas contacted Trudeau at BASI by email and advised him of Spencer's decision.

46.    On or about April 8, 2008, Trudeau provided Mactas with the appropriate documentation for Spencer to execute to make Universitas his sole, irrevocable beneficiary under the Charter Oak Trust.  On or about May 14, 2008, Mactas, on behalf of Spencer, submitted the new irrevocable designation forms to Trudeau, in which Spencer irrevocably designated Universitas as his sole beneficiary.

47.    Spencer died unexpectedly on June 10, 2008.

48.    Less than a week after Spencer's death, Mactas contacted BASI/Nova representatives regarding Spencer's death and the process for making a claim for benefits.  At Mactas' request, the Charter Oak Trust executed a claim for a total of $30 million in death benefits to be submitted to Lincoln Life with respect to the Spencer Policies, so that Lincoln Life

would pay the death benefit to the Charter Oak Trust, which in turn should have paid that death benefit over to the sole, irrevocable beneficiary—Universitas. Acknowledging that the claim had been filed, Trudeau sent an email to Mactas on June 18, 2008 with the subject line "COT claim"—or, Charter Oak Trust claim.

49.     To expedite the processing of Universitas' claim, on July 10, 2008, Mactas provided the Charter Oak Trust with a copy of Spencer's death certificate.

50.     In a letter dated July 23, 2008, in furthering Carpenter's scheme to deprive Universitas of the insurance proceeds belonging to it, Robinson wrote to Universitas and Spencer's widow, on behalf of each of Nova, the Charter Oak Trust, and Grist Mill Capital, claiming that the Charter Oak Trust was entitled to keep $6 million in "fees" from the $30 million in death benefits. Robinson claimed that certain purported amendments to the applicable Declaration of Trust permitted the exorbitant fee; however, neither the Charter Oak Trust nor anyone affiliated therewith had ever provided Spencer or Mactas with a copy of such purported amendments. Robinson knew or should have known that there were no such amendments and that the alleged agreement was a fabrication in order to assist Carpenter in his scheme to deprive Universitas of some or all of those insurance funds, for Carpenter's personal benefit.

51.     Both Universitas, through counsel, and Mactas continued to dispute the Trust's entitlement to the $6 million "fee" and from late 2008 through early 2009, the two sides continued to discuss the validity of the Trust's claim to the purported fee. Thus, Robinson knew full well, due to his involvement in the matter, that the fee was disputed by Universitas.

52.     On or about March 2, 2009, Robinson wrote to counsel for Universitas—on the letterhead of a company called Benistar, a company which is the 100% owner of BASI and which a Court has found to be Carpenter's *alter ego*—claiming that Universitas' dispute of the

validity of the fees constituted a "threat of litigation," which, under the governing Declaration of Trust, would entitle the Charter Oak Trust to terminate Spencer's former company, Holding Capital, as an employer under the Trust, and would thereby entitle Nova to keep the entire $30 million death benefit. Thus, according to Robinson, unless Universitas agreed to pay those $6 million of fees (which were fictitious and bogus), Universitas would forfeit—to Carpenter-controlled entities, of course—the entire $30 million death benefit. While the Charter Oak Trust later retreated from Robinson's specious contention, Robinson's attempts to extract these funds demonstrate the depth of his involvement in the Carpenter Criminal Enterprise.

53.     On or about May 5, 2009, Bursey, as "Named Trustee" of the Charter Oak Trust, brought suit against Lincoln Life to recover the $30 million in death benefits on Spencer's life. In Bursey's Complaint, he acknowledged that Universitas was the sole beneficiary of the death benefits payable under the Spencer policies. See Bursey v. Lincoln Nat. Life Ins. Co., No. 09-cv-735-AWT (D. Conn. May 5, 2009), ECF No. 1. On information and belief, and as supported by his sworn declaration acknowledging full familiarity with all of the activities of the Charter Oak Trust, Robinson was aware of the Complaint and the allegations therein.

54.     Within several days of the filing of Bursey's Complaint, on or about May 15, 2009, Lincoln Life paid the death benefits to the Trust. Specifically, Lincoln Life issued two checks to Nova, designated "PAY TO THE ORDER OF CHARTER OAK Trust DTD 10/1/06 / WAYNE BURSEY TTEE / 100 GRIST MILL ROAD / SIMSBURY CT06070," totaling $30,677,276.85, representing $30 million in proceeds from the two life insurance policies issued on Spencer's life and for which Universitas was designated as the sole, irrevocable beneficiary, and $677,276.75 in interest from the date of Spencer's death (the "Universitas Insurance Proceeds"). Robinson knew or should have known of that payment.

55.     On May 18, 2009, Bursey deposited the two checks into the Charter Oak Trust's account with T.D. Bank, N.A. ("TD Bank") (Account No. xxx-xxx-4548).[1]  As of that date, the Universitas Insurance Proceeds were the only funds contained in the Charter Oak Trust's account.  From May to December, 2009, Carpenter was to siphon and steal the entirety of those funds, using his various companies, including Grist Mill Capital and Carpenter Financial Group, to accomplish that result.  And, as discussed below, through the unrelenting efforts and assistance of Robinson and other confederates to conceal the theft of those funds, Universitas did not become aware of the receipt and theft of those funds until 2012, in violation of the Charter Oak Trust's and Robinson's fiduciary duties to Universitas.

56.     Bursey was the only signatory on TD Bank Account No. xxx-xxx-4548.  Carpenter, however, helped arrange for that account to be opened.  Indeed, in an email exchange with representatives from U.S. Trust, Bank of America Private Wealth Management spanning May 11, 2009 to May 14, 2009, Carpenter—who failed in his attempt to open a Charter Oak Trust account at Bank of America upon refusing to provide Bank of America with an acceptable response to the bank's "Know Your Customer" inquiry—informed Bank of America that "we have" opened Charter Oak Trust accounts at two other banks.

57.     By letter dated July 8, 2009, Robinson again wrote to Universitas, this time claiming that Universitas was not entitled to the death benefits from the Spencer policies because Universitas had purportedly failed to file a timely claim with the Charter Oak Trust for such benefits.  By the date of that letter, Robinson was aware (but did not disclose to Universitas) or should have been aware that the Charter Oak Trust had received the insurance proceeds

---

[1] All references to account numbers herein contain only the final digits for such numbers, for the purpose of public filing.  Full account numbers are known to Universitas, and will be made available as appropriate throughout the course of this litigation.

belonging to Universitas, and had already transferred over $10.8 million of the Universitas Insurance Proceeds to Grist Mill Capital, another Carpenter-controlled entity (for which Robinson was a Manager), and nearly $5.9 million of that amount had already been transferred out of Grist Mill Capital to various Carpenter controlled companies, as detailed below. In his letter, Robinson claimed, incredibly, that Grist Mill Capital was entitled to those death benefits. Robinson, pointing to the Declaration of Trust for the Charter Oak Trust, alleged that the deadline for filing a claim or claim application had been March 30, 2009. As with prior (and subsequent) pretexts to deprive Universitas of the funds to which it was entitled, and in facilitation of the Carpenter Criminal Enterprise, Robinson knew or should have known (had he conducted even a limited due diligence to determine whether his claims had good grounds to support them) that such claim was a fabrication made to facilitate and conceal Carpenter's usurpation of the Universitas Insurance Proceeds. Thus, Robinson's omission of and failure to disclose the information that the Lincoln Life insurance proceeds had been received, deposited and transferred by Charter Oak Trust to Grist Mill Capital, was a material omission that was necessary to be disclosed to render Robinson's statements not misleading.

58. Robinson, in his letter, overlooked the fact that Universitas had already filed a claim, as Trudeau had acknowledged in his June 18, 2008 email. As Robinson has sworn under oath that he was fully aware of and familiar with all the dealings, operations, assets and liabilities of the Charter Oak Trust, he was aware or should have been aware that Universitas had filed a claim.

59. In that same July 8, 2009, letter, Robinson also claimed that Grist Mill Capital— not Universitas—was entitled to the Universitas Insurance Proceeds based upon an alleged 2008

agreement between Spencer and Grist Mill Capital, pursuant to which Spencer purportedly assigned his beneficial interest in the Charter Oak Trust to Grist Mill Capital.

60.    Universitas responded with a written request that any such agreement which actually existed, as Robinson claimed on Nova's behalf, be produced to Universitas.   Not surprisingly, no contract between Spencer and Grist Mill Capital selling the policies or assigning a beneficial interest in Charter Oak Trust was ever produced.

61.    Also in his July 8, 2009 letter, on behalf of Nova, Robinson granted Universitas the right to file a "provisional claim" by July 15, 2009, which Universitas did.

62.    In a July 30, 2009, letter, Bursey as Trustee again alleged that Grist Mill Capital had a competing claim to the Universitas Insurance Proceeds, only this time he reversed Nova's position from Robinson's July 8, 2009 letter, and instead alleged that Grist Mill Capital had a "binding and enforceable agreement to purchase the Policies."   As with all its other claims and dilatory pretexts for concealing the misappropriation of the Universitas Insurance Proceeds, Nova's claim regarding Spencer's supposed sale of the policies was meritless and untrue and, in any event, Spencer had no authority to sell the policies to Grist Mill Capital because the policies were owned by the Charter Oak Trust, and no such agreement has ever been produced.

63.    By letter dated September 11, 2009, all the while continuing to conceal the defalcation of the Universitas Insurance Proceeds, Robinson inexplicably threatened to deny Universitas' claim in its entirety if there were any communications—written or otherwise— between Universitas (or its counsel) and Trudeau or Bursey.  Robinson claimed to be writing on behalf of and as counsel to the Charter Oak Trust, Nova, and BASI.  However, he demanded that all correspondence be directed to him at "Benistar, Clearwater House, 2187 Atlantic St., Stamford, CT 06902" or via email at "jrobinson@benistar.com" or robinsonesq@aol.com.

(There are a number of companies formed by Carpenter and controlled by Carpenter which contain the name Benistar.)  Robinson again failed to disclose the receipt and transfer of the Universitas Insurance Proceeds, which was a material omission by Robinson, which facts were necessary to disclose in order to render Robinson's statements not misleading.

64.    On or about October 2, 2009, Bursey wrote to Universitas and its counsel, this time alleging that Spencer had promised in early 2008 to designate Grist Mill Capital as beneficiary to his life insurance policies, in yet another attempt to conceal the receipt and misappropriation of the Universitas Insurance Proceeds.  Neither Nova nor Bursey ever provided any evidence of such a promise—which promise was never made.

65.    As discussed in detail below, it was later determined at an arbitration proceeding that Universitas had timely submitted its claim for the Spencer death benefits and that Grist Mill Capital had no entitlement to those benefits.

## V.    Robinson Helps Carpenter Loot the Universitas Insurance Proceeds from the Charter Oak Trust

66.    Rather than fulfilling its fiduciary obligations to Spencer and Universitas, Nova improperly refused to pay the Universitas Insurance Proceeds to Universitas, improperly refused to disclose the location of those funds to Universitas, and wrongly misappropriated and defalcated the Universitas Insurance Proceeds.

### A.    Initial Fraudulent Transfers

67.    From May to December 2009, concurrent with Nova and Universitas' extended correspondence regarding the Universitas Insurance Proceeds, Carpenter—in concert with Robinson, Bursey, and several of the aforementioned Carpenter-controlled entities—transferred the Universitas Insurance Proceeds out of the Charter Oak Trust and to TD Bank accounts standing in the names of other entities in Carpenter's control, including Grist Mill Capital, Grist

19

Mill Holdings, Avon Capital, Phoenix, Carpenter Financial Group, Hanover, and Moonstone—all while actively concealing those transfers. Thereafter, several transferees, all of whom were also controlled by Carpenter, either consumed or retransferred those funds to Carpenter cronies or Carpenter-controlled entities. Because of his position with those entities, and his close personal and professional relationship with Carpenter, Robinson knew or should have known of those transfers.

68.     In the short period of time following the Charter Oak Trust's receipt of the Universitas Insurance Proceeds on May 15, 2009 and the first fraudulent transfer out of the Charter Oak Trust on May 21, 2009 (described below), Carpenter opened up numerous bank accounts for the express purpose of misappropriating and defalcating the Universitas Insurance Proceeds.

69.     On May 21, 2009, three days after the Charter Oak Trust deposited the Universitas Insurance Proceeds in its bank account, Carpenter opened up the following seven TD Bank accounts (among others): Account Nos. xxx-xxx-4712 and xxx-xxx-4655 in the name of Grist Mill Capital; Account No. xxx-xxx-4663 in the name of Nova; Account No. xxx-xxx-4689 in the name of Avon Capital; Account No. xxx-xxx-4671 in the name of Phoenix; Account No. xxx-xxx-7136 in the name of Grist Mill Holdings; and Account No. xxx-xxx-4697 in the name of Carpenter Financial Group. Only Carpenter and Benistar employee Amanda Rossi were the signatories to those accounts.

70.     On May 22, 2009, Carpenter opened an eighth new TD Bank Account, No. xxx-xxx-5455 in the name of Moonstone. The only signatories to that account were Carpenter and his wife, Molly Carpenter.

71.    These myriad accounts in the names of different companies allowed Carpenter to fraudulently transfer the Universitas Insurance Proceeds after the Charter Oak Trust received those funds.  The transfers of this money, from the Charter Oak Trust to entities that Carpenter controls or controlled, were made without consideration, and have no valid basis, particularly since Bursey and Carpenter were required, by the Declaration of Trust for the Charter Oak Trust, to hold this money in trust for Universitas.

72.    On or about May 21, 2009, Bursey transferred $8,677,276.75 from the Charter Oak Trust's TD Bank account (Account No. xxx-xxx-4548) into a TD Bank account standing in the name of Grist Mill Capital (Account No. xxx-xxx-4712).

73.    On or about May 26, 2009, Bursey transferred $2,186,566.00 from the Charter Oak Trust's TD Bank account (Account No. xxx-xxx-4548) into the same Grist Mill Capital account (Account No. xxx-xxx-4712).

74.    These two deposits, from the Charter Oak Trust account (which held only the Universitas Insurance Proceeds) to the Grist Mill Capital account, represent the only two sources and deposits of funds during May 2009 and June 2009, for the newly opened Grist Mill Capital account.

75.    On or about May 22, 2009, Carpenter transferred $2,100,000.00 from the Grist Mill Capital account (Account No. xxx-xxx-4712) to the newly opened Grist Mill Holdings account (Account No. xxx-xxx-7136).  This money, $2,100,000.00, originated with the Charter Oak Trust, since the only funds that Grist Mill Capital had on deposit in May and June 2009 are the result of the transfers it received from the Charter Oak Trust (of $8,677,276.75 and $2,186,566.00, respectively).

76.     On or about June 9, 2009, Carpenter transferred $2,833,568.64 from the Grist Mill Capital account (Account No. xxx-xxx-4712) to a JP Morgan account standing in the name of the Grist Mill Trust (JP Morgan Account No. xxx-xxx-488).  This money, $2,833,568.64, originated with the Charter Oak Trust, since the only funds that Grist Mill Capital had on deposit in May and June 2009 are the result of the transfers it received from the Charter Oak Trust (of $8,677,276.75 and $2,186,566.00, respectively).

77.     Also on or about June 9, 2009, Carpenter transferred an additional $965,314.17 from the Grist Mill Capital account (Account No. xxx-xxx-4712) to a JP Morgan account standing in the name of the Grist Mill Trust (JP Morgan Account No. xxx-xxx-488).  This money, $965,314.17, originated with the Charter Oak Trust, since the only funds that Grist Mill Capital had on deposit in May and June 2009 are the result of the transfers it received from the Charter Oak Trust (of $8,677,276.75 and $2,186,566.00, respectively).

78.     When Grist Mill Capital transferred a total $3,798,882.81 to the Grist Mill Trust on or about June 9, 2009, it was transferring money that originated from Lincoln Life's payment of $30.7 million to the Charter Oak Trust, since the only money that Grist Mill Capital had in its account came from deposits of $8,677,276.75 and $2,186,566, respectively, from the Charter Oak Trust account at TD Bank (Account No. xxx-xxx-4548), which in turn held only the Universitas Insurance Proceeds.

79.     On or about July 15, 2009, Carpenter transferred $1,200,000.00 from the Grist Mill Holdings account (Account No. xxx-xxx-7136) to a TD Bank account in the name of Hanover (Account No. xxxx-xxx-940).  This account for Hanover was opened on July 13, 2009—two days prior to receiving a $1,200,000.00 deposit.  This money, $1,200,000.00, originated with the Charter Oak Trust, since all of the funds in Grist Mill Holdings' account

came from Grist Mill Capital, and all the funds in the Grist Mill Capital account were deposits by the Charter Oak Trust of the Universitas Insurance Proceeds.

80.    On or about July 15, 2009, Carpenter transferred $1,100,000.00 from the Hanover account (Account No. xxxx-xxx-940) to the Moonstone account (Account No. xxx-xxx-5455).

81.    On that same day, July 15, 2009, Carpenter withdrew $1,040,000 from the Moonstone account (Account No. xxx-xxx-5455) in the form of an official bank check made out to his name, and subsequently endorsed that check to a real estate attorney for the purpose of purchasing for his family an oceanfront vacation home located at 392B Cards Pond Road in South Kingstown, Rhode Island.

82.    Indeed, Moonstone appears to have been formed for the very purpose of using a portion of the Universitas Insurance Proceeds to purchase the Carpenters' vacation home. According to the records of the Delaware Secretary of State, Moonstone was formed on or about April 20, 2009.  Carpenter controlled Moonstone as the Chairman of Moonstone's managing member, while Molly Carpenter was Moonstone's secretary.  Even though Moonstone was not formed until April 20, 2009, Carpenter made a $1,200,000.00 offer on the vacation home property on April 8, 2009, writing on Grist Mill Capital letterhead and claiming to be acting on Moonstone's behalf.

83.    Each transfer or transaction referenced in paragraphs 72 to 81 has been found by the United States District Court for the Southern District of New York to be intentionally and constructively fraudulent, without consideration, and undertaken for the personal benefit of Carpenter and his affiliates.  Attached as **Exhibit 3** is a true and correct copy of the district court's November 20, 2013 opinion and order holding that such transfers were fraudulent.

### B.    The Robinson-Drafted Sham Agreement

84.    In late October 2009, Robinson assisted Carpenter's misappropriation and defalcation of the remaining $19.8 million of the Universitas Insurance Proceeds out of the Charter Oak Trust and into the Grist Mill Capital bank account.

85.    Robinson prepared a document entitled Confidential Settlement and Indemnification Agreement, dated October 26, 2009, purportedly to document a "settlement" between the Charter Oak Trust and Grist Mill Capital (the "Sham Agreement"), both of which were controlled by and the instrumentality of Carpenter, and both of which had already received and retransferred substantial portions of the Universitas Insurance Proceeds. Robinson, as a fiduciary of the Charter Oak Trust who had a fiduciary duty to the beneficiaries of that Trust, had a conflict of interest in representing Grist Mill Capital in any such "settlement."

86.    In Robinson's Sham Agreement, Grist Mill Capital purported to hold a competing claim against the Universitas Insurance Proceeds, based on Spencer's supposed agreement, prior to his death, to permit Grist Mill Capital to purchase the Spencer policies from the Charter Oak Trust and become the sole beneficiary thereto, and to pay to Universitas $1.8 million to release it as a beneficiary to the policies. Robinson knew or should have known that no such underlying agreement existed.

87.    The Sham Agreement further purported that Grist Mill Capital would forego its competing claim to the Universitas Insurance Proceeds in exchange for the Charter Oak Trust's immediate payment of the "net death benefit," and other mutual releases and lesser payments between the parties. In other words, Grist Mill Capital was to receive all the remaining insurance proceeds, after having already received the first $10.8 million of the insurance proceeds, for no consideration, since even the bogus alleged agreement by Spencer required a payment of $1,800,000.00 to Universitas to purchase the policies.

88.    In fact, Spencer never agreed to any such transaction, and, as Robinson knew or should have known, there was no documentation of any such agreement by Spencer.  Likewise, Universitas was the sole, irrevocable beneficiary of the Spencer policies, whose consent to such a transaction would have been required, and Robinson knew that Universitas never made any such agreement.

89.    Moreover, there were no legitimate competing claims to the Universitas Insurance Proceeds.  Carpenter controlled the Charter Oak Trust and Grist Mill Capital, Robinson was counsel to both of them and a manager of Grist Mill Capital during all relevant times, and Spencer had designated Universitas as its sole, irrevocable beneficiary with the Charter Oak Trust's and Nova's full knowledge, thus precluding any subsequent designation of Grist Mill Capital as beneficiary to his life insurance policies without Universitas' consent.

90.    Upon information and belief, Robinson submitted drafts of the Sham Agreement to Carpenter for his approval.  With Robinson's assistance, Carpenter ultimately approved the document on behalf of both parties to the Sham Agreement, Charter Oak Trust and Grist Mill Capital, and signed it on behalf of Grist Mill Capital as of October 26, 2009.  Bursey signed on behalf of the Charter Oak Trust.

91.    Robinson knew or should have known that the Sham Agreement was a fraudulent agreement designed to assist Carpenter's misappropriation and defalcation of the balance of the Universitas Insurance Proceeds.  Robinson also knew that Carpenter controlled both the Charter Oak Trust and Grist Mill Capital at the time the Sham Agreement was executed, which was little more than Carpenter's agreement with himself, prepared in conflict with Robinson's fiduciary duties to the beneficiaries of the Charter Oak Trust.

### C.    Additional Fraudulent Transfers

92.    On October 27, 2009, the very next day after Carpenter and Bursey signed the Sham Agreement, Carpenter and Bursey commenced another series of transfers to misappropriate and defalcate the remaining $19.8 million of the Universitas Insurance Proceeds.

93.    On or about October 27, 2009, Bursey transferred $19,800,000.00 from the Charter Oak Trust's TD Bank account (Account No. xxx-xxx-4548) into the Grist Mill Capital account (Account No. xxx-xxx-4712).

94.    At the time of this transfer of $19,800,000.00, the Charter Oak Trust still had not received any other deposits from any source other than the Lincoln Life payments deposited into the Charter Oak Trust account on May 18, 2009. This money, $19,800,000.00, was required by the Declaration of Trust of Charter Oak Trust to be held in trust for Universitas; instead it was wrongfully transferred to Grist Mill Capital. Grist Mill Capital's corporate agent appears to have had no idea why the funds were transferred to Grist Mill Capital. For this transfer of $19,800,000.00, Grist Mill Capital's general ledger described it as "unknown depo" (meaning, "unknown deposit").

95.    On October 28, 2009, the day after the transfer of $19,800,000.00 from the Charter Oak Trust to Grist Mill Capital, Carpenter transferred $19,000,000.00 from the Grist Mill Capital account (Account No. xxx-xxx-4712) to the Grist Mill Holdings account (Account No. xxx-xxx-7136).

96.    On or about November 12, 2009, Carpenter transferred $6,710,065.92 from the Grist Mill Capital account (Account No. xxx-xxx-4712) to the Avon Capital account at TD Bank (Account No. xxx-xxx-4689).

97.     On or about November 12, 2009, Carpenter transferred $4,140,000.00 from the Grist Mill Holdings account (Account No. xxx-xxx-7136) to the Carpenter Financial Group account at TD Bank (Account No. xxx-xxx-4697).

98.     On or about December 3, 2009, Carpenter transferred $7,000,000.00 from the Grist Mill Holdings account (Account No. xxx-xxx-7136) to the Carpenter Financial Group account at TD Bank (Account No. xxx-xxx-4697).

99.     On or about December 3, 2009, Carpenter transferred $5,000,000.00 from the Carpenter Financial Group account (Account No. xxx-xxx-4697) to the Phoenix account at TD Bank (Account No. xxx-xxx-4671).

100.    On or about December 3, 2009, Carpenter transferred $510,000.00 from the Grist Mill Capital account (Account No. xxx-xxx-4712) to a JP Morgan account standing in the name of the Grist Mill Trust (JP Morgan Account No. xxx-xxx-488).

101.    Also on or about December 3, 2009, Carpenter transferred an additional $178,125.00 from the Grist Mill Capital account (Account No. xxx-xxx-4712) to a JP Morgan account standing in the name of the Grist Mill Trust (JP Morgan Account No. xxx-xxx-488).

102.    As with the transactions referenced in paragraphs 72 to 81 above, each transfer or transaction referenced in paragraphs 93 to 101 has been found by the United States District Court for the Southern District of New York to be fraudulent, without consideration, and undertaken for the personal benefit of Carpenter, entities that he directly or indirectly controlled, and his personal and professional affiliates. Attached as **Exhibit 4** is a true and correct copy of the District Court's August 7, 2014 opinion and order holding that such transfers were fraudulent and with actual intent to defraud Universitas and holding Carpenter and the recipients of each transfer liable to Universitas.

**VI.    Robinson Is Paid Handsomely With Money Belonging to Universitas**

103.    Robinson prepared the Sham Agreement in his capacity as the attorney for each of Charter Oak Trust, Nova and Grist Mill Capital.

104.    Robinson received $810,000.00 or more of the Universitas Insurance Proceeds out of the accounts of Grist Mill Capital and Carpenter Financial Group, into which portions of the Universitas Insurance Proceeds had previously been transferred.  Robinson knew or should have known that those funds rightfully belonged to Universitas.

105.    On September 23, 2009, Robinson received a wire transfer in the amount of $50,000.00 from the Grist Mill Capital TD Bank account (Account No. xxx-xxx-4712).  By that point, $10.8 million of the Universitas Insurance Proceeds had already been deposited into that Grist Mill Capital account.

106.    On October 9, 2009, Robinson received a wire transfer in the amount of $75,000.00 from the Carpenter Financial Group TD Bank account (Account No. xxx-xxx-4697).

107.    On November 9, 2009, Robinson received a wire transfer in the amount of $100,000.00 from the Carpenter Financial Group TD Bank account (Account No. xxx-xxx-4697).

108.    On November 25, 2009, Robinson received a wire transfer in the amount of $275,000.00 from the Carpenter Financial Group TD Bank account (Account No. xxx-xxx-4697).

109.    On December 3, 2009, Robinson received a wire transfer in the amount of $125,000.00 from the Carpenter Financial Group TD Bank account (Account No. xxx-xxx-4697).

110.    On December 4, 2009, Robinson received a wire transfer in the amount of $125,000.00 from the Carpenter Financial Group TD Bank account (Account No. xxx-xxx-4697).

111.    On March 30, 2010, Robinson received a wire transfer in the amount of $60,000.00 from the Carpenter Financial Group TD Bank account (Account No. xxx-xxx-4697).

112.    The funds that Robinson received from Carpenter Financial Group were likewise directly linked to the Universitas Insurance Proceeds.  Carpenter had transferred over $11.1 million of the Universitas Insurance Proceeds to Carpenter Financial Group in November and December 2009, as described above—either just prior to the transfers to Robinson, or effectively replenishing funds that were just transferred to Robinson.

113.    Upon information and belief, each wire transfer was directed to Robinson in Stamford, Connecticut, where  Robinson maintained his law practice at that time, Robinson Law Offices, and/or maintained an office in connection with his work for BASI and other Carpenter-affiliated entities.

## VII.    Robinson Actively Aids and Abets Carpenter's Theft by Concealing the Misappropriations and Delaying Universitas' Discovery of Carpenter's Theft

114.    In addition to facilitating and participating in the misappropriations and fraudulent transfers described above, Robinson also thereafter undertook to destroy, conceal, or otherwise block the dissemination of information regarding the transfers, and to thereby conceal Carpenter's theft and delay Universitas' discovery of the theft in order to enable Carpenter to dissipate all the Universitas Insurance Proceeds before his theft was discovered.

### A.    Robinson's Misrepresentations, Half-Truths and Material Omissions in his Declaration Under Oath Submitted to the Arbitrator During Arbitration

115.    On June 17, 2010, in light of the refusal of the Charter Oak Trust to turn over the Universitas Insurance Proceeds, Universitas filed a demand for arbitration with the American

Arbitration Association against Nova and others for recovery of the Universitas Insurance Proceeds (the "Arbitration"). Unknown to Universitas, that date was more than six months after Carpenter had completed his misappropriation of all of the Universitas Insurance Proceeds out of the Charter Oak Trust and Grist Mill Capital had re-transferred those proceeds to other Carpenter-controlled entities. Shortly after the demand for arbitration was filed, Peter L. Altieri (the "Arbitrator") was appointed as arbitrator for the Arbitration.

116.    On or about October 1, 2010, Universitas requested a preliminary injunction ordering Nova to remit the Universitas Insurance Proceeds into a neutral, interest-bearing account, and preventing Nova from using such funds pending the outcome of the Arbitration. As noted above, by that date, all the Universitas Insurance Proceeds had long since been misappropriated and defalcated by Carpenter.

117.    On or about October 28, 2010, the parties participated in a telephonic oral argument with the Arbitrator regarding the preliminary injunction application. During that argument, attorney Richard S. Order ("Order") of Updike, Kelley & Spellacy, PC, Nova's counsel in the arbitration, represented that Nova and the Charter Oak Trust had assets sufficient to satisfy an arbitration award in Universitas' favor of up to $35 million.

118.    On or about November 3, 2010, the Arbitrator denied Universitas' request for a preliminary injunction—in part based upon attorney Order's representations during the telephonic oral argument—but directed Nova to submit documentary proof of the Charter Oak Trust's ability to satisfy any award that might issue in the Arbitration.

119.    On or about November 12, 2010, Bursey, purportedly as Nova's President, submitted an affidavit in the Arbitration, swearing, under penalty of perjury, that the Charter Oak Trust's assets "exceed $35 million."

120.    On or about November 24, 2010, the Arbitrator found Bursey's affidavit regarding Trust "assets" to be insufficient (at least in part on the basis that the Trust's liabilities may exceed its purported assets) and directed Nova to provide an amended or supplemental affidavit indicating that the Charter Oak Trust has the ability to satisfy a judgment of $30 million.    The Arbitrator ruled that if Nova could not provide such information, he would reconsider his denial of the preliminary injunction request.

121.    On or about November 30, 2010, more than eighteen months after the Charter Oak Trust had received the Universitas Insurance Proceeds, and a full year after those proceeds had been misappropriated and fraudulently transferred out of the Charter Oak Trust by the Carpenter Criminal Enterprise, Robinson submitted a declaration under oath (the "Declaration") on behalf of Nova in the Arbitration, affirmatively swearing: (a) that he was "an authorized representative of Nova Group," (b) that he was "familiar with the [Charter Oak Trust's] operation, assets, liabilities and financial condition," and (c) that the Trust "has the current ability to satisfy a judgment of $30 million."  Robinson's failure to disclose, in his Declaration, the 2009 transfers of the Universitas Insurance Proceeds out of the Charter Oak Trust, and the retransfer of those proceeds to different Carpenter-controlled entities, was an omission of material fact, the disclosure of which was necessary to render Robinson's Declaration under oath not misleading.    Although Robinson was aware or should have been aware of the misappropriation, none of this critical information was disclosed in his Declaration under oath. As Robinson knew or should have known, the Arbitrator relied on Robinson's inaccurate Declaration in denying injunctive relief to Universitas, to the great damage and prejudice of Universitas.  A true and correct copy of the Declaration is attached as **Exhibit 5** hereto.

122.    At the time Robinson made these misrepresentations in his Declaration under oath, (a) Robinson had already drafted the Sham Agreement to enable and assist the transfer of the remaining portion of the Universitas Insurance Proceeds out of the Charter Oak Trust, which proceeds were transferred out by December 2009, nearly a year prior to his Declaration; (b) Robinson had already received a portion of the Universitas Insurance Proceeds from both Grist Mill Capital and Carpenter Financial Group; (c) Robinson already knew that the Charter Oak Trust was subject to a lien of approximately $35 million held by a third party called Ridgewood Finance Inc., which provided most of the premium payments for life insurance policies owned by the Charter Oak Trust; (d) Robinson already knew that the Charter Oak Trust had agreed, in September 2010, to transfer its remaining assets—life insurance policies—to Ridgewood Finance Inc. to discharge its debt to that entity, as he was involved with preparing the written agreement to carry out those transfers; (e) Robinson had not performed adequate due diligence regarding the Charter Oak Trust's assets and liabilities; and, therefore, (f) Robinson already knew or should have known that Charter Oak Trust had absolutely no ability to satisfy a $30 million judgment.

123.    The Arbitration proceeded to a hearing on the merits on December 6 through 8, 2010.  Robinson was the sole witness who testified on behalf of Nova, and he identified himself as an employee and Vice President of BASI, and as General Counsel of Nova and of BASI.

124.    By an arbitration award dated January 24, 2011, the Arbitrator found that each of Nova, Bursey, and BASI owed fiduciary duties to Universitas and that they breached those fiduciary duties.  Specifically, the Arbitrator stated, "I determine that the PHASE I Respondents"—which included each of Nova, Bursey, and BASI—"violated their fiduciary duties by denying the claim for benefits under the [Charter Oak Trust]."  The arbitrator held that

32

Nova was liable to Universitas for a total of $26,525,535.98 (the "Arbitration Award"), and further directed that Nova deposit the amount of the Arbitration Award in escrow with Order's law firm, Updike Kelley & Spellacy, PC.

125.    Following the issuance of the arbitration award, counsel for Universitas contacted Order to confirm that the amount of the Arbitration Award had been deposited into escrow with his law firm. However, Order did not respond to the requests. Instead, Robinson—who was not counsel of record for Respondents in the Arbitration, but instead functioned as the sole fact witness at the Arbitration—transmitted a February 16, 2011 letter to the Arbitrator and a copy to counsel for Universitas, purporting to write on behalf of Nova and the other Respondents. Robinson, in that letter, continued to insist that nothing wrong had occurred, and continued to withhold and not disclose the critical information, of which he was certainly aware, that the Universitas Insurance Proceeds had been fraudulently transferred out of the Charter Oak Trust. Perhaps most egregious, in that same letter, Robinson sought to impugn the integrity of Arbitrator in conducting the Arbitration and personally attack the reputation of Universitas, its members, and its counsel in bringing the Arbitration. A true and correct copy of the February 16, 2011 letter is attached hereto as **Exhibit** 6.

126.    Of course, as of the dates of the January 2011 Arbitration Award and the February 2011 letter from Robinson, the Universitas Insurance Proceeds had long since been transferred out of the Charter Oak Trust bank account. None of the Charter Oak Trust, Nova, Robinson, nor any of the affiliated Carpenter entities to whom all the Universitas Insurance Proceeds had been fraudulently transferred, had disclosed those transfers to Universitas, its counsel, or the Arbitrator.

127.     In the months following Robinson's February 2011 letter, Universitas continued to attempt to secure the deposit of the amount of the Arbitration Award into escrow with attorney Order's law firm—to no avail.

**B.     Robinson's Dilatory Filings in the District Court to Conceal the Misappropriation of the Universitas Insurance Proceeds**

128.     On or about February 11, 2011, Universitas commenced a civil action in New York state court seeking confirmation of the January 24, 2011, Arbitration Award.

129.     On or about March 8, 2011, Nova removed the state court action to the United States District Court for the Southern District of New York (the "S.D.N.Y."), arguing that the district court had subject matter jurisdiction under both federal question and diversity jurisdiction in connection with that removal petition.

130.     Separately, Nova commenced an action in Connecticut state court seeking to vacate the Arbitration Award, which was subsequently removed to the United States District Court for the District of Connecticut.   In January 2012, both cases were consolidated in the S.D.N.Y. before Judge Laura Taylor Swain.

131.     On June 5, 2012, Judge Swain confirmed the Arbitration Award, awarding Universitas pre-judgment interest at an annual rate of ten percent (10%) and entering judgment on June 7, 2012 for Universitas in the amount of $30,181,880.30.

132.     On September 5, 2012, Nova's previous attorneys having withdrawn, Robinson entered a notice of appearance in the S.D.N.Y. on behalf of Nova and the Charter Oak Trust.

133.     Despite purporting to represent Nova and the Charter Oak Trust, Robinson's retainer (for $15,000) was paid by Grist Mill Capital, which had by then wrongfully received and further misappropriated and fraudulently transferred the Universitas Insurance Proceeds; which was controlled by Carpenter; for which Robinson served as Manager; and from which Robinson

had already received a portion of the Universitas Insurance Proceeds. When Robinson entered his notice of appearance for Nova and the Charter Oak Trust on September 5, 2012, the receipt and misappropriation of the Universitas Insurance Proceeds three years prior to that date still had not been disclosed to Universitas, to the Arbitrator, or to the Court.

134.    On September 11, 2012, in an effort to continue to conceal the theft of the Universitas Insurance Proceeds, Robinson filed a frivolous motion to dismiss the action on Nova's behalf—the third motion to dismiss filed in that action. Nova had previously filed, and then reinstated, two motions to dismiss, but subsequently withdrew those motions after the Court admonished Nova to consider its Rule 11 obligations and Universitas provided to Nova a draft Rule 11 motion it planned to file in connection with those motions.

135.    In Nova's third motion to dismiss, Robinson expressly contradicted earlier arguments advanced by Nova, arguing that the Court lacked both diversity and federal question jurisdiction, and advanced other frivolous arguments contradicted by long-standing controlling law, primarily in an effort to delay Universitas' discovery that the proceeds had been misappropriated and fraudulently transferred by Carpenter.

136.    The Court summarily denied the motion to dismiss on October 5, 2012. That decision was later affirmed on appeal by the U.S. Court of Appeals for the Second Circuit on March 4, 2013, an appeal that was also filed by Robinson for the dilatory purpose of delaying the discovery of the misappropriation and fraudulent transfer of the Universitas Insurance Proceeds.

137.    On November 8, 2012, Universitas moved for sanctions against Nova and Robinson, primarily on the basis of Robinson's frivolous September 11 motion to dismiss.

138.    On September 13, 2013, Judge Swain granted the motion for sanctions, (a) ordering Nova to deposit the judgment amount with the clerk of court,[2] (b) ordering Nova to pay Universitas' legal fees in connection with the motion for sanctions, (c) prohibiting Nova from filing further motions without prior permission from the Court, (d) ordering Robinson to pay Universitas' legal fees in connection with litigating the motion to dismiss, and (e) issuing a written reprimand against Robinson.  As of the date of Judge Swain's Order, nearly three years after Carpenter had stolen the Universitas Insurance Proceeds, the fact that the proceeds had been transferred out of the Charter Oak Trust still had not been disclosed to either Universitas or the Court.

### C.    Robinson's Efforts to Further Conceal the Misappropriation By Blocking and Delaying Production of Banking Records Subpoenaed by Universitas

139.    From 2010 into 2012, in a further effort to conceal the misappropriation of the Universitas Insurance Proceeds, Robinson also supervised and orchestrated efforts by Nova to prevent Universitas from obtaining TD Bank's production of crucial bank records, knowing that the bank records demonstrate the theft of the Universitas Insurance Proceeds and the transfer of such proceeds into and out of the Charter Oak Trust.  Robinson successfully delayed Universitas until November 2012, from discovering the misappropriation of the Universitas Insurance Proceeds, by which time the funds were long gone.

140.    On or about November 19, 2010 (i.e., during the Arbitration proceedings), Universitas subpoenaed records from TD Bank in connection with accounts maintained by or in the name of Nova, the Charter Oak Trust, Bursey, BASI, and Nova Benefit Plans.

---

[2] This aspect of Judge Swain's decision has since been reversed.

141.    On November 29, 2010, attorney Order wrote to the Arbitrator purporting that Universitas had "no legitimate need" for the TD Bank documents in the Arbitration—despite the fact that those documents ultimately revealed the massive fraud that had occurred—and seeking both to quash the subpoena and impose sanctions upon Universitas and its counsel in connection with the service thereof.

142.    On or about April 13, 2011, Robinson wrote to TD Bank, purportedly on behalf of Nova, the Charter Oak Trust, Bursey, Nova Benefit Plans, and BASI, objecting to the disclosure of account records and threatened to seek criminal and civil sanctions against TD Bank if it complied with the subpoena.    Specifically, Robinson threatened that compliance with the subpoena would render TD Bank employees guilty of a class C misdemeanor under Connecticut law and would invite a lawsuit from Nova and others for $50 million in actual damages plus treble punitive damages.

143.    In that April 13, 2011 letter, Robinson further threatened that service of the subpoena by Universitas on TD Bank subjected Universitas' counsel, Paula K. Colbath, to criminal liability under Connecticut law.    Robinson purported that Universitas did not serve a certified copy of the subpoena on Nova and its affiliates at least 10 days prior to the date on which the records were due to be disclosed.    Robinson copied Ms. Colbath on that correspondence.    A true and correct copy of Robinson's April 13, 2011 letter is attached hereto as **Exhibit 7**.

144.    On April 19, 2011, yet another attorney, Joseph M. Pastore III, wrote to TD Bank, also purportedly on behalf of Nova, the Charter Oak Trust, Bursey, Nova Benefit Plans, and BASI, to object to its production of documents regarding those entities.    That letter contained substantially similar language to the letter which Robinson had previously transmitted to TD

Bank on April 13, 2011, and also threatened TD Bank that production of records regarding these entities would constitute a class C misdemeanor under Connecticut law.

145.    In or about September 2012, Universitas served additional subpoenas on TD Bank seeking account information for accounts maintained by or in the name of Nova, the Charter Oak Trust, Grist Mill Capital, Grist Mill Holdings, and Phoenix.

146.    Later that same month, on September 21, 2012, Mr. Pastore, who had sent the April 19, 2011 letter to TD Bank, sent yet another letter to TD Bank, copying Universitas' counsel and Robinson, this time purportedly on behalf of Nova and the Charter Oak Trust, containing substantially similar language to his previous letter and Robinson's letter of April 13, 2011.  The letter once again threatened TD Bank with civil sanctions, and threatened that Universitas' counsel and TD Bank were subject to criminal liability for, respectively, serving and complying with the subpoena.

147.    Upon information and belief, Robinson assisted those entities in their dilatory efforts to avoid producing the bank records in question.

148.    Upon information and belief, these letters were part of a coordinated letter-writing campaign organized by Robinson, in conjunction with Carpenter and his cronies, knowingly designed to conceal and prevent disclosure of information regarding the transfer of the Universitas Insurance Proceeds to and from the TD Bank accounts of various Carpenter-controlled entities.  Each of the letters in question was forwarded to TD Bank and to counsel for Universitas through the United States mails.

149.    On November 21, 2012, Magistrate Judge Henry Pitman ordered TD Bank to comply with Universitas' subpoenas.  Judge Pitman found the criminal and civil penalties threatened by Robinson to be entirely without basis in law, and suggested that the acts of

Robinson, Nova, and the rest of the Carpenter enterprise might constitute tampering with a witness under federal law.  In his report, he noted as follows:

> I note that the efforts of Nova Group and individuals and entities associated with it to conceal the whereabouts of the insurance proceeds in issue here is extremely troubling. If it has a genuine, colorable issue with Judge Swain's decision confirming the arbitration award, one wonders why it simply hasn't deposited the funds into the Court, pending the outcome of its appeal. The disturbing nature of Nova's conduct is reinforced by the fact that in depositions conducted earlier this year, several individuals currently or formerly associated with Nova Group have invoked the Fifth Amendment in response to questions concerning the disposition of the insurance proceeds. **The baseless nature of the threats made to TD Bank lends further support to an inference of bad faith or worse.  Universitas may want to consider consulting with the Federal Bureau of Investigation or the Department of Justice as to whether the conduct of Nova Group and the individuals associated with it rises to the level of a violation of 18 U.S.C. § 1512.** (emphasis added)

A true and correct copy of Judge Pittman's report and recommendation is attached as **Exhibit 8.**

150.    TD Bank finally complied with the Universitas subpoenas in November 2012.

151.    Upon TD Bank's production in November 2012, nearly three years after the Universitas Insurance Proceeds had been misappropriated, Universitas learned for the first time about Carpenter's above-described theft of those proceeds, the above-described numerous fraudulent transfers of the Universitas Insurance Proceeds among the various Carpenter controlled affiliates, and the transfer of $810,000.00 or more of those proceeds to Robinson.

**D.    Robinson's Destruction of Documents After Federal Government Raid**

152.    In or about May 2011, Robinson's office was raided by the U.S. Department of Labor in connection with a grand jury investigation into the Charter Oak Trust.

153.    As noted above, Robinson was listed as target in the search warrant, among other individuals and entities affiliated with Carpenter.

154.    As part of the raid, the federal government generated a copy of the computer in Robinson's office, which Robinson used during the course of his direct involvement in and/or representation of Carpenter-related entities for, among other things, creating electronic files concerning the Universitas Arbitration and litigation and the disposition of the Universitas Insurance Proceeds.

155.    In June 2011, following the raid, Robinson destroyed his computer and all electronic information on his computer relating to the Universitas Insurance Proceeds—despite the fact that, at that time, cases were pending in both New York and Connecticut regarding the disposition of those insurance proceeds.

### E.    Carpenter's Baseless Threats, with Robinson's Acquiescence and Support, to Inflict Reputational Harm Upon Counsel for Universitas

156.    In March 2013, Universitas moved in the S.D.N.Y, by order to show cause, for, among other things, the turnover of certain insurance proceeds that Carpenter sought from the insurance carrier United Services Automobile Association ("USAA") in connection with the Rhode Island vacation home that Carpenter had purchased with a portion of the Universitas Insurance Proceeds.

157.    On February 26, 2013, counsel for Universitas emailed to Carpenter, his counsel, his wife Molly Carpenter, and Robinson a copy of the order to show cause and supporting materials that Universitas planned to file with the Court.  Counsel had included Carpenter on the email exchange (along with his counsel) because at that point Moonstone—through which Carpenter had purchased the vacation home, and which was a subject of the turnover motion— was not then represented by counsel.  On February 27, 2013, Carpenter responded, with a copy to Robinson, by email threatening to inflict reputational harm on Universitas' counsel, Ms. Colbath and Bryan Reyhani.  Carpenter wrote:

> [I]f you file this baseless action tomorrow or at any time, we will be suing you, your firm, Ms. Colbath and Loeb [& Loeb LLP] for a very long time to come.
>
> ….
>
> Not that you appear to care about your professional status, but we will be filing grievance claims against you and Ms. Colbath for your unconscionable conduct to date.
>
> Therefore, please govern yourself accordingly. Filing this motion will be the single biggest mistake of your professional career, and since you have already commercially defamed us, you will need to apologize to us and USAA within the next 24 hours or face the consequences.

A true and correct copy of Carpenter's February 27, 2013 email, showing Robinson as a recipient, is attached hereto as **Exhibit** 9. Later that same day, Carpenter emailed counsel for Universitas yet again, also with a copy to Robinson, this time threatening to seek their disbarment. Carpenter stated: "I promise you that I will be personally seeking YOUR disbarment as well as Ms. Colbath's for your unprofessional conduct to date and clearly outrageous behavior in going after non-judgment debtors not involved with the Charter Oak Trust or subject to the soon to be vacated Universitas judgment." He added, ominously: "Please govern yourself accordingly before you find yourself in even more trouble." A true and correct copy of Carpenter's second February 27, 2013 email, showing Robinson as a recipient, is attached hereto as **Exhibit** 10.

158.    By that point, however, as Robinson knew or should have known, Carpenter had already knowingly and intentionally misappropriated and defalcated the Universitas Insurance Proceeds and used a portion of those funds to purchase his family's vacation home in Rhode Island through Moonstone. Based on Carpenter's close relationship with Robinson, Carpenter would not have written those emails without Robinson's knowledge and approval, as reflected by

Robinson's failure to correct or cause Carpenter to retract his clearly inappropriate and improper threatening emails.

159.    Contrary to what Carpenter represented in his February 27, 2013 emails, the Judgment that Universitas had obtained against Nova was never vacated. Moreover, Universitas ultimately obtained an additional judgment against Carpenter himself, as explained below.

160.    Notwithstanding Carpenter's wrongful threats of reputational harm, in an effort to intimidate Universitas from pursuing its rights, Universitas proceeded to move for turnover of the USAA insurance proceeds, and ultimately prevailed on that motion.

## VIII.    Universitas' Additional Judgments

161.    On or about August 12, 2014, Universitas obtained a $30.6 million judgment against Carpenter in the S.D.N.Y., Exhibit 4 hereto.

162.    In that same August 12, 2014 opinion and order (Exhibit 4), Universitas further obtained S.D.N.Y. judgments against the following Carpenter shell companies for the Universitas Insurance Proceeds fraudulently transferred to them:  Grist Mill Capital for $30,600,000.00; Grist Mill Holdings for $21,000,000.00; Carpenter Financial Group for $11,140,000.00; Avon for $6,710,065.92; Phoenix for $5,000,000.00; Hanover for $1,200,000.00; and Grist Mill Trust, and any trustees and plan sponsors thereof insofar as they hold Grist Mill Trust assets, for $4,487,007.81.

163.    As of the date of this Complaint, Universitas has collected only approximately $800,000.00—less than 4%—of the over $30.6 million that Robinson helped Carpenter steal from Universitas.

164.    Carpenter, in particular, has not satisfied the August 2014 Judgment, not even in part, and claims not to have any assets in his own name.

IX.    **Additional Criminal Conduct**

165.    The long-running Carpenter Criminal Enterprise has been and is engaged in repeatedly diverting funds which were entrusted to a Carpenter-controlled entity designed to exploit tax benefits, and otherwise fleecing persons doing business with his entities.  It has inflicted harm on dozens of victims other than Universitas.  Indeed, Carpenter, in concert with Bursey, various other cronies, and his shell companies and sham businesses, several of which Robinson served as an officer or General Counsel, has defrauded other individuals and entities by converting for his personal use funds that were entrusted to him to be held in escrow or trust and has fleeced many other persons doing business with his enterprise.

A.    **Massachusetts Prosecution Stemming from Carpenter's Conversion of Client Funds Through BPETCO Entities Controlled by Carpenter**

166.    Carpenter is currently serving time in federal prison in connection with his June 2008 conviction, in this Court, for nineteen (19) counts of wire fraud and mail fraud.  The latest appeal on his behalf was decided against Carpenter by the U.S. Court of Appeals for the First Circuit on March 30, 2015.  That conviction stems from Carpenter's operation of "§ 1031 exchanges" through his alter ego companies Benistar and its subsidiary BPETCO (together with Benistar, the "BPETCO Entities") in the late 1990s and early 2000s.

167.    The "§ 1031 exchanges" that Carpenter operated through the BPETCO Entities purported to allow owners of investment properties to defer paying capital gains taxes upon the sale of such properties if they were "exchanged" for properties "of like kind."  Under the Internal Revenue Code, 26 U.S.C. § 1031(a)(3), the funds from the initial sale of an investment property may be held temporarily in cash form with no tax penalty so long as they are used to purchase a new property within 180 days and so long as the investor designates the replacement property within 45 days.  However, federal regulations provide that the exchange or may not take

possession of the funds before purchasing the new property. See 26 C.F.R. § 1.1031(k)-1(a). As a result, exchangors typically rely on "qualified intermediaries" to hold and invest the funds until the exchange is completed.

168.    The BPETCO Entities, all of which were dominated and controlled by Carpenter as his *alter ego*, offered their services as qualified intermediaries, ostensibly agreeing to hold the exchangors' funds in escrow, in a safe and secure investment, until the § 1031 exchanges were completed. Carpenter executed, for the BPETCO Entities, many of the contracts which exchangors entered into with the companies.

169.    The BPETCO Entities advertised their services through marketing materials approved by Carpenter, to enable the Carpenter Criminal Enterprise to have access to § 1031 funds which were entrusted to him by unsuspecting exchangors.  Those marketing materials promised that exchangors' funds would be kept safe and secure (much as the Charter Oak Trust promised that participant funds would be safe, secure, and held in trust), and assured them that the BPETCO Entities were trustworthy and would assist and protect them in obtaining § 1031 tax benefits.

170.    Once Carpenter had induced investors to entrust their funds in escrow to a BPETCO Entity, he would convert some or all of such funds and invest them for his own account and in the name of a BPETCO Entity.  He then used those funds to trade in risky assets, including high-risk "put options" that were "uncovered" (meaning that Carpenter did not own the underlying shares or take an offsetting position—which further increased the high-risk quality of those investments).

171.    As a result of his risky investments, Carpenter lost millions of dollars which he had converted from exchangors who had invested their funds, supposedly to be held safely in

escrow. From late March to late May 2000, Carpenter lost approximately one million dollars from Benistar's Merrill Lynch trading account as various stocks fell significantly during the option periods. Carpenter's strategy ultimately failed completely when the NASDAQ stock market crashed in late 2000. By the end of September 2000, Carpenter had lost about four million dollars.

172.    Even as Carpenter's losses mounted, the BPETCO Entities continued to solicit funds from § 1031 exchangors, using the same marketing materials and again assuring them that their funds would be safely held in an escrow account. Once the funds were received, Carpenter continued to convert exchangor funds and to employ the same trading strategy.

173.    By the beginning of 2001, Carpenter had converted and lost approximately $9 million belonging to seven exchangors who had contracted with Benistar between August and December 2000. Specifically, from May 2000 to January 2001, Carpenter squandered the following amounts that had been entrusted to a BPETCO Entity to be held in escrow by the following exchangors, each of which was located either in Massachusetts or New Hampshire: $984,730.00 belonging to Gail A. Cahaly; $3,237,190.00 belonging to Massachusetts Lumber Co. and Eliot Snider; $3,428,141.00 belonging to Joseph Iantosca; $541,931.00 belonging to Jeffrey M. Johnston; $306,665.00 belonging to Byron Darling; $444,660.00 belonging to Bellemore Associates; and $97,369.00 belonging to R&B Enterprises and Brian Fitzgerald (collectively, the "Mass. Creditors").

174.    On February 4, 2004, Carpenter was indicted for nineteen (19) counts of wire fraud and mail fraud in violation of 18 U.S.C. §§ 1343 and 1341, respectively, in connection with his defalcation of exchangor funds. The government alleged that Carpenter had fraudulently induced the exchangors to use his company to perform their exchanges in part

through false promises that their money would be kept in safe, interest-bearing accounts. A superseding indictment was filed on September 24, 2004 ("Mass. Superseding Indictment"). Attached as **Exhibit 11** is a true and correct copy of the Mass. Superseding Indictment, which enumerates each instance of mail fraud and wire fraud that Carpenter committed, through the BPETCO Entities, with respect to the Mass. Creditors.

175.    Ultimately, Carpenter was found guilty on all nineteen (19) counts of mail fraud and wire fraud. Carpenter was first tried and convicted in July 2005, and again upon re-trial in June 2008. The June 2008 conviction was upheld by the U.S. Court of Appeals for the First Circuit on November 25, 2013, and this Court sentenced Carpenter on January 28, 2014, to three (3) years in prison and three (3) years' probation. Carpenter appealed again, and the sentence and conviction were upheld by the U.S. Court of Appeals for the First Circuit on March 30, 2015.

176.    Robinson knew or should have known of Carpenter's conduct, and the Carpenter Criminal Enterprise's involvement in misappropriating exchangors' escrow funds. Robinson not only was involved with the BPETCO Entities, he also served as Carpenter's attorney for both criminal trials, having entered a notice of appearance in the case in May 2005, and again in November 2007 and May 2008, after having previously withdrawn twice. As a result, when the Universitas Insurance Proceeds were received by the Charter Oak Trust in May, 2009, Robinson was fully familiar with Carpenter's criminal enterprise in connection with the defalcation of the Mass. Creditors' and other exchangors' funds.

### B.    Connecticut Indictment of Carpenter and Bursey Stemming from Fraudulent Origination of Insurance Policies with the Charter Oak Trust

177.    Carpenter faces additional prison time in connection with a federal indictment in Connecticut in connection with the fraudulent origination of life insurance policies placed into

the Charter Oak Trust for Carpenter and Bursey's exclusive benefit.  Robinson was heavily involved in the entities in question, and either knew or should have known of Carpenter's fraudulent scheme and of Carpenter's criminal enterprise in connection therewith.  As noted above, he was listed as a target of the grand jury investigation conducted by the United States Attorney in Connecticut.

178.    From 2006 through 2013, Carpenter and Bursey, in concert with several Carpenter-controlled entities operating out of Simsbury, Connecticut, used the Charter Oak Trust to secure insurance policies on the lives of elderly individuals that could be held by Carpenter and Bursey as investments, or resold on the life settlement market (a secondary market for life insurance policies).  Such use was prohibited by the insurance policies and the insurance companies.

179.    Upon information and belief, the policies were not *bona fide* insurance policies; instead, Carpenter and Bursey used an insurance agent, Waesche—the very same insurance agent with whom the Spencer beneficiaries discussed their death benefit, as noted above—to entice individuals over the age of 70 to act as "straw insureds" and apply for policies, by promising to provide them with free life insurance for two years and, at the end of the two years, selling the policies on the life settlement market to make a profit for the Carpenter-controlled entities.  Upon information and belief, to induce them to participate, Carpenter, Bursey, and/or their operatives promised the insureds an up-front cash inducement or a portion of the sale proceeds.

180.    Upon information and belief, in order to effectuate their scheme, Waesche, Carpenter, and Bursey caused to be submitted to insurance providers policy applications that, among other misrepresentations, falsely denied that third parties would pay the premiums for the insurance, falsely denied discussions about the resale of the policies, falsely inflated the net

worth and/or income of the insureds, and falsely claimed that the insurance was being purchased for legitimate estate planning purposes.

181.    Upon information and belief, Bursey signed all such applications as individual Trustee of the Charter Oak Trust, and, as with the Spencer policies discussed above, the Charter Oak Trust was the owner of the policies procured and the applications purported that the Charter Oak Trust was a *bona fide* employee welfare benefit plan wherein employers would make contributions to the Trust to fund policies for the benefit of their employees.

182.    Upon information and belief, from 2006 through 2008, while Robinson served as General Counsel to the Charter Oak Trust, Nova and BASI, and served as an officer of BASI, Waesche enlisted twelve (12) elderly insureds to participate in Carpenter's scheme.  Upon information and belief, from May 2007 through January 2009, Carpenter, Bursey, and Waesche submitted, via mail and electronically, fraudulent applications to, and obtained insurance policies on the lives of those insureds from, Penn Mutual, Lincoln Life, the Phoenix Companies, Sun Life Assurance Company of Canada, AXA Equitable Life Insurance Company, American National Insurance Company, Jefferson Pilot Financial, Metropolitan Life Instance Company, and Trans America.

183.    Upon information and belief, from October 2008 to March 2010, Carpenter and Bursey wired funds to the Charter Oak Trust from private funding affiliates (like Ridgewood Finance Inc.)—rather than from *bona fide* employers, as represented in the life insurance applications—in order to fund policy premiums.  Upon information and belief, the Charter Oak Trust promoted its purported compliance with Section 419(e) of the Internal Revenue Code, to induce the insurance companies to approve the applications on the assumption that they were legitimate applications in furtherance of a Section 419(e) welfare benefit plan.

184.    On December 12, 2013, Carpenter and Bursey were indicted by a Connecticut federal grand jury on thirty-two (32) counts of mail and wire fraud, and one (1) count of conspiracy to commit mail and wire fraud, in connection with the scheme. See U.S. v. Carpenter et al., Case No. 13-CR-226-RNC (D. Conn.).

185.    On May 12, 2014, a superseding indictment was filed in the same federal criminal action (the "Conn. Superseding Indictment"). The Conn. Superseding Indictment charges Carpenter and Bursey with an additional twenty-four (24) counts—on top of the previous thirty-three (33) counts—relating specifically to their misappropriation of the Universitas Insurance Proceeds, including one (1) count of conspiracy to commit money laundering, ten (10) counts of money laundering, and thirteen (13) counts of illegal monetary transactions. Attached as **Exhibit 12** is a true and correct copy of the Conn. Superseding Indictment, which details each instance of mail fraud, wire fraud, money laundering, illegal monetary transaction, and conspiracy to commit same, discussed above. Each of those counts remain pending.

186.    Robinson knew or should have known, in his official capacities at the Charter Oak Trust, Nova and BASI, of the Carpenter Criminal Enterprise's fraudulent origination of life insurance policies. Indeed, in the Declaration that he filed in the Arbitration proceedings, he specifically referred to (and accused Spencer of being a participant in) the insurance fraud scheme, and, in any event, Robinson participated, in concert with Carpenter, Bursey and others, in the operation of and decisions made by the Carpenter Criminal Enterprise. Moreover, Robinson himself has acknowledged, in sworn testimony, that he is aware that such insurance practices are improper.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF (VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"))

187.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 186 of this Complaint as if fully set forth herein.

188.    At all relevant times hereto, Robinson was employed by and associated with the Carpenter Criminal Enterprise, in the conduct of the Carpenter Criminal Enterprise's affairs through in a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) from approximately 2000 through 2010.

189.    All at relevant times hereto, Robinson and the Carpenter Criminal Enterprise were engaged in, and/or their activities did affect, interstate commerce.  As described more fully above, the Carpenter Criminal Enterprise conducted its activities out of Simsbury, Connecticut, and was engaged in criminal conduct in, and affecting individuals and entities located in, New York, Massachusetts, and New Hampshire, among other places.

190.    The Carpenter Criminal Enterprise consisted of numerous individuals and entities who were associated in fact, employed by the entities participating in the enterprise, and/or acting in concert to advance the purposes of the enterprise, including, without limitation:  Daniel E. Carpenter, Jack E. Robinson, Wayne Bursey, Molly Carpenter, Kathy Kehoe, Amanda Rossi, Donald Trudeau, J. Edward Waesche IV, Avon Capital, BASI, Benistar, BPETCO, Caroline Financial, Carpenter Financial Group, the Charter Oak Trust, Grist Mill Capital, Grist Mill Holdings, Grist Mill Trust, Hanover, Moonstone, Nova Benefit Plans, Nova, and Phoenix.

191.    The purpose of this enterprise was to accumulate funds under its control by inducing individuals seeking to participate in tax-beneficial arrangements—such as employee

welfare benefit plans and property exchanges, which the enterprise at all relevant times represented qualified for tax-beneficial status—to entrust their funds to the enterprise so that individual members thereof could convert those funds for personal use and otherwise enrich themselves. Each of the acts described herein were taken in furtherance of this purpose.

192.    The means and methods that the enterprise employed to conduct its organized criminal activity included a pattern of, among other things, wire fraud, mail fraud, insurance fraud, conversion, intimidation, tampering, economic duress, extortion, money laundering, and destruction of evidence.

193.    The pattern of racketeering activity in which the enterprise has engaged occurred on a continuing basis from at least 2000 through 2010—if not over a longer period of time.

194.    As set forth in greater detail above, specific racketeering acts undertaken by the enterprise, and which qualify as racketeering acts under 18 U.S.C. § 1961, included, but were not limited to:

(a)    the sixteen (16) instances of wire fraud and illegal monetary transactions perpetrated with respect to Universitas, in violation of 18 U.S.C. §§ 1343 and 1957, as enumerated and further detailed in paragraphs 72 to 81 and 93 to 101 above and as further detailed on pages 56 to 61 of the Conn. Superseding Indictment, which is incorporated herein by reference (see Exhibit 12 hereto);

(b)    Robinson's and Bursey's transmission, through the U.S. mails of letters to Universitas and/or its counsel in July 2009, September 2009, and October 2009, to the Arbitrator and Universitas' counsel in February 2011, and to TD Bank and Universitas' counsel in April 2011, which contained material omissions by failing to make any reference to the fraudulent misappropriation and defalcation of the Universitas Insurance

Proceeds (which had begun in May 2009), by which they sought to further conceal such misappropriation and defalcation and which constituted mail fraud in violation of 18 U.S.C. § 1341;

(c)     Robinson's submission of his November 30, 2010 Declaration in the Arbitration, in which he intentionally misrepresented that the Charter Oak Trust had the ability to satisfy a judgment against it—when in fact it did not—which permitted the Charter Oak Trust to avoid having to relinquish control over the $30.6 million that Carpenter looted by paying it into a neutral account pending the outcome of the Arbitration, and which constituted the obstruction and impeding of the administration of justice, in violation of 18 U.S.C. § 1503;

(d)     Robinson's coordination of a letter-writing campaign from 2010 to 2012, and his personal transmission of his April 13, 2011 letter, to TD Bank and counsel for Universitas in which Robinson, and others, through the threat of criminal and civil liability, attempted to delay or prevent the lawful production and disclosure to Universitas of account documents that would have revealed the misappropriation and defalcation of the Universitas Insurance Proceeds, which constituted tampering with a witness in violation of 18 U.S.C. § 1512 (a);

(e)     Carpenter's and Robinson's extortionate conduct, through the transmission of a letter on April 13, 2011, and emails on February 27, 2013, in threatening counsel for Universitas with reputational, professional, legal, and economic harm in an attempt to have Universitas abandon its recovery of the Universitas Insurance Proceeds, without a good faith belief either in the legitimacy of their threats or in the entitlement of Carpenter, the Charter Oak Trust, Nova, and/or other members of the Carpenter Criminal

Enterprise to those funds, which constituted a violation of the Hobbs Act, 18 U.S.C. § 1951;

(f)    Robinson's unlawful destruction of electronic records in June 2011, in violation of 18 U.S.C. § 1512(c), in an attempt to hinder federal investigations pending in both New York and Connecticut, and to conceal the misappropriation of the Universitas Insurance Proceeds;

(g)    the 19 instances of wire fraud and mail fraud, in violation of 18 U.S.C. §§ 1341 and 1343, perpetrated with respect to the Mass. Creditors, as enumerated and further detailed on pages 27 to 30 of the Mass. Superseding Indictment, Exhibit 11 hereto, which is incorporated herein by reference; and

(h)    the 32 instances of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, in connection with the Carpenter criminal enterprise's fraudulent origination of insurance policies for elderly "straw insureds," as enumerated and further detailed on pages 17 to 47 of the Conn. Superseding Indictment, Exhibit 12 hereto.

195.    Robinson was employed by, associated with, and participated in the conduct of the Carpenter Criminal Enterprise by and through, among other things (a) his outside legal representation of Carpenter, the Charter Oak Trust, Nova, BASI, Bursey, Grist Mill Capital, Avon and Benistar; (b) his work as General Counsel for Nova and BASI; (c) his work as Manager of Grist Mill Capital; and (d) his work as Vice President of BASI.

196.    In those various capacities, Robinson, among other things, (a) conducted an extensive letter-writing campaign in an effort to convince Universitas it was not entitled to the Universitas Insurance Proceeds; (b) drafted the Sham Agreement, which permitted at least a portion of the Universitas Insurance Proceeds to be transferred out of the Charter Oak Trust and,

in the first instance, to Grist Mill Capital; (c) personally accepted a portion of the Universitas Insurance Proceeds through Grist Mill Capital and Carpenter Financial Group; (d) intentionally misrepresented in a Declaration submitted in the Arbitration that the Charter Oak Trust had the ability to satisfy a judgment against it—when in fact it did not—which permitted the Charter Oak Trust to avoid having to relinquish control over the Universitas Insurance Proceeds; (e) initiated frivolous court proceedings in an effort to delay Universitas' judgment collection and discovery of the fraudulent transfers and provide the enterprise with additional time to transfer, conceal, or otherwise squander the Universitas Insurance Proceeds; (f) improperly destroyed documents potentially embodying additional evidence of the enterprise's fraud; (g) transmitted and coordinated the transmission of letters to TD Bank and counsel for Universitas frivolously threatening legal harm in a further effort to prevent discovery of the misappropriation and defalcation of the Universitas Insurance Proceeds; and (h) due to his position with and employment by the Carpenter entities in question, was a participant in Carpenter's fraudulent straw insurance policy scheme that is the subject of the Conn. Superseding Indictment.

197.    Universitas was harmed by the of wire fraud and illegal monetary transactions enumerated and further detailed paragraphs 72 to 81 and 93 to 101 above, as well as on pages 56 to 61 of the Conn. Superseding Indictment, in the amount of $30,677,276.85.

198.    Universitas did not discover that each of the elements of its civil RICO claim had been satisfied until, at the earliest, TD Bank's production of bank records in November 2012, at which time Universitas first learned about the aforementioned wire fraud and illegal monetary transactions.

199.    Pursuant to 18 U.S.C. § 1964(c), Universitas seeks to recover threefold damages, interest, costs of this litigation, and attorneys' fees.

**SECOND CLAIM FOR RELIEF (AIDING AND ABETTING FRAUD)**

200.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 199 of this Complaint as if fully set forth herein.

201.    Carpenter and his affiliates defrauded Universitas, as established (among other things) by several judicial decisions, including the November 20, 2013 decision (Exhibit 3 hereto) and the August 7, 2014 decision (Exhibit 4 hereto) from the S.D.N.Y., in Case No. 11-1590.

202.    Carpenter and his affiliates defrauded Universitas by misappropriating and fraudulently conveying the Universitas Insurance Proceeds.  Carpenter and his affiliates further defrauded Universitas by refusing to disclose the whereabouts of the Universitas Insurance Proceeds, by asserting a litany of bogus reasons why Universitas was not entitled to any money, and by forcing Universitas to undertake years of costly litigation, all the while knowing that Carpenter had misappropriated the Universitas Insurance Proceeds and used them to benefit himself, his family, Robinson, and others.

203.    Robinson knew about the fraud by virtue of, among other things, (a) his legal representation, at various points in time, of Carpenter, Nova, the Charter Oak Trust, BASI, Bursey, Grist Mill Capital, Avon, and Benistar, (b) his position as General Counsel for Nova and BASI, (c) his position as Manager of Grist Mill Capital, (d) his work as Vice President of BASI, and (e) his close personal and business relationship with Carpenter.

204.    Among other things, Robinson knew that (a) the Charter Oak Trust was set up to benefit the beneficiaries of Trust participants, (b) Spencer had died, (c) Lincoln Life had paid approximately $30.6 million in insurance proceeds to the Charter Oak Trust for Universitas' benefit, (d) Carpenter, Nova, Bursey, and/or BASI refused to pay those insurance proceeds to

Universitas out of the Charter Oak Trust, (e) the reason for the refusal was for Carpenter and his affiliates to keep the Universitas Insurance Proceeds for themselves, (f) the Declaration of Trust of the Charter Oak Trust prohibited transferring the Universitas Insurance Proceeds out of the Charter Oak Trust, and (g) Carpenter directed the transfer of the Universitas Insurance Proceeds first into the Charter Oak Trust's account and then out of that account and through a series of shell companies and alter egos.

205.    Robinson substantially assisted Carpenter's fraud because, among other things, he drafted the Sham Agreement, which permitted at least a portion of the $30.6 in Spencer insurance proceeds to be transferred out of the Charter Oak Trust and, in the first instance, to Grist Mill Capital's bank account, and intentionally misrepresented in a Declaration submitted in the Arbitration that the Charter Oak Trust had the ability to satisfy a judgment against it—when in fact it did not—which permitted the Charter Oak Trust to avoid having to relinquish control over the $30.6 million that Carpenter looted by paying it into a neutral account pending the outcome of the Arbitration.

206.    Robinson further substantially assisted Carpenter in his efforts to conceal the misappropriation and fraud, as aforesaid.

207.    Robinson's misconduct was willful and in bad faith.

208.    Robinson's substantial assistance in the fraud was not known to Universitas until, at the earliest, TD Bank's production of bank records in November 2012, at which time Universitas first learned about Carpenter's theft of the Universitas Insurance Proceeds.

209.    As a result of Robinson's actions and failures to act, Universitas was harmed in an amount to be determined at trial, but not less than $30,677,276.85.

## THIRD CLAIM FOR RELIEF (BREACH OF FIDUCIARY DUTY)

210.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 209 of this Complaint as if fully set forth herein.

211.    Robinson served as attorney and General Counsel to the Charter Oak Trust, Nova, and BASI, and served as Vice President of BASI and Manager of Grist Mill Capital.

212.    Robinson was familiar with the fiduciary responsibilities that Nova, BASI, and Bursey owed to Universitas by virtue of his legal representation of the Charter Oak Trust, Nova, and BASI, and due to his extensive familiarity with the Charter Oak Trust's operations and finances, which he admitted and specifically represented in the Declaration he submitted to the Arbitrator on or about November 30, 2010.

213.    As the Arbitrator held in his award of January 24, 2011—and as the S.D.N.Y. confirmed on June 5, 2012—Nova, Bursey, and BASI each breached their fiduciary duties to Universitas by denying Universitas' claim to the Universitas Insurance Proceeds under the Charter Oak Trust.

214.    As the attorney and General Counsel to the Charter Oak Trust, Nova, and BASI, and as an officer of BASI and Grist Mill Capital, Robinson was aware or should have been aware, that appropriate action on his part was necessary to prevent, mitigate, and/or rectify Nova's, Bursey's, and BASI's breaches of fiduciary duty with respect to Universitas.

215.    Instead, Robinson permitted Nova, Bursey, and BASI to breach their fiduciary duties to Universitas— and, in fact, facilitated and participated in such breaches.

216.    As a result of Robinson's breach of his fiduciary duty, Universitas was unable to protect its rights to collect the Universitas Insurance Proceeds.  Despite making a timely and proper claim for the death benefits from the Spencer policies and initiating arbitral proceedings

in an attempt to recover the Universitas Insurance Proceeds, among other attempted remedial measures, Carpenter, Bursey, Robinson and others—through the Charter Oak Trust, Nova, and BASI—prevented Universitas from collecting the Universitas Insurance Proceeds and concealed the theft of those proceeds.

217.    Robinson therefore had a duty not to assist and to instead prevent Nova, Bursey, and BASI from breaching their fiduciary duties to Universitas.

218.    Such duty was not inconsistent with Robinson's obligations to zealously represent the interests of Nova, Bursey, and BASI within the bounds of the law.

219.    By assisting and by failing to act to prevent Nova, Bursey, and BASI from denying Universitas' claim to the Universitas Insurance Proceeds under the Charter Oak Trust, Robinson breached his fiduciary duty to Universitas.

220.    Robinson's breach of his fiduciary duty to Universitas was not known to Universitas until, at the earliest, TD Bank's production of bank records in November 2012, at which time Universitas first learned about Carpenter's theft of the Universitas Insurance Proceeds.

221.    As a result of Robinson's actions and failures to act, Universitas was harmed in an amount to be determined at trial, but not less than $30,677,276.85.

**FOURTH CLAIM FOR RELIEF (NEGLIGENT MISREPRESENTATION)**

222.    Universitas repeats and re-alleges the allegations set forth in Paragraphs 1 through 221 of this Complaint as if fully set forth herein.

223.    To the extent that Robinson claims that he did not knowingly and intentionally assist Carpenter's defalcation of the funds of Universitas, then Robinson negligently misrepresented, made material omissions, and failed to disclose the material facts necessary to

render his statements not misleading and not actionable half-truths, particularly in light of his fiduciary duty to Universitas, through the following representations, each of which is actionable alone or in the aggregate:

(a)     Stating, in his July 23, 2008 letter that Grist Mill Capital was entitled to fees of $6 million dollars, but failing to disclose that no documentation existed to support that claim;

(b)     Stating in his July 8, 2009 letter that Grist Mill Capital was entitled to the funds, but failing to disclose that no documentation existed to support that claim; and

(c)     Misrepresenting, in his Declaration dated June 7, 2010 that based on his full familiarity with all finances, assets and liabilities of the Charter Oak Trust, there were sufficient assets available to pay a $30,000,000.00 judgment for Universitas, and failing to disclose his material omissions that the Universitas Insurance Proceeds by that time had been fully transferred out of the Charter Oak Trust in breach of the Declaration of Trust, and failing to disclose that there were at most minimal liquid assets available to pay any judgment.

224.    Additionally, in light of the numerous contentions and statements made by Robinson on behalf of Charter Oak Trust, Nova and BASI, Robinson had a duty to speak honestly and to divulge all material facts and omissions necessary to assess the validity of his representations.  However, Robinson however negligently failed to disclose:

(a)     The Universitas Insurance Proceeds were received by the Charter Oak Trust on May 18, 2009;

(b)     At various times from May 18, 2009 through December 2009, those funds were transferred to several additional entities, as aforesaid, which were controlled by Carpenter;

(c)     The Universitas Insurance Proceeds were taken out of trust and out of escrow by Carpenter and others; and

(d)     Robinson himself had received $810,000.00 or more from the Universitas Insurance Policy proceeds.

225.     Universitas, the Arbitrator, and other Courts relied on Robinson's negligent misrepresentations, and Robinson's material omissions and failures to make the above disclosures, throughout these proceedings, to the great damage of Universitas.

226.     If Robinson had disclosed the truth to Universitas or the Arbitrator, Universitas would have been able to act at an earlier date to better protect itself and to recover the proceeds transferred to the Universitas Insurance Proceeds before they were fully dissipated by Carpenter and put out of the reach of Universitas.

**FIFTH CLAIM FOR RELIEF (NEGLIGENT OPINION)**

227.     Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 226 of this Complaint as fully set forth herein.

228.     Robinson submitted his Declaration to the Arbitrator, in his capacity as counsel to Charter Oak Trust, Nova and BASI.

229.     Since Robinson was acting on behalf of Charter Oak Trust, which had a fiduciary duty to Universitas to safeguard the Universitas Insurance Proceeds, Robinson had a like fiduciary duty to Universitas, and a duty in his capacity as counsel to exercise reasonable care

and due diligence in rendering professional opinions in his capacity as counsel and to the extent that said opinions concerned the Universitas Insurance Proceeds.

230.    To the extent that Robinson claims that he did not knowingly participate in the defalcation and fraudulent transfers of the Universitas Insurance Proceeds, he was negligent in the preparation of the opinions in his Declaration, in failing to conduct an appropriate due diligence, and in opining that Nova had the ability to pay to Universitas any judgment of up to $30,000,000.00.

231.    Indeed, in Paragraph 4 of his Declaration, Robinson stated as follows: "I am familiar with the [Charter Oak Trust] Plan's operations, assets, liabilities and financial condition, and state that the Plan has the current ability to satisfy a judgment of $30 million."

232.    If Robinson had exercised due care as counsel to the Charter Oak Trust, Nova and BASI, and had rendered his opinions after exercise of appropriate due diligence and professional expertise, he would have discovered and disclosed that the Charter Oak Trust did not have sufficient assets net of liabilities to pay a $30 judgment and would have disclosed that the Universitas Insurance Proceeds had been transferred out of the Charter Oak Trust by Carpenter.

233.    Universitas was caused significant damage by Robinson's negligent opinion contained in his Declaration.   If the Arbitrator had known the truth, Universitas and the Arbitrator could and would have better protected Universitas' ability to recover on its Judgment.

234.    Universitas has been damaged, in substantial amounts, by Robinson's aforesaid negligence.

## SIXTH CLAIM FOR RELIEF (PROFESSIONAL MALPRACTICE)

235.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 234 of this Complaint as fully set forth herein.

236.    Robinson had a duty to Universitas, as a beneficiary of the Charter Oak Trust, to exercise a reasonable degree of skill and care in the performance of his legal duties for the Charter Oak Trust.  Robinson had a duty to prevent the Charter Oak Trust from violating the terms of the Declaration of Trust by misappropriating the Universitas Insurance Proceeds, and in any event to promptly disclose the misappropriation of those proceeds to Universitas.

237.    By virtue of his foregoing conduct, to the extent that Robinson was not knowingly participating in the misappropriation and defalcation of the Universitas Insurance Proceeds, Robinson committed professional malpractice by failing to exercise a reasonable degree of skill and care as an attorney.

238.    As a result of Robinson's professional malpractice, Universitas has sustained substantial damages.

## SEVENTH CLAIM FOR RELIEF (AIDING AND ABETTING
## BREACH OF FIDUCIARY DUTY)

239.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 238 of this Complaint as if fully set forth herein.

240.    Nova (as trustee and plan sponsor to the Charter Oak Trust), Bursey (as President of Nova), and BASI (as administrator and *de facto* Plan Administrator of the Charter Oak Trust) each owed a fiduciary duty to the participants and beneficiaries of the Charter Oak Trust—including Universitas.

241.    As the Arbitrator held in his award of January 24, 2011—and as the S.D.N.Y. confirmed on June 5, 2012—Nova, Bursey, and BASI each breached their fiduciary duties to Universitas by denying Universitas' claim to the Universitas Insurance Proceeds under the

Charter Oak Trust. They also breached those duties by participating in or permitting the fraudulent transfer of those funds.

242. Robinson knew that Nova, Bursey, and BASI owed and breached their fiduciary duties to Universitas, because, among other things, Robinson served as attorney and General Counsel to the Charter Oak Trust, Nova, and BASI, was an officer of BASI and Grist Mill Capital, and was therefore familiar with those entities' fiduciary responsibilities; and Robinson further was familiar with the Charter Oak Trust's operations and finances, as he represented in his November 30, 2010, Declaration.

243. Among other things, Robinson knew that (a) the Charter Oak Trust was set up to benefit the beneficiaries of Trust participants, (b) Spencer had died, (c) Lincoln Life had paid approximately $30.6 million in insurance proceeds to the Charter Oak Trust for Universitas' benefit, (d) Carpenter, Nova, Bursey, and/or BASI refused to pay those insurance proceeds to Universitas out of the Charter Oak Trust, (e) the reason for the refusal was for Carpenter and his affiliates to keep the Universitas Insurance Proceeds for themselves, and (f) Carpenter directed the misappropriation and fraudulent transfer of the Universitas Insurance Proceeds first into the Charter Oak Trust's account and then out of that account and through a series of shell companies and alter egos.

244. Robinson, moreover, substantially assisted Nova's, Bursey's, and BASI's breach of their fiduciary duties because, among other things, he actively participated in efforts to "deny" Universitas' claim; he drafted the Sham Agreement, which purportedly authorized and enabled at least a portion of the $30.6 million in Spencer insurance proceeds to be transferred out of the Charter Oak Trust and, in the first instance, to Grist Mill Capital; he intentionally misrepresented in his Declaration that the Charter Oak Trust had the ability to satisfy a judgment against it—

when in fact it did not—which permitted the Charter Oak Trust to avoid having to relinquish control over the $30.6 million that Carpenter looted by paying it into a neutral account pending the outcome of the Arbitration.

245.    Robinson's misconduct was willful and in bad faith.

246.    Robinsons' substantial assistance in the breaches of fiduciary duty was not known to Universitas until, at the earliest, TD Bank's production of bank records in November 2012, at which time Universitas first learned that Robinson's representations in his affidavit to the AAA regarding the Charter Oak Trust's ability to pay the Universitas Insurance Proceeds were false.

247.    As a result of Robinson's actions and failures to act, Universitas was harmed in an amount to be determined at trial, but not less than $30,677,276.85.

## EIGHTH CLAIM FOR RELIEF (CIVIL CONSPIRACY TO COMMIT FRAUD AND BREACH OF FIDUCIARY DUTY)

248.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 247 of this Complaint as if fully set forth herein.

249.    As detailed above, (a) Carpenter defrauded Universitas by misappropriating and then fraudulently conveying the Universitas Insurance Proceeds, (b) Bursey, Nova, and BASI breached their fiduciary duties to Universitas by denying the Universitas' claim to the Universitas Insurance Proceeds, and (c) Robinson was aware or should have been aware of both the fraud and the breaches of fiduciary duty.

250.    Robinson entered into an agreement with Carpenter, Bursey, Nova, BASI, and others to deprive Universitas of the Universitas Insurance Proceeds.  Specifically, Robinson entered into the agreement to deprive Universitas of the Universitas Insurance Proceeds in or

about June 2008, shortly after Universitas, through its agents, submitted a claim to Nova and BASI for the death benefits on the Spencer policies.

251.    Robinson undertook myriad overt acts in furtherance of this agreement, including: (a) writing various letters to Universitas, its agents, the Arbitrator, and TD Bank; (b) drafting the Sham Agreement; (c) submitting his intentionally misleading Declaration, which contained material omissions, to the Arbitrator; and (d) destroying documents potentially embodying additional evidence of Carpenter's fraud.

252.    Robinson intentionally participated in the agreement to deprive Universitas of the Universitas Insurance Proceeds.

253.    Such knowing participation is evidenced by his drafting of the Sham Agreement with full knowledge that Grist Mill Capital did not have a legitimate competing claim to the Universitas Insurance Proceeds.  Specifically, Robinson knew that Carpenter controlled both the Charter Oak Trust and Grist Mill Capital during all relevant times, and that Spencer had designated Universitas as its sole, irrevocable beneficiary with the Charter Oak Trust's and Nova's full knowledge, thus precluding any subsequent designation of Grist Mill Capital as beneficiary to his life insurance policies.

254.    Robinson's knowing participation is further evidenced by his submission of his Declaration to the Arbitrator in which he represented that the Charter Oak Trust had the ability to satisfy a judgment against it, with knowledge that Carpenter, in conjunction with Bursey, Nova, and BASI, had already directed transfer of the Universitas Insurance Proceeds out of the Charter Oak Trust.

255.    At all relevant times, Robinson had an independent, personal conspiratorial purpose to participate in the agreement to deprive Universitas of the Universitas Insurance

Proceeds—namely to secure a portion of the Universitas Insurance Proceeds for himself. Indeed, from approximately September 23, 2009 to approximately March 20, 2010, Robinson received $810,000.00 or more of the Universitas Insurance Proceeds through Grist Mill Capital and Carpenter Financial Group.

256.    As a result of the agreement to deprive Universitas of the Universitas Insurance Proceeds, and Robinson's knowing participation therein, Universitas has suffered the loss of over $30.6 million.

257.    Therefore, Robinson is liable for the torts committed by Carpenter, Bursey, Nova, and BASI in furtherance of the civil conspiracy in which Robinson participated.

### NINTH CLAIM FOR RELIEF (CONVERSION)

258.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 257 of this Complaint as if fully set forth herein.

259.    The Declaration of Trust for the Charter Oak Trust confirmed that "in no event shall any asset of the [Trust's] Fund be used for or diverted to purposes other than providing benefits … for Participants and their dependents and beneficiaries and defraying reasonable expenses of administering the … Trust."

260.    Spencer named Universitas as the sole, irrevocable beneficiary to two life insurance policies placed with the Charter Oak Trust.

261.    As a result, Universitas was entitled to the $30 million combined death benefit payable under those policies and any interest accrued thereupon.

262.    Universitas' legal entitlement to the Universitas Insurance Proceeds has been established by, among other things, the Arbitrator's January 24, 2011 Arbitration Award; Judge Swain's June 5, 2012 order confirming the Arbitration Award; Judge Swain's November 20,

2013 opinion and order granting Universitas' motion for turnover of insurance proceeds payable in connection with Carpenter's oceanfront vacation home in Rhode Island, which was purchased with a portion of the Universitas Insurance Proceeds; and Judge Swain's August 7, 2014 opinion and order finding that Carpenter fraudulently transferred the Universitas Insurance Proceeds out of the Charter Oak Trust.

263.    From approximately September 23, 2009 to approximately March 20, 2010, Robinson received $810,000.00 or more of the Universitas Insurance Proceeds through Grist Mill Capital and Carpenter Financial Group.

264.    Universitas did not discover that Robinson had received these funds until November 2012 at the earliest, at which time Universitas received documents from TD Bank— the production of which Robinson and others sought to block—evidencing wire transfers from Grist Mill Capital and Carpenter Financial Group to Robinson.

265.    At no time has Robinson returned or repaid any portion of those funds to Universitas.

## TENTH CLAIM FOR RELIEF (UNJUST ENRICHMENT)

266.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 265 of this Complaint as if fully set forth herein.

267.    As set forth above, Universitas, as the sole, irrevocable beneficiary of the two Spencer life insurance policies placed with the Charter Oak Trust, was legally and equitably entitled to receive the Universitas Insurance Proceeds.

268.    As a result of his participation in and facilitation of Carpenter's fraudulent scheme to transfer the Universitas Insurance Proceeds out of the Charter Oak Trust to prevent

Universitas from recovering any portion thereof, Robinson received $810,000.00 or more of the Universitas Insurance Proceeds through Grist Mill Capital and Carpenter Financial Group.

269.    Universitas did not discover that Robinson had received these funds until November 2012 at the earliest, at which time Universitas received documents from TD Bank— the production of which Robinson and others sought to block—evidencing wire transfers from Grist Mill Capital and Carpenter Financial Group to Robinson.

270.    Robinson has not returned or repaid any portion of those funds to Universitas.

271.    Accordingly, Robinson has been unjustly enriched at Universitas' expense, in the amount of $810,000.00 or more.

## ELEVENTH CLAIM FOR RELIEF (STATUTORY THEFT)

272.    Universitas repeats and re-alleges the allegations set forth in paragraphs 1 through 271 of this Complaint as if fully set forth herein.

273.    Connecticut General Statute § 52-564 provides that "[a]ny person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

274.    Robinson knew that the $810,000.00 or more that he received from Grist Mill Capital and Carpenter Financial Group was taken from the Universitas Insurance Proceeds that Carpenter fraudulently misappropriated and defalcated from Universitas.

275.    Robinson intentionally deprived Universitas of the $810,000.00 or more that he received from Grist Mill Capital and Carpenter Financial Group, in violation of Connecticut General Statute § 52-564.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Universitas Education, LLC respectfully demands judgment against Defendant Jack E. Robinson III, a/k/a Jack E. Robinson and an award of the following:

A. Threefold damages in the amount of $92,031,830.55, including attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c), for Robinson's violation of 18 U.S.C. § 1962(c) in participating in the conduct of the Carpenter Criminal Enterprise, including the theft of $30,677,276.85 from Universitas;

B. Compensatory damages, to be proven at trial, but in an amount no less than $30,677,276.85, representing the amount of life insurance proceeds and accrued interest that Robinson permitted and helped Carpenter and others steal, as well as the attorneys' fees Universitas has had to incur as a result of the theft;

C. An order for restitution of $810,000.00 or more in stolen life insurance proceeds that Robinson received in connection with his involvement in the theft;

D. Treble damages in the amount of $2,430,000.00, pursuant to Conn. Gen. Stat. § 52-564, for Robinson's knowing receipt and concealment of $810,000.00 or more in stolen life insurance proceeds;

E. Attorneys' fees and costs;

F. Prejudgment interest; and

G.  Such other and further relief as the Court deems just and proper.


Dated: May 14, 2015
Boston, Massachusetts

<div style="margin-left: 40%;">

UNIVERSITAS EDUCATION, LLC,

By its Attorneys,
RIEMER & BRAUNSTEIN LLP


By: /s/Paul S. Samson_____
Paul S. Samson, Esq., BBO No. 440160
Three Center Plaza
Boston, Massachusetts 02108
(617) 880-3555
psamson@riemerlaw.com

and

Paula K. Colbath, Esquire
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154
(212) 407 4905
pcolbath@loeb.com

*Attorneys for Universitas Education, LLC*

</div>

1836936.3