UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSSETTS

| | |
|---|---|
| UNIVERSITAS EDUCATION, LLC<br><br>    Plaintiff,<br><br>        v.<br><br>LILLIAN GRANDERSON,<br><br>As successor in interest to<br><br>JACK E. ROBINSON, III a/k/a JACK E. ROBINSON,<br><br>    Defendant. | Civil Action No.<br>1:15-CV-11848 (DPW)<br><br>Leave to File Oversized Brief<br>Granted on Aug. 21, 2024<br>(Doc. No. 235) |

**<u>MEMORANDUN IN SUPPORT OF PLAINTIFF UNIVERSITAS EDUCATION, LLC'S
MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**INTRODUCTION**……………………………………………………………………1

**STATEMENT OF MATERIAL FACTS WITH NO GENIUNE ISSUE TO BE TRIED**…….2

    **A.** **Background on the Carpenter Enterprise and the Charter Oak Trust**………………2

    **B.** **Universitas Education, LLC and the Theft of the Sash Spencer Proceeds**……………5

    **C.** **The Denial of Universitas's Claim to the Sash Spencer Death Benefit**………………..7

    **D.** **Legal Proceedings**………………………………………………………15

        **1.** **Arbitration**…………………………………………………………..15

        **2.** **Litigation to Confirm the Arbitration Award**……………………………17

    **E.** **Robinson's Receipt of Stolen Funds**…………………………………………20

    **F.** **Carpenter Criminal Conviction**………………………………………………22

**PROCEDURAL POSTURE**………………………………………………………22

**ARGUMENT**………………………………………………………………………23

    **A.** **Standard of Review**………………………………………………………..23

    **B.** **Summary Judgment is Appropriate on Plaintiff's RICO Claim because there is No Genuine Issue of Material Fact as to whether Defendant Violated the Statute…**…...24

        **1.** **There can be no genuine dispute that the CCN was a criminal enterprise under the RICO statute…**……………………………………………………27

        **2.** **The CCN's members engaged in racketeering activity through the commission of multiple crimes that serve as predicate acts under the RICO statute…**…………28

            *i.* *The CCN committed multiple counts of Wire Fraud in regards to acquiring STOLI policies and concealing the defalcation of the Spencer proceeds by the CCN*...………………………………………………………..28

            *ii.* *Robinson himself committed multiple counts of Mail Fraud in its scheme to conceal the defalcation of the Spencer proceeds by the CCN*...…………30

    *iii.*     *Carpenter Committed Money Laundering by ordering others in the CCN to illegally move money.* …………………………………………………32

    iv.    *Carpenter Commanded the Commission of Illegal Monetary Transactions* …………………………………………………………………....33

**3.  The Undisputed Material Facts Prove that the CCN enterprise and its members engaged in a pattern of continuous racketeering activity**…………………………35

**4.  There is no genuine dispute that the CCN enterprise's and Robinson's RICO violations caused Universitas' harm**……………………………………………36

**C.  <u>Summary Judgment is Appropriate on the Breach of Fiduciary Duty Claim because there is no Genuine Issue of Material Fact that Defendant Robinson had a Fiduciary Relationship with Universitas and that he Breached his Duty under that Relationship</u>…**…………………………………………………………………..36

**1.  The indisputable facts prove that Robinson owed Universitas a fiduciary duty**…38

2.  **There exists no genuine dispute that Robinson engaged in misconduct by self-dealing and aiding Nova in their efforts to improperly deny the Spencer insurance proceeds to Universitas**……………………………………………40

**3.  The undisputed facts show that Universitas was proximately injured by Robinson's breach of fiduciary duty and that compensatory damages are appropriate.** ……………………………...…………………………42

**D.  <u>Summary Judgment in Favor of the Plaintiffs is Appropriate on the Aiding and Abetting Breach of Fiduciary Duty Claim Because there is No Genuine Issue of Material Fact that Defendant Aided Wayne Bursey and Nova in Breaching their Fiduciary Duty to Universitas</u>**……………………….………………………43

**1.  There is no genuine dispute of material fact that Nova breached its fiduciary duty to Universitas**…………………….……………………………44

**2.  Robinson knowingly participated in the breach of fiduciary duty by Bursey and Nova by offering substantial assistance to Bursey and Nova to conceal the theft of the insurance proceeds.** ……………………………………………45

**3.  The undisputed facts demonstrate that the breach of fiduciary duty by Bursey and Nova proximately caused Universitas injury.** …………………………47

**E. Robinson is Liable for Negligent Misrepresentation and Opinion because the Undisputed Material Facts Prove that Robinson Imparted Incorrect Information to Universitas and that Universitas Reasonably Relied on the Incorrect Information, Leading to Damages.** …………………………………………………………...…47

    **1. There exists no genuine dispute of material facts that Robinson had a special relationship with Universitas.** …………………………………………………..49

    **2. There is no genuine dispute of material fact that the statement and/or opinion that Nova could satisfy a judgment was incorrect and negligently made because when Robinson made the statement, Nova had literally no assets, and Robinson never actually examined COT's or Nova's assets**…………………………………50

    **3. There can be no genuine dispute that Universitas reasonably relied on the statements in the Robinson's declaration.** ………………………………………..51

**F. Defendant is Liable to Universitas for Unjust Enrichment because there is No Genuine Dispute of Material Fact that Defendant was Inequitably Enriched at Universitas' Expense.** …………………………………………………………...…52

    **1. The undisputed facts prove that Robinson was enriched as a result of the illegal transfers of the Spencer proceeds that were rightfully owed to Universitas because Robinson received over a $1 million from funds directly traceable to the Spencer proceeds.** ……………………………………….…………………53

    **2. There is no genuine dispute of material fact that Robinson's enrichment came at Universitas' expense because the funds paid to Robinson were part of the Spencer proceeds, which rightfully belonged to Universitas**……………………54

    **3. The undisputed facts show that Robinson had a sufficient relationship with Universitas to find that he was unjustly enriched at Universitas' expense**……..54

    **4. The undisputed facts overwhelmingly prove that it is against equity and good conscience to allow Robinson to retain the funds he received from the Spencer proceeds.**………………………………………………………………………54

**G. Defendant is Liable to Universitas for Aiding and Abetting Fraud because there is No Genuine Dispute of Material Facts that Defendant knew of the Underlying Fraud Committed by Nova, Bursey, and Carpenter and that he Substantially Assisted in Perpetrating that Underlying Fraud**…………………………………………………56

1. **The indisputable facts prove that Bursey, Nova, and Carpenter committed fraud against Universitas.** ……………………………………………………...56

    i. *The undisputed facts prove that Bursey and other CCN parties made material misrepresentations and omissions of fact to Universitas, and that they knew that such omissions were false.* ……………………………………………...57

    ii. *It is clear that this omission of fact was made with the intent that Universitas rely on it, and that Universitas actually did rely on it.*………………………58

    iii. *Universitas suffered damages directly as a result of the fraudulent material omission*...…………………………………………………………………59

2. **The Indisputable Facts Prove that Defendant Aided and Abetted Carpenter's, Bursey's and Nova's Fraud.** ……………………………………………………...59

    i. *Robinson knew about the underlying fraud*...………………………………60

    ii. *Robinson provided substantial assistance to Bursey to assist and conceal Bursey's breach of fiduciary duty*...……………………………………………60

H. **Defendant is Liable for Conspiracy to Commit Fraud and Conspiracy to Commit Breach of Fiduciary Duty because there is no Genuine Dispute of Material Fact that Defendant Took Overt Action in the Carpenter Conspiracy to Steal the Universitas Insurance Proceeds.** ………………………………………………………………61

    1. **There is no genuine dispute that there existed an agreement between Robinson and other members of the Carpenter criminal network to improperly deprive Universitas of the Spencer Proceeds.** …………………………………………62

    2. **The Undisputed Evidence Proves that Robinson committed a plethora of overt acts in furtherance of the conspiracy to defraud Universitas of the Spencer proceeds.**………………………………………………………………………63

    3. **Robinson intentionally participated in the conspiracy's purpose because he took actions in furtherance of the conspiracy with knowledge of the purpose of the conspiracy.** …………………………………………………………………64

    4. **The Undisputed Facts Prove that Universitas was damaged by this conspiracy**.65

**CONCLUSION**………………………………………………………………………65

# TABLE OF AUTHORITIES

## Cases

*Abacas Fed. Sav. Bank v. Lim*, 75 A.D.3d 472 (N.Y. App. Div. 2010)………………..…………..61

*Alexander & Alexander, Inc. v. Fritzen*, 503 N.E.2d 102 (N.Y. 1986)………………..…….…..61

*Arfa v. Zamir*, 952 N.E.2d 1003 (N.Y. 2011)……………………………………….…..…………49

*Arfa v. Zamir*, 76 A.D.3d 56 (N.Y. App. Div. 2010)……………………………….…..…………49

*Baldeo v. Majeed*, 150 A.D.3d 942 (N.Y. App. Div. 2017)…………………………………………36

*Boyle v. United States*, 556 U.S. 938 (2009)………………………………………………………25, 27

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008)…………………..………..…26

*Carmona v. Toledo*, 215 F.3d 124 (1st Cir. 2000)…………………………………………………23

*Carpenter v. United States*, 2020 U.S. LEXIS 5363 (U.S. Nov. 9, 2020)…………………………3

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260 (S.D.N.Y. 1991)………61, 62

*Citibank, N.A. v. Walker*, 12 A.D.3d 480 (N.Y. App. Div. 2004)…………………………………52

*Crossland Sav. FSB v. Rockwood Ins. Co.*, 700 F. Supp. 1274 (S.D.N.Y. 1988)…………………47

*Deblinger v Sani-Pine Prods. Co., Inc.*, 107 A.D.3d 659 (N.Y. App. Div. 2013)……………….36

*DePinto v Ashley Scott, Inc.*, 222 A.D.2d 288 (N.Y. App. Div. 1995)……………………………44

*EBC I, Inc. v. Goldman Sachs & Co.*, 832 N.E.2d 26 (N.Y. 2005)…………………………………37, 39

*Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12 (1st Cir. 2000)…………..……………25

*Flaum v. Birnbaum*, 120 A.D.2d 183 (N.Y. App. Div. 1986)………………………….…..……….37

*Genger v. Genger*, 152 A.D.3d 444 (N.Y. App. Div. 2017)…………………………………………56

*Georgia Malone Co., Inc. v. Rieder*, 973 N.E.2d 743 (N.Y. 2012)…………………………………52

*Global Mins. & Metal Corp. v. Holmes*, 35. A.D.3d 93 (N.Y. App. Div. 2006)…………………49

*Goldstein v. Siegel*, 19 A.D.2d 489 (N.Y. App. Div. 1963)…………………………………………61

*Gomez-Jimenez v. New York Law School*, 2012 N.Y. Misc. LEXIS 1225 (N.Y. S. Ct. Mar. 21, 2012)……………………………………………………………………………………..49

*Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*, 958 N.E.2d 77 (N.Y. 2011)………..48, 49

*Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010)……………………………………………26

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989)……………………………………26

*Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521 (1st Cir. 2015)………………………..26, 35

*ICONICS, Inc. v. Massaro*, 192 F. Supp. 3d 254 (D. Mass. 2016)………………..23, 24, 25, 26, 35

*In re Agape Litig. v. Cosmo*, 773 F. Supp. 2d 298 (E.D.N.Y. 2011)………………………………59

*In re Carpenter et al*, No. 5:24-mc-00005 (W.D. Okla. 2024)……………………………………….3

*In re Estate of Rothko*, 372 N.E.2d 291 (N.Y. 1977)……………………………………38, 43

*In re Wallens*, 877 N.E.2d 960 (N.Y. 2007)………………………………………………………37

*J.A.O. Acquisition Corp. v. Stavitsky*, 863 N.E.2d 585 (N.Y. 2007)………………………47, 49, 57

*Jana L. v. W. 129th St. Realty Corp.*, 22 A.D.3d 274 (N.Y. App. Div. 2005)…………………….57

*Jenkins v. Macatawa Bank Corp.*, Nos. 1:03-CV-321, 1:05-CV-460, 1:05-CV-499, 2006 U.S. Dist. LEXIS 81658 (W.D. Mich. Nov. 9, 2006)………………………………………………………..39

*Jo Ann Howard & Assocs., P.C. v. Cassity*, No. 4:09CV01252 ERW, 2014 U.S. Dist. LEXIS 178072 (E.D. Mo. Dec. 29, 2014)……………………………………………………………...39

*Jones v. Jones*, 820 F. App'x 659 (10th Cir. 2020)……………………………………………..24

*Katz v. Beil*, 142 A.D.3d 957 (N.Y. App. Div. 2016)…………………………………………..43

*Kaufman v. Cohen*, 307 A.D.2d 113 (N.Y. App. Div. 2003)…………………………………43, 46

*Keywell Corp. v Weinstein*, 33 F3d 159 (2d Cir. 1994)……………………………………...49

*Kolbeck v. LIT Am., Inc.*, 152 F.3d 918 (2d Cir. 1998)……………………………………..44

*Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240 (S.D.N.Y. 1996)…………………………….44, 46

*Lares Group, II v. Tobin*, 47 F. Supp. 2d. 223 (D. R.I. 1999)………………………………25, 27

*LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836 (1st Cir. 1993)…………………………………………..24

*Libertad v. Welch*, 53 F.3d 428 (1st Cir. 1995)……………………………………………………25

*Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104 (N.Y. 2011)…..………………52, 54, 55

*MBIA Ins. Co. v. Royal Bank of Can.*, 2010 N.Y. Misc. LEXIS 3958 (N.Y. Sup. Ct. Aug. 19, 2010)…………………………………………………………………………………………59, 60

*Mohammed v. Juno*, No. 656428/2017, 2019 NYLJ LEXIS 912 (N.Y. Sup. Ct. Jan. 24, 2019)………………………………………………………………………………………53, 55

*Murphy v. Kuhn*, 682 N.E.2d 972 (N.Y. 1997)…………………………………………..47, 48, 49

*Northeast Gen. Corp. v. Wellington Adv.*, 624 N.E.2d 129 (N.Y. 1993)…………………………37

*Northbay Const. Co., Inc. v. Bauco Constr. Corp.* 38 A.D.3d 737 (N.Y. App. Div. 2007)………38

*People v. Menaches*, 98 A.D.2d 335 (N.Y. App. Div. 1983)…………………………………61, 63

*Racecourse v. Wynn Resorts*, 990 F.3d 31 (1st Cir. 2021)………………………………………..26

*Robinson v. Liberty Mut. Ins. Co.*, 958 F.3d 1137 (11th Cir. 2020)………………………………24

*Sankel v. Spector*, 33A.D.3d 167 (N.Y. App. Div. 2006)…………………………………………37

*Shareholder Representative Servs. LLC v. Sandoz Inc.*, 2015 N.Y. Misc. LEXIS 740 (N.Y. S. Ct. Mar. 16, 2015)………………………………………………………………………………56, 58

*Sperry v. Crompton Corp.*, 863 N.E.2d 1012 (N.Y. 2007)………………………………………..52

*St. Louis Baptist Temple v. Fed. Deposit, Ins. Corp.*, 605 F.2d 1169 (10th Cir. 1979)…………..24

*Torrance Constr., Inc. v. Jacques*, 127 A.D.3d 1261 (N.Y. App. Div. 2015)……………………44

*United States v. Bursey*, 801 F. App'x 1 (2d Cir. 2020)………………………………………3, 28

*United States v. Carpenter*, 190 F. Supp. 3d 260, 281 (D. Conn. 2016)……………………*passim*

*United States v. Carpenter*, 763 F.3d 619 (1st Cir. 2013)…………………………………………3

*United States v. Chua*, 16 F. App'x 737 (9th Cir. 2001)…………………………………………31

*United States v. DiRosa*, 761 F.3d 144 (1st Cir. 2014)………………………………………28, 31

*United States v. Hebshie*, 549 F.3d 30 (1st Cir. 2008)……………………………………………30

*United States v. Local 560, Int'l Bd. Of Teamsters*, 780 F.2d 267 (3rd Cir. 1985)………………25

*United States v. Pimental*, 380 F.3d 575 (1st Cir. 2004)…………………………………………30

*United States v. Soto*, 799 F.3d 68, 92 (1st Cir. 2015)…………………………………………30

*United States v. Thorn*, 317 F.3d 107 (2d Cir. 2003)……………………………………………32

*Universitas Educ., LLC v. Nova Grp., Inc.*, No. 11-cv-01590 (LTS) (HBP), 2014 U.S Dist. LEXIS 109077 (S.D.N.Y. Aug. 7, 2014)………………………………………………...7, 19, 21

*Universitas Educ., LLC v. Nova Group, Inc.*, No. 11-cv-01590 (LTS)(HBP), 2013 U.S. Dist. LEXIS 142481 (S.D.N.Y. Sept. 30, 2013)……………………………………………………18

*Universitas Educ., LLC v. Nova Grp. Inc.*, No. 11-cv-01590 (LTS) (HBP), 2013 U.S. Dist. LEXIS 99957 (S.D.N.Y. July 11, 2013)………………………………………………………19, 39

*Universitas Educ., LLC v. Nova Group, Inc.*, No. 11-cv-01590 (LTS)(HBP), 2013 U.S. Dist. LEXIS 142902 (S.D.N.Y. May 21, 2013)…………………………………………………..18

*Universitas Educ., LLC v. Nova Grp., Inc.*, No. 11-cv-01590 (LTS) (HBP), 2013 U.S. Dist. LEXIS 165803 (S.D.N.Y. Nov. 20, 2013)……………………………………………3, 4, 7, 45

*Universitas Educ., LLC v. Nova Group, Inc.*, No. 11-cv-01590 (LTS)(HBP), 2012 U.S. Dist. LEXIS 79295, (S.D.N.Y. June 5, 2012)……………………………………………………..17

*Vineberg v. Bissonnette*, 548 F.3d 50 (1st Cir. 2008)……………………………………….23, 24

*William Doyle Galleries, Inc. v. Stettner*, 167 A.D.3d 501 (N.Y. App. Div. 2018)…………..56, 59

*World Wrestling Fed'n Entm't v. Bozell*, 142 F. Supp. 2d 514 (S.D.N.Y. 2001)…………………..61

*Xaleron Pharms, Inc. v. Actvais, Inc.*, 2016 N.Y. Misc. LEXIS 3271 (N.Y. Sup. Ct. Sept. 12, 2016)……………………………………………………………………………………..53

## Arbitration Proceedings

*Universitas Education, LLC v. Nova Grp., Inc. et al*, AAA No. 13-195-Y-01558-10 (2012)……..15

## Statutes

18 U.S.C. § 1341 (2024)………………………………………………………………28, 30, 31, 32

18 U.S.C. § 1343 (2024)………………………………………………………………...28, 32

18 U.S.C. § 1956 (2024)………………………………………………………………24, 28, 32

18 U.S.C. § 1956(a)(1) (2024)………………………………………………………………32

18 U.S.C. § 1956(c)(6) (2024)………………………………………………………………32

18 U.S.C. § 1956(c)(7) (2024)………………………………………………………………32

18 U.S.C. § 1957 (2024)………………………………………………………………...28, 34, 35

18 U.S.C. § 1957(a) (2024)………………………………………………………………33

18 U.S.C. § 1957(f) (2024)………………………………………………………………34

18 U.S.C. § 1961(1) (2024)………………………………………………………………25, 28, 32

18 U.S.C. § 1961(4) (2024)………………………………………………………………24

18 U.S.C. § 1962(a) (2024)………………………………………………………………24

18 U.S.C. § 1962(c) (2024)………………………………………………………………24, 36

18 U.S.C. § 1964 (2024)………………………………………………………………24, 25, 36

18 U.S.C. § 1964(c) (2024)………………………………………………………………25, 36

31 U.S.C. § 5312(a)(2) (2024)………………………………………………………………32

## Rules

Fed. R. Civ. P. 56(a)………………………………………………………………23

Fed. R. Civ. P. 56(c)(1)………………………………………………………………...24

Fed. R. Evid. 201………………………………………………………………24

## Treatises

*Black's Law Dictionary* (10th ed. 2014)………………………………………………………56

Restatement (Second) of Torts §  874, Comment a…………………………………………37

## INTRODUCTION

This is a case to recover $30 million in assets stolen in 2009 from Plaintiff Universitas, Education, LLC ("Universitas") by convicted felon Daniel Carpenter, with the help of Defendant Jack E. Robinson III, who is now represented by his successor in interest, Lillian Granderson. Daniel Carpenter is a long-time fraudster, who has been found guilty of federal crimes in multiple jurisdictions, including mail and wire fraud and money laundering, in connection with multiple schemes to defraud individuals and companies with the promise of beneficial tax treatment. Defendant Robinson, who died in November of 2017, was the long-time friend, business partner, and right-hand man of Daniel Carpenter, and at various times served as an officer, director, or general counsel of multiple shell companies set up by Carpenter in furtherance of Carpenter's fraudulent schemes. Robinson also defended Carpenter and Carpenter's shell companies in the dozens of criminal and civil actions against them.

Universitas was the sole, irrevocable beneficiary of two life insurance policies taken out on the life of Sash Spencer with a net benefit of $30 million. These policies were supposed to be kept in the Charter Oak Trust, and protected by Nova Group, both of which were entities controlled by Carpenter and in which Robinson was involved. After the death of Sash Spencer, the life insurance company paid funds in excess of $30 million to the Charter Oak Trust. Instead of holding these funds in trust for the benefit of Universitas, Carpenter directed the trustee to defalcate the life insurance proceeds, caused the transfer of the proceeds among a network of shell companies wholly controlled by Carpenter, and used the funds to, *inter alia*, continue his scheme to defraud life insurance providers and purchase property for his own personal use. Robinson was instrumental in leading a campaign to conceal the defalcation of the proceeds by providing fraudulent, frivolous, and bad faith reasons to deny the death benefits to Universitas.

1

Despite the efforts of Robinson—including by providing perjurious testimony in the arbitration—and other Carpenter affiliates, Universitas won an arbitration award against Nova Group, which was confirmed in the Southern District of New York in 2012. After years of discovery and litigation that were protracted by Carpenter and Robinson's bad faith litigation tactics, Universitas acquired joint and several judgments against Carpenter, as well as the shell companies Carpenter used to illegally transfer the life insurance proceeds belonging to Universitas for a total amount of $30,677,276.85. Robinson also deserves to be held responsible for his integral role in defrauding Universitas of the life insurance proceeds and contributing to the seemingly endless and costly litigation that Universitas has been forced to endure over the last fifteen years in an attempt to regain the funds that rightly belong to it in the first place. Therefore, Universitas moves for Summary Judgment against Defendant Granderson, Robinson's successor in interest, on all of its remaining claims in this litigation.

## STATEMENT OF MATERIAL FACTS WITH NO GENUINE ISSUE TO BE TRIED

Pursuant to District of Massachusetts Local Civil Rule 56.1, Universitas includes the following statement of material facts of record for which it contends there is no genuine issue to be tried. These facts are supported by sworn testimony; affidavits; business and bank records produced during the course of discovery in this and related proceedings; and adjudicative facts noticed from other related cases.[1]

### A. Background on Carpenter Enterprise and the Charter Oak Trust

1.  Daniel Carpenter is a convicted felon and fraudster, who as of writing has been convicted of over 70 felony counts of fraud and related charges, and is currently the subject of a

---

[1] While the numbering of exhibits differs in the instant motion, all of the exhibits used have previously had their authenticity attested to in the Declaration of Benjamin Chernow in Support of First Motion for Summary Judgment. (Doc. No. 172.)

criminal contempt proceeding in the United States District Court for the Western District of Oklahoma. *United States v. Carpenter*, 763 F.3d 619 (1st Cir. 2013) (nineteen convictions for mail and wire fraud); *United States v. Carpenter*, 190 F. Supp. 3d 260, 281 (D. Conn. 2016), *aff'd sub nom United States v. Bursey*, 801 F. App'x 1 (2d Cir. 2020), *cert denied Carpenter v. United States*, 2020 U.S. LEXIS 5363 (U.S. Nov. 9, 2020) (59 felony convictions); *In re Carpenter et al*, No. 5:24-mc-00005 (W.D. Okla. 2024) (ongoing criminal contempt proceeding).

2.      Daniel Carpenter established the Charter Oak Trust as a vehicle to hold life insurance policies for resale on the secondary market.

3.      In December of 2006, Robinson and Carpenter discussed a business model predicated on the fraudulent acquisition of life insurance policies for resale on the secondary market. (Emails from Jack E. Robinson III dated December 14 and 17, 2006, Re: Spreadsheet. Ex. 8.)

4.      Robinson created numerous shell entities that were eventually used by Carpenter in furtherance of his fraudulent schemes, including Grist Mill Trust, (Dep. of Wayne Bursey, Nov. 17, 2009, Ex. 53 at 33:5-15), Grist Mill Capital ("GMC") (GMC Secretary Certificate, Ex. 36), and the Charter Oak Trust, (Trans. of AAA No. 13-195-Y-1558-10 vol. II, Ex. 4 at 458:23-459:8).

5.      The Trustee of the Charter Oak Trust ("COT") was Nova Group, Inc. ("Nova"). (COT Decl. of Trust, Ex. 5 at 1.)

6.      Nova was controlled by Daniel E. Carpenter, and he was originally its only officer and director of Nova. (Ex. 4, 462:17-463:25.) Wayne Bursey subsequently replaced Mr. Carpenter at Nova, but Mr. Carpenter retained control of Nova. (Ex. 4, 462:2-16.)

7.      Daniel Carpenter controlled hundreds of shell companies in addition to the COT and Nova. *Universitas Educ., LLC v. Nova Grp., Inc.*, No. 11-cv-01590 (LTS) (HBP), 2013 U.S.

Dist. LEXIS 165803, at *5 (S.D.N.Y. Nov. 20, 2013). These entities and the individuals involved formed network to further Carpenter's criminal schemes.[2]

8.      These shell companies were largely interchangeable, and between 2007 and 2011, these entities operated out of the following addresses: 100 Grist Mill Road in Simsbury, Connecticut and 300 Stamford Place in Stamford, Connecticut. (Stip. Re: Duplication of Seized and Subpoenaed Materials, No. 3:12-cv-882 (D. Conn. Nov. 28, 2012, Ex. 6 at 1.)

9.      The centerpiece of the network of shell companies was Benistar Administrative Services, Inc. ("BASI"), which aggregated all the resources and employees that the other shell companies utilized. (Depo. of Peter A. Goldman, July 26, 2013, Ex. 7 98:15-100:18.)

10.     Nova lacked any employees and contracted out management of the Charter Oak Trust to BASI. (Ex. 1, 462:9-16, 469:18-470:12.)

11.     The COT was ultimately found to be a vehicle for the acquisition of stranger-originate life insurance ("STOLI") policies through fraud for resale to third-party investors. *Carpenter*, 190 F. Supp. 3d at 273; (Transcript of Bench Trial, No. 3:13-cr-226 (D. Conn), Ex. 8 787:1-803). Other entities in the Carpenter enterprise—GMC and Avon Capital, LLC ("Avon")—paid the premiums for STOLI policies in the COT. (Transcript of Bench Trial, No. 3:13-cr-226, Ex. 9 160:2-161:15.)

12.     Ultimately, the financing for the premiums came from a third party—Ridgewood Finance, Inc. ("Ridgewood"). (Settlement Agreement with Ridgewood Finance, Ex. 10 at 1; Ex. 9 159:25-160:23.)

---

[2] For purposes of this Motion, Universitas refers to this network of entities and individuals controlled and directed by Daniel Carpenter as the "Carpenter Criminal Network" or "CCN."

4

13.     The United States District Court for the District of Connecticut ("Connecticut Court") found that the COT made numerous misrepresentations in policy applications, including the source of the funding for premiums and false answers regarding the discussions of resale of the policies. *Carpenter*, 190 F. Supp. 3d at 281.

14.     The original defendant in this case, Jack E. Robinson III ("Robinson"), was the Vice President and General Counsel of Nova Group. (Ex. 4, 467:24-468:2.) Mr. Robinson also served as General Counsel to BASI. (Ex. 4, 458:5-19.)

15.     Robinson was involved in the organization of shell companies, the CCN, controlled by Daniel Carpenter since its inception and was a subject of a Department of Labor investigation with the rest of the entities and individuals involved. (Ex. 6 at 2, ¶ 5.)

16.     Robinson also served as a liaison for entities in the Carpenter organization to third parties. Robinson was one of two people who negotiated with Ridgewood on behalf of GMC and Nova and signed both their agreements with Ridgewood. (Ex. 9, 158:8-25; Christiana Bank & Trust Appointment Agreement for GMC, Dec. 6, 2012, Ex. 11; Christiana Bank & Trust Appointment Agreement for Nova, Ex. 12.)

17.     Robinson also set up accounts with Christiana Bank and Trust, which served as the insurance trustee for the COT. Robinson was an authorized signatory. (Letter from Jack E. Robinson III dated Dec. 21, 2006, Ex. 13 (requesting accounts to be opened for COT and GMC)); Invoices for COT accounts were sent to him. (Email from Jack E. Robinson III dated Mar. 28, 2008, Re: Fees, Ex. 14.)

**B. Universitas Education, LLC and the Theft of the Sash Spencer Proceeds**

18.     Universitas was the sole, irrevocable beneficiary of two life insurance policies taken out on the life of Sash Spencer in 2006 and 2007. (Letter from Jack E. Robinson III dated

July 23, 2008, Re: COT and Sash A. Spencer, Ex 15 at 1; Beneficiary Designation Form dated

May 9, 2008, Ex. 16.)

19.      The face value of these policies was $30 million. (Ex. 15 at 1.)

20.      The first policy, with a face value of $10 million, was taken out on December 16,

2006, and issued on December 22, 2006. (First Am. Statement of Claim, AAA No. 13-195-Y-1558-

10, Ex. 17 ¶ 25-27.)

21.      A second policy, with a face value of $20 million, was taken out on Sash Spencer's

life on March 19, 2007 and issued as of December 22, 2006. (Ex. 17 ¶ 28; Decl. of Valerie Lofton,

Dec. 3, 2010, Ex. 18 at ¶ 2.)

22.      Mr. Spencer amended his beneficiary designations in 2008 to make Universitas the

sole, irrevocable beneficiary of the policies. (Ex. 15.)

23.      Thus, the policies were meant to be kept in the COT for the benefit of Universitas.

24.      Mr. Spencer died on June 10, 2008, and the COT executed a claim for death benefits

with Lincoln Life Insurance Company, the insurer, for both of the policies. (Ex. 18, ¶ 3.)

25.      On or about May 5, 2009, Bursey as "Named Trustee of the Charter Oak Welfare

Benefit Plan" brought suit against Lincoln for its failure to pay the $30 million in death benefits

on Spencer's life. (Compl., No. 309-cv-00735 (D. Conn. May 5, 2009), Ex. 107.)

26.      On May 15, 2009, Lincoln made a payment of $30,667,276.85 to the COT,

representing the death benefit and applicable interest ("Spencer Proceeds"). (Ex. 18 ¶ 14.)

27.      The money deposited by Lincoln was transferred out of the COT to GMC in May

and October of 2009. (Consent Letter from Ira Kleiman to Hon. Judge Laura Taylor Swain dated

Oct. 4, 2013, *Universitas Educ., LLC v. Nova Grp., Inc.*, No 11-cv-01590 (S.D.N.Y.), Ex. 20 at 2

(Carpenter and counsel for GMC conceding to the transfers).)

6

28.     Instead of being paid out to Universitas—the sole, irrevocable beneficiary of the policies—the funds were then transferred for no consideration among numerous other entities controlled directly or indirectly by Daniel Carpenter, including, *inter alia*: Grist Mill Holdings, LLC; Carpenter Financial Group, Inc.; Avon Capital, LLC; Grist Mill Trust and Welfare Benefit Group; and Phoenix Capital Management. (Ex. 20 at 2); *Universitas Educ., LLC v. Nova Grp., Inc.*, No. 11-cv-01590 (LTS) (HBP), 2014 U.S Dist. LEXIS 109077, at *33 (S.D.N.Y. Aug. 7, 2014).

29.     Daniel Carpenter claimed that the money was diverted to GMC for the repayment of a debt and pursuant to a confidential settlement agreement, but that explanation was rejected by numerous Courts and was the basis for an obstruction of justice charge in his criminal trial. (Gov't Sentencing Memo., No. 3:13-cr-226 (D. Conn. Mar. 23, 2018), Ex. 21 at 63-65); (Transcript of Hr'g, No. 11-cv-01590 (S.D.N.Y. Nov. 22, 2013), Ex. 22, 43:8-49:22); *Universitas Educ.*, 2014 LEXIS 109077 at *13.

30.     Ultimately, in addition to using the funds rightfully belonging to Universitas to repay Ridgewood and other policy premiums, (Transcript of Bench Trial, No. 3:13-cr-226 (D. Conn), Ex. 23, 2509:9-20), the funds were used to purchase a vacation home for Daniel Carpenter and his family. *Universitas*, 2013 U.S. Dist. LEXIS 165803 at *39-*40.

**C. The Denial of Universitas's Claim to the Sash Spencer Death Benefit**

31.     While the COT began transferring money to GMC in May of 2009, it did not formally deny Universitas' claim to the proceeds until October 2, 2009. (Letter from Jack E. Robinson III dated Oct. 2, 2009, Re: Charter Oak Trust/Universitas, Ex. 24 at 1.).

32.     After Universitas made its claim to the Spencer Proceeds, a series of communications regarding its claim was sent between Nova Group and Universitas's representatives. (Ex. 4, 453:6-16.)

33.     Robinson was one of the key architects of the strategy employed by Nova Group, and a primary author of many of Nova Group's communications, which ultimately sought to improperly deny Universitas's claim to the policies.

34.     Robinson drafted a letter on behalf of Nova Group dated July 23, 2008 to Universitas and its representatives. (Ex. 15.) Mr. Robinson signed this letter in his capacity as Vice President of Nova Group. (Ex. 15 at 3.)

35.     In the letter, Robinson stated, for the first time, that Section 6.01 of the COT Declaration of Trust ("COT Declaration") authorized Nova Group to withhold twenty percent (20%) of the Spencer Proceeds—$6 million—as a fee. (Ex 15 at 2.)

36.     In reality, the holdback provision in Section 6.01 was not originally part of the COT Declaration and was later found to be fraudulent in Mr. Carpenter's criminal proceedings. *Carpenter*, 190 F. Supp. 3d at 293-94.

37.     Donald Trudeau, the President of BASI and another Carpenter co-conspirator, was informed by Bruce Mactas, Spencer's insurance agent, that none of the documentation provided to Universitas or Spencer permitted Nova to retain twenty percent of the Spencer Proceeds. (Email from Bruce Mactas dated July 25, 2008, Re: Robinson Letter Corrected, Ex. 25 (noting in attachment that twenty percent holdback should be removed from Robinson's letter).) Mactas sent a follow up email once again stating that Nova was not entitled to twenty percent of the death benefits as a fee. (Email from Bruce Mactas dated Aug. 15, 2008, Re: Spencer Matter – Errors in 7.23.2008 Letter, Ex. 26.)

38.     Counsel for Mary Spencer, Mr. Spencer's widow, with whom Universitas had an arrangement to pay a portion of the Spencer Proceeds also informed Robinson that the COT Declaration did not authorize Nova to retain any portion of the death benefits. (Email from Arthur Michaelson dated November 14, 2008, Re: Insurance on Sash Spencer, Ex. 27.)

39.     Robinson, Carpenter, and other Carpenter affiliates were involved in creating the Settlement Agreement with Ms. Spencer, (Email from Wayne Bursey to Daniel Carpenter dated July 15, 2008 Re: FW: Spencer, Ex. 28), and approved it internally.

40.     In response, Robinson provided a single page of the COT Declaration to Ms. Spencer's counsel.

41.     Section 6.01 of the version sent by Robinson in 2008 read:

"Employee Death Benefits for Covered Employees. In general, each Covered Employee [i.e. Mr. Spencer] shall be provided with a death benefit while an Eligible Employee in an amount set forth in the Adoption Agreement. With the consent of the Insurance Trustee, the Employer can adjust the amount of the Death Benefit by amending the Adoption Agreement. *If a Participant dies while participating in the Plan, a Death Benefit equal to Eighty (80%) percent of the original face value of any policies held by the Plan of the Participant's life minus the cost of any premiums or placement or origination fees listed in the Plan Documents and minus any benefits paid under the Plan shall be paid to the Participant's designated Beneficiary.* Once a Covered Employee ceases being . . . ." (Letters from Ivan Schinderman to Jack E. Robinson III dated Mach 5 & 9, 2009, Ex. 29, at 4.) (emphasis added)

42.     Section 6.01 of the original Plan stated, in relevant part:

"Employee Death Benefits for Covered Employees. In general, each Covered Employee [i.e. Mr. Spencer] shall be provided with a death benefit while an Eligible Employee in an amount

set forth in the Adoption Agreement. With the consent of the Insurance Trustee, the Employer can adjust the amount of the Death Benefit by amending the Adoption Agreement. Once a Covered Employee ceases being . . . ." (Ex. 29, at 3.)

43.     Robinson knew that Section 6.01 had been modified after it had originally been agreed-to by Mr. Spencer. The holdback provision was first added on July 7, 2008 by BASI employees and Carpenter affiliates. (Ex. 23, 2491:8-2492:15 (testimony of Department of Labor Special Agent Lily Allen verifying that the holdback provision was added one month after Spencer died in July of 2008); *Carpenter*, 190 F. Supp. 3d at 294 (finding that the COT Declaration was "altered by [Carpenter] in the wake of Mr. Spencer's death for the specific purpose of enabling COT to keep twenty percent of the total death benefit . . . ."). During the Arbitration with Universitas, discussed *infra*, Carpenter emailed numerous members of the CCN, including Robinson, seeking to only provide the altered COT Declaration in discovery. (Email from Daniel Carpenter dated Nov. 18, 2010, Re: Universitas Discovery, Ex. 75.) Carpenter asked if "anyone OBJECTS to any of [the modified] documents." (Ex. 75 at Bates Number Govt_001136.) Robinson did not object.

44.     Pursuant to Section 6.01 and 13.01 of the COT Declaration, consent of the insurance trustee was necessary to adjust the amount of the death benefit or modify the COT Declaration. (Ex. 5 at 8, §§ 6.01 & 13.01.) No such consent was ever received.

45.     In light of Nova's recalcitrance in paying out the death benefit and its insistence on the retention of twenty percent of the death benefit, Universitas hired counsel. In a letter dated February 25, 2009, counsel for Universitas informed the COT and Nova that there was no genuine provision in the COT Declaration authorizing the retention of the Spencer Proceeds. (Letter from Ivan Schinderman dated Feb. 25, 2009, Re: Charter Oak Trust and Sash A. Spencer, Ex. 30.)

46.     Robinson responded in a letter dated March 2, 2009, signed in his capacity as General Counsel for BASI, and argued that the February 25 letter constituted a "threat of litigation" in violation of the COT Declaration's "no contest" clause. (Ex. 31 at 2.)

47.     Robinson then stated that this threat of litigation constituted cause to terminate Mr. Spencer from the COT and for Nova to retain the entirety of the Spencer Proceeds unless Universitas's letter was rescinded. (Ex. 31 at 2.) Counsel for Universitas later clarified that the letter was not intended as a threat of litigation. (Ex. 29 at 1).

48.      Universitas also sought the aid of Alex Sgoutas, a business advisor of Universitas, to expedite the negotiations over the Spencer Proceeds. On May 29, 2009, Sgoutas emailed Robinson indicating a desire to make an agreement for the distribution of the proceeds. (Email from Alex Sgoutas dated May 29, 2009, RE: Charter Oak Trust, Ex. 32.)

49.     Robinson responded to Sgoutas's May 29, 2009 email once alleging that the email constituted a threat of litigation and that all benefits would be terminated if Sgoutas's email was not withdrawn. (Email from Jack E. Robinson III dated May 29, 2009, Re: Charter Oak Trust, Ex. 33.)

50.     Carpenter instructed that the email sent by Robinson to Sgoutas be an email telling Universitas to "eat sh** and die." (Ex. 23, 2501:8-2510:10.)

51.     On July 8, 2009, Robinson, now in his capacity as General Counsel for Nova Benefit Plans, LLC, wrote a letter to Universitas stating, for the first time, that Universitas could not receive the Spencer Proceeds because it had failed to claim with the COT within the allotted time period following Mr. Spencer's death. (Ex. 34 at 2-3.)

52.    The July 8, 2009 letter further stated for the first time that GMC was allegedly entitled to the $30 million death benefit because of a confidential agreement entered into by Mr. Spencer and GMC. (Ex. 34 at 4-5.)

53.    On July 9, 2008, Carpenter, Robinson, Bursey and Trudeau had for the first time created a letter memorializing the fraudulent agreement between the Charter Oak Trust and GMC for the Spencer Proceeds. (Email from Dan Carpenter dated July 9, 2008, Ex. 35 at Bates Stamp NOVA009255 (fabricating a basis for a competing claim of GMC or Grist Mill Partners against Universitas's claim to the proceeds).) Notably, Universitas had filed its claim in June of 2008.

54.    No such agreement involving Mr. Spencer and GMC existed. (Ex. 23, 2505:16-2506:12.)

55.    The letter further claimed to unilaterally erase the claim filed in June of 2008 and rendering all prior communications regarding the Spencer Proceeds null and void. (Ex. 34 at 1-2.)

56.    Pursuant to instructions in Robinson's July 8, 2009 letter, Universitas submitted a written claim, and on July 30, 2009, Nova sent a letter to Universitas, signed by Bursey, stating that it acknowledged timely receipt of the claim. (Ex. 36 at 1). The letter further noted that the agreement between Ms. Spencer and Universitas was a barrier to the payment of the Spencer Proceeds. (Ex. 36 at 2 ¶ 4.)

57.    The July 30 letter was actually written by Robinson. (Trans. of AAA No. 13-195-Y-1558-10 vol. III, Ex. 37 at 924:15-19 (Robinson testimony that he drafted the letter).)

58.    On or about August 25, 2009, COT had an "executive board meeting" to discuss the Spencer death benefits and the benefits payable to Universitas, in which Robinson was involved. (Email from Wayne Bursey dated Aug. 20, 2009, Re: Equally Privileged and Confidential List, Ex. 38 (including Robinson on the email chain).)

12

59.     In response to the new correspondence, Universitas hired new counsel. Upon learning of new counsel's participation in the matter, Robinson sent another letter to Universitas new counsel, Loeb & Loeb, on September 11, 2009, outlining numerous pretextual issues preventing the disbursement of funds to Universitas and seeking to nullify previous communications, except two letters written by Nova. (Ex. 39 at 2.).

60.     Mr. Robinson's September 11 letter also threatened to deny Universitas's claim if Universitas attempted to communicate with anyone other than Mr. Robinson. (Ex. 39 at 2.)

61.     Despite further correspondence in which Universitas addressed and cured the issues alleged in the September 11 Letter, (Letter from Lenny Oppenheim dated September 21, 2009, Re: Charter Oak Trust/Universitas, Ex. 40), Nova informed Universitas on October 2, 2009 that it was denying its claim for the benefits. (Ex. 24 at 1.)

62.     On October 2, 2009, Nova sent a letter denying the claim because it alleged that: (1) the settlement agreement with Mary Spencer constituted an illegal reversion of benefits; (2) Universitas failed to timely file a claim; (3) Universitas had threatened litigation against Charter Oak Trust; and (4) GMC's alleged agreement with Spencer (which did not exist) created a conflicting claim to the plan benefit. (Ex. 24 at 1- 3.)

63.     The October 2, 2009 letter, while signed by Bursey, was actually authored by Robinson. (Ex. 37 964:11-14; 970:15-971:2.)

64.     Universitas sought to appeal the denial of the claim pursuant to Section 8.02(a) of the COT Declaration, and insisted that Nova demonstrate that the "disputed funds are being held in a separate, interest-bearing account and will not be commingled with any other funds until the matter is fully resolved between the parties." (Letter from Paula Colbath dated November 10, 2009, Re: Charter Oak Trust/Sash A. Spencer Life Insurance Benefits, Ex. 41.)

13

65.     Instead, Robinson responded with a letter dated November 18, 2009 refusing to state that the funds were being held separately and once again claiming that Universitas's letters were a threat of litigation and that the settlement agreement with Mary Spencer constituted a fraud. (Ex. 42 at 1-3.) Mr. Robinson also alleged, incorrectly and for the first time, that the Spencer death benefits were only $20 million. (Ex. 42 at 2.)

66.     By this time, the Spencer Proceeds had already been transferred out of the COT and Robinson was aware of the fact that Nova was no longer in possession of the Spencer Proceeds.

67.     Robinson's involvement extended to the dissipation of the proceeds. Robinson was involved in Avon Capital, LLC's, another Carpenter controlled entity, acquisition of SDM Holdings, LLC, as well as a portfolio of life insurance policies nominally held by SDM. (Depo. of Donald Trudeau dated Feb. 6, 2013, Ex. 43, 280:1-24.)[3]

68.     Universitas submitted an appeal of Nova's decision within the proper timeframe and pursuant to Robinson's instructions for correspondence. (Letter from Paula Colbath dated November 25, 2009 and Aff. of Service of Appeal, Ex. 44.) Notwithstanding the timely appeal of the decision, Nova failed to respond in a timely fashion. When Universitas informed Nova of the failure to timely decide, Nova then sent a letter once again alleging that Universitas had threatened litigation. (Letter from Wayne Bursey dated Feb. 2, 2010, Re: Untimely Appeal, Ex. 45.)

69.     Ultimately, Nova denied the appeal on February 9, 2010 claiming, *inter alia*, that it was untimely because Robinson had not seen it until after the deadline and that it was sent to the wrong address, despite explicit instructions from Robinson to send it to his address. (Letter from

---

[3] As explained, *infra*, a judgment was ultimately entered against Avon Capital for its role in the theft and dissipation of the Spencer Proceeds.

Wayne Bursey dated Feb. 9, 2010, Re: Denial of Claim and Appeal of Denial), Ex. 46; *see also* Ex. 44 (noting that the appeal was sent via email and by Federal Express to Robinson's addresses).)

**D. Legal Proceedings**

**1. Arbitration**

70.     Pursuant to the terms of the COT Declaration, Universitas submitted the dispute to binding arbitration against Nova in case number AAA 13-195-Y-01558-10.

71.     On July 19, 2010, Nova informed the arbitrator that Robinson would be serving as the corporate representative for Nova, BASI, and GMC in the arbitration. (Letter from Richard Order dated July 19, 2010, Re: 13 195 Y 01558 10, Ex. 47 at 3.)

72.     During the arbitration, Nova refused to provide information regarding the status of the Spencer Proceeds. (Letter from Richard Order dated Sept. 21, 2010, Re: 13 195 Y 01558 10, Ex. 48 at 1 (refusing to provide information regarding the location of the Spencer Proceeds).)

73.     The Arbitrator ultimately ordered that Nova provide documentary proof of the Charter Oak Trust's ability to satisfy an award. Bursey initially submitted an affidavit stating that Nova had assets in excess of $35 million. (Aff. of Wayne Bursey dated Nov. 12, 2010, Ex. 49.)

74.     The Arbitrator found that the affidavit submitted by Bursey was inadequate. Thus, on November 30, 2010, Robinson submitted an affidavit stating that he was familiar "with the plans operations, assets, liabilities, and financial condition, and state that the Plan has the current ability to satisfy a judgment of $30 million." (Ex. 50, ¶ 4.)

75.     In reality, both the Charter Oak Trust and Nova had closed their bank accounts in June of 2010. (Bank Statements for Nova and COT for June 2010, Ex. 51 (showing account closures on June 9, 2010).)

76.     Robinson also concealed the location of the funds from Nova's counsel, and Nova's counsel stated that Robinson did not want Nova's counsel to know the location of the funds so that he would be unable to provide that information to the Arbitrator. (Depo. of Richard Order, Jan. 3, 2013, Ex. 52, 243:2-16.)

77.     As described *supra*, all the Spencer Proceeds had been fraudulently transferred from the COT over a year prior and neither the COT nor Nova had assets to satisfy a judgment.

78.     Many of the rest of the statements were demonstrably false and were the basis for obstruction of justice charges when repeated by Carpenter. (Ex. 50; Ex. 21 at 63-65.)

79.     Universitas relied in good faith upon Robinson's affidavit and continued to arbitrate the case. (Aff. of Sharon Siebert dated September 6, 2019 ¶ 14, Doc. No. 174.)

80.     Robinson's other testimony in the Arbitration was also demonstrably false. Robinson testified that Carpenter was not involved with Nova or the COT. (Ex. 4, 462:2-469:17.) The SDNY Court later found that Carpenter controlled both Nova and the COT, as well as its litigation strategy.[4] *Universitas Educ., LLC v. Nova Grp., Inc.*, No. 11-cv-01590 (LTS) (HBP), 2013 U.S. Dist. LEXIS 165803, at *11 (S.D.N.Y. Nov. 20, 2013).

81.     Robinson also falsely testified that the COT owed the Spencer Proceeds to GMC pursuant to a secret agreement between Spencer and GMC. (Ex. 4, 757:12-758:25.) As described, *supra*, no such agreement existed.

82.     Robinson further testified that Section 6.01 of the COT Declaration included a twenty percent holdback provision in January of 2007, (Ex. 4, 536:23-537:13), despite the fact that Robinson was involved in adding that clause in July of 2008. (Ex. 23, 2491:8-2492:15.)

---

[4] Moreover, in Carpenter's criminal case, the Connecticut Court  found that Carpenter's testimony that he was not involved with Nova or the Charter Oak Trust constituted obstruction of justice.

83.     The Arbitrator issued an Interim Award on January 24, 2011, finding every reason advanced by Nova for the denial of Universitas's claim to be illegitimate. (Ex. 53 at 4-5.)

84.     The Arbitrator further found that no "credible evidence" existed that the COT and GMC had ever consummated an agreement that competed with Universitas's claim to the proceeds. (Ex. 53 at 5-6.)

85.     The Arbitrator further found that Nova and COT had violated their fiduciary duties by denying the claim for benefits under the COT, and awarded Universitas $26,525,535.98.[5] (Ex. 53 at 13.)

### 2. Litigation to Confirm the Arbitration Award

86.     Following the issuance of the Interim Award, Nova and Universitas filed competing actions—Nova to vacate the Interim Award and Universitas to confirm the Interim Award—that were ultimately consolidated in the United States District Court for the Southern District of New York ("SDNY Court"). *See Universitas Educ., LLC v. Nova Group, Inc.*, No. 11-cv-01590 (LTS)(HBP), 2012 U.S. Dist. LEXIS 79295, at *3 (S.D.N.Y. June 5, 2012).

87.     The SDNY Court confirmed the arbitration award on June 5, 2012 and entered judgment in favor of Universitas in the amount of $30,181,880.30.37 *See Universitas Educ., LLC*, 2012 U.S. Dist. LEXIS 79295 at *9-*10.

88.     Following entry of judgment, Nova filed numerous motions for reconsideration and vacatur, which were all denied. Among these was a motion to vacate for lack of subject matter

---

[5] This award represented a deduction of twenty percent (20%) from the $20 million life insurance policy, as the Arbitrator erroneously found that the twenty percent holdback provision was valid as to that policy. Ex. 53 at 8-9. Evidence uncovered later in Department of Labor raids and the Carpenter criminal proceeding revealed that the twenty percent holdback provision was fraudulently added after both policies were taken out.

jurisdiction, which Mr. Robinson helped to draft. (Depo. of Jack E. Robinson III dated Oct. 18, 2012, Ex. 54, 344:4-346:12.)

89.     Following admonitions by the SDNY Court regarding the obligations and potential penalties of FRCP 11 and 28 U.S.C. § 1927, the motion was subsequently withdrawn. *See Universitas Educ., LLC v. Nova Group, Inc.*, No. 11-cv-1590 (LTS)(HBP), 2013 U.S. Dist. LEXIS 142902, at *8 (S.D.N.Y. May 21, 2013), *adopted by* 2013 U.S. Dist. LEXIS 142481 (Sept. 30, 2013).

90.     Robinson entered a notice of appearance on behalf of Nova and the Charter Oak Trust in the SDNY Court on September 5, 2012. *Universitas Educ., LLC*, 2013 U.S. Dist. LEXIS 142902, at *8.

91.     Robinson submitted the previously withdrawn motion to vacate, for which the SDNY Court had provided an admonition regarding sanctionable filings on September 11, 2012. *See Universitas Educ., LLC*, 2013 U.S. Dist. LEXIS 142902, at *8.

92.     On October 5, 2012, the SDNY Court denied Nova's motion to dismiss for lack of subject matter jurisdiction, filed by Robinson, finding it wholly without merit. *Id.* at *9.

93.     Robinson was sanctioned for filing this motion, and the SDNY Court found that Robinson filed this motion in "bad faith and with a motive to delay, harass, or needlessly increase the cost of litigation." *Universitas Educ., LLC . Nova Group, Inc.*, No. 11-civ-1590 (LTS)(HBP), 2013 U.S. Dist. LEXIS 142481, at *11 (S.D.N.Y. Sep. 30, 2013).

94.     Nova and other Carpenter-affiliated entities and individuals also vigorously opposed providing any post-judgment discovery. Specifically, Robinson sought to use his position as Nova's general counsel to quash a subpoena issued to him in the proceeding. (Mot. to Quash

Subpoena, July 17, 2012, *Universitas Educ, LLC v. Nova Grp., Inc.*, No. 11-cv-01590 (LTS) (HBP) (S.D.N.Y.), Ex. 55 at 3-5.)

95.      Robinson was found to be in contempt of court for his non-compliance with the discovery sought in the SDNY Court proceedings. *Universitas Educ., LLC v. Nova Grp. Inc.*, No. 11-cv-01590 (LTS) (HBP), 2013 U.S. Dist. LEXIS 99957, at *42 (S.D.N.Y. July 11, 2013) *adopted by* Memorandum Order Adopting Certification dated Feb. 11, 2014 (unpublished) (attached as Ex. 56).[6]

96.      Universitas ultimately filed two motions for the turnover of assets pursuant to N.Y. C.P.L.R. § 5225. These motions culminated in money judgments against Carpenter and various of his shell companies in the following amounts: against Daniel Carpenter in the amount of $30,600,000, against GMC in the amount of $30,600,000, against GM Holdings in the amount of $21,000,000, against CFG in the amount of $11,140,000, against Avon in the amount of $6,710,065.92, against Phoenix in the amount of $5,000,000, against GMT in the amount of $4,487,007.81, and against Hanover in the amount of $1,200,000. *Universitas Educ., LLC v. Nova Grp., Inc.*, No. 11-cv-01590 (LTS) (HBP), 2014 U.S. Dist. LEXIS 109077, at *33 (S.D.N.Y. Aug. 7, 2014).

97.      Only Grist Mill Trust satisfied the judgment against it. (Satisfaction of Judgment, June 19, 2018, No. 11-cv-01590 (S.D.N.Y.), Ex. 57.)

---

[6] Robinson even destroyed evidence relevant to Universitas's collection efforts. Robinson testified that he disposed of the computer he used throughout the events underlying the arbitration and litigation with Universitas. (Ex. 54, 190:10-198:20.) Robinson acknowledged that he knew the computer contained documents relevant to these legal proceedings when he disposed of that computer. (Ex. 54, 190:10-198:20.)

### E. **Robinson's Receipt of Stolen Funds**

98.     The Spencer death benefits were deposited into an account controlled by COT. (Charter Oak Trust Bank Records, Ex. 58, at Bates Number TD-Universitas 0011.)

99.     The Spencer death benefits was the only money ever put into in the account. (*See*, Charter Oak Trust Bank Statements, Ex. 59.)

100.     On May 21, 2009 Bursey transferred $8,677,276.75 from COT to GMC. (Ex. 59 at Bates Number TD-Universitas 0013.) On May 26, 2009 Bursey transferred another $2,186,566 from COT to GMC. (*Id*.)

101.     On September 23, 2009, Robinson was paid $50,000 from this GMC account. (Ex. 58 at Bates Number TD-Universitas 0365.)

102.     On October 27, 2009, Bursey withdrew and transferred $19,800,000 from COT to GMC, which constituted the remainder of the Spencer Proceeds. (TD Bank Checking Withdrawal, Ex. 60.) Thus, all of the money in GMC's account after October 28, 2009 was money wrongfully denied from Universitas.

103.     On October 28, 2009, $19,000,000 of the Spencer Proceeds was transferred from GMC to an account for Grist Mill Holdings ("GM Holdings"). (GMC Bank Statement for Oct. 2009, Ex. 61 (showing transfer to account ending in *7136); TD Bank New Account for Grist Mill Holdings, Ex. 62 (account ending in 7136).)

104.     On November 12, 2009, GM Holdings transferred $4,140,000 to an account belonging to CFG, another turnover judgment debtor. (GM Holdings Bank Statement for Nov. 2009, Ex. 63 (showing transfer to account ending in *4697); TD Bank New Account for Carpenter Financial Group, Ex. 64 (account ending in *4697).)

105.    Robinson received $75,000 from CFG on October 9, 2009, (Ex. 65 at Bates Number TD-Universitas 0910.))

106.    On November 9, 2009, Robinson CFG paid Robinson $100,000. (Ex. 65 at Bates Number TD-Universitas 0913.) On November 25, 2009, CFG paid Robinson $275,000. (*Id.*)

107.    GM Holdings transferred another $7,000,000 to CFG on December 3, 2009. (GM Holdings Bank Statement for December 2009, Ex. 66 at Bates Number TD-Universitas 0505.) CFG paid Robinson $125,000 on December 3, 2009 and $125,000 on December 4, 2009. (Ex. 65 at Bates Number TD-Universitas 0917.) CFG paid Robinson another $60,000 on March 30, 2010. (Ex. 65 at Bates Number TD-Universitas 0331.)

108.    CFG paid Robinson another $15,000 on May 11, 2011 from another account held at People's United Bank. (Ex. 67 at 1 (check made out to Robinson).)

109.    Benistar Group, Ltd., another Carpenter alter ego, paid Robinson $25,000 on January 31, 2012. (Benistar Group Ltd. Bank Statement for Jan. 2012, Ex. 68 at 1.) Benistar Group, Ltd. received a transfer of $25,000 from CFG earlier that same day. (*Id*.)

110.    Robinson further received three checks from Benistar Group, Ltd. on September 15, 2010, totaling $45,000. (Ex. 69 at 1.)

111.    The SDNY Court held that the aforementioned transfers to GMC, GM Holdings, and CFG actually occurred and that those conveyances were fraudulent and made without consideration. *Universitas*, 2014 U.S. Dist. LEXIS 109077 at *10-*12.

112.    Thus, Robinson received a total of at least $770,000 from Carpenter-controlled entities that had received the Spencer Proceeds.

### F. **Carpenter Criminal Conviction**

113.    On June 6, 2016, Daniel Carpenter was found guilty of thirty-two counts of mail fraud and wire fraud, conspiracy to commit mail and wire fraud, thirteen counts of illegal monetary transactions, ten counts of money laundering, conspiracy to commit money laundering, and aiding and abetting the foregoing substantive offenses. *See United States v. Carpenter*, 190 F. Supp. 3d 260 (Dist. Conn. 2016).

114.    These convictions arose from his actions and the actions of individuals and entities in the CCN with respect to the acquisition of the life insurance policies taken out on the life of Sash Spencer and the efforts to steal and conceal the Spencer Proceeds from Universitas. *Id.*

## **PROCEDURAL POSTURE**

Universitas first moved for summary judgment on its remaining claims on September 3, 2019. (Doc. No. 170.)  This Court denied its motion without prejudice on February 7, 2023, in light of the fact that no party had formally been substituted for the deceased Defendant, Jack E. Robinson III, and noted Universitas's failure to provide a statement of facts for which it contended there existed no genuine dispute pursuant to Local Rule 56.1. (Doc. No. 191 at 5.)

On May 8, 2023, This Court substituted Lillian Granderson as the successor in interest to Jack. E. Robinson III. (Doc. No. 197.) The United States Court of Appeals for the First Circuit affirmed Ms. Granderson's substitution, and this Court ordered that the parties submit cross-motions for summary judgment on their remaining claims and defenses. Thus, Universitas now seeks summary judgment on all remaining claims in this case that were not dismissed by this Court on December 11, 2015.[7] (*See* Doc. No. 34-1, 5:22-6:4.) Specifically, Universitas intends to seek

---

[7] As Universitas is moving for summary judgment on all its remaining claims, it has complied with this Court's directive to address how it shall proceed on remaining claims. (Doc. No. 191 at 6.)

summary judgment on the following claims (Doc. No. 1, pp. 50-69): (a) First Claim for Relief (Violation of Racketeer Influenced and Corrupt Organizations Act); (b) Second Claim for Relief (Aiding and Abetting Fraud); (c) Third Claim for Relief (Breach of Fiduciary Duty); (d) Fourth Claim for Relief (Negligent Misrepresentation); (e) Fifth Claim for Relief (Negligent Opinion); (f) Seventh Claim for Relief (Aiding and Abetting Breach of Fiduciary Duty); (g) Eighth Claim for Relief (Civil Conspiracy to Commit Fraud and Breach of Fiduciary Duty); (h) Tenth Claim for Relief (Unjust Enrichment).

## **ARGUMENT**

Universitas asserts a federal claim alleging a violation of the Racketeer Influenced and Corrupt Practices Act against Robinson for his role in the crimes committed by the CCN that gave rise to Universitas' injury. Universitas also asserts six claims under New York law, which this Court has found to be the applicable law in this Case, for torts that Robinson committed or helped commit against Universitas that gave rise to Universitas' injury. (Tr. of Mot. Hr'g and Scheduling Conference 3, Dec. 11, 2015, Doc. No. 31, 34-1.) These claims are addressed in turn.

### A. **Standard of Review**

Under Rule 56 of the Federal Rules of Civil Procedure ("FRCP"), a court may only grant summary judgment if there is no "genuine dispute of material facts and if the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law." *ICONICS, Inc. v. Massaro*, 192 F. Supp. 3d 254, 262 (D. Mass. 2016) (citing *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000)); Fed. R. Civ. P. 56(a). An issue is genuine if it "may reasonably be resolved in favor of either party." *Massaro*, 192 F. Supp. 3d. at 262 (citing *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008)). Facts are material if they can sway the litigation under the applicable law. *Id.*

"A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of material in the record," including, but not limited to depositions, documents, electronically stored information, and affidavits. Fed. R. Civ. P. 56(c)(1). Courts may also consider judicially noticed facts from other proceedings. *E.g. Jones v. Jones*, 820 F. App'x 659, 661 n.3 (10th Cir. 2020) ("[I]t has been held that federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.") (quoting *St. Louis Baptist Temple v. Fed. Deposit, Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979)). Courts can take notice of adjudicative facts that are generally known and whose accuracy cannot reasonably be questioned," so long as it affords the parties an opportunity to be heard on the propriety of doing so . . . ." *Robinson v. Liberty Mut. Ins. Co.*, 958 F.3d 1137, 1142 (11th Cir. 2020) (quoting Fed. R. Evid. 201). Adjudicative facts are those developed in a particular case. *Id.*

In determining genuine issues of material fact, "courts resolve all conflicts and draw all reasonable inferences in the nonmovant's favor." *Vineberg*, 548 F.3d at 56. Once the moving party meets its burden, the nonmoving party must provide specific evidence of disputes in the material facts and cannot do so merely by "rest[ing] upon merely allegations or denials." *Massaro*, 192 F. Supp. 3d. at 262 (quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993)).

**B.**   **Summary Judgment is Appropriate on Plaintiff's RICO Claim because there is No Genuine Issue of Material Fact as to whether Defendant Violated the Statute.**

Under the Racketeer Influenced and Corrupt Organizations Act, ("RICO"), a person is prohibited from, *inter alia*, investing in an enterprise that affects interstate commerce any income derived from a pattern of racketeering activity, 18 U.S.C. § 1962(a) (2024), or conducting the affairs of an enterprise that affects interstate commerce through a pattern of racketeering, *id.* § 1962(c). Under 18 U.S.C. § 1964 (2024), any person injured in his business or property by a

24

violation of § 1962 may sue a party that violated § 1962 and may recover treble the damages sustained. *Id.* § 1964(c).

To establish a civil RICO violation, "a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Massaro*, 192 F. Supp. 3d. at 267 (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 14-15 (1st Cir. 2000)). Proof by a preponderance of evidence is sufficient to support a finding of liability under civil RICO. *See, e.g.*, *United States v. Local 560, Int'l Bd. Of Teamsters*, 780 F.2d 267, 279-80 & n.12 (3rd Cir. 1985). The RICO statute defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *Lares Group, II v. Tobin*, 47 F. Supp. 2d. 223, 229 (D. R.I. 1999). The enterprise must be an "entity apart and distinct from the pattern of racketeering activity in which it engages." *Libertad v. Welch*, 53 F.3d 428, 441-42 & n.10 (1st Cir. 1995) (internal quotations omitted). The enterprise requirement is proven by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* (quoting *United States v. Turkette*, 452 U.S. 576, 580-81 (1981)). In *Boyle v. United States*, the Supreme Court found that an enterprise must have at "least three structural features: a purpose, relationships among those associated with the enterprise, and enough "longevity" to allow pursuit of the enterprise's purpose. 556 U.S. 938, 946 (2009).

For the purposes of RICO, "racketeering activity" is defined to include a variety of state and federal predicate crimes, enumerated in 18 U.S.C. § 1961(1). Moreover, there must be a pattern of this "racketeering activity." To demonstrate the existence of a "pattern," a plaintiff must show two predicate acts of racketeering activity. *E.g. Massaro*, 192 F. Supp. 3d at 268. The plaintiff must also demonstrate that these predicate acts are "related, and that they amount to or pose a threat of

25

continued criminal activity." *Id.* (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). The latter of these requirements is referred to as the "continuity requirement." The Supreme Court has held that a plaintiff can show continuity in two ways.  If the plaintiff pleads the "closed" approach, the plaintiff "would have to prove a 'closed period of repeated conduct' that 'amounted to . . . continued criminal activity.'" *Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 528 (1st Cir. 2015) (quoting *H.J. Inc.*, 492 U.S. at 237, 241). Courts have not "offered a fixed formula" for when the repeated conduct satisfies the closed approach, but it is clear that "sporadic activity" or acts that span only a "few weeks or months" cannot establish continuity. *Massaro,* 192 F. Supp. 3d at 270 (internal citations omitted). The First Circuit has instructed that closed-ended continuity should be found only where "the temporal duration of the alleged activity and the number of predicate acts are so extensive that common sense compels a conclusion of continuity." *Id.* (quoting *Home Orthopedics Corp.*, 781 F.3d at 529). A plaintiff can also prove continuity "under the 'open-ended' approach," by "showing 'past conduct that by its nature projects into the future with a threat of repetition.'" *Id.* (quoting *H.J. Inc.*, 492 U.S. at 237).

The Supreme Court requires a plaintiff to demonstrate both "but for" cause and proximate cause to show injury by reason of a RICO violation. *Racecourse v. Wynn Resorts*, 990 F.3d 31, 35 (1st Cir. 2021) (citing *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)). Proximate cause requires some "direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp.*, 559 U.S. at 9. The central question in determining whether there exists proximate cause is "whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). Overall, a plaintiff must prove that the damages incurred by plaintiff were a "foreseeable and natural consequence" of a defendant's RICO violation. *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 657 (2008).

1.  **There can be no genuine dispute that the CCN was a criminal enterprise under the RICO statute.**

Here, it is clear that the Carpenter CCN constituted an enterprise as defined by the RICO statute. A RICO enterprise requires both an "individual" or "other legal entity," as well as "any union or group of individuals associated in fact although not a legal entity." *Tobin*, 47 F. Supp. 2d. at 229. Here, the undisputed facts demonstrate that the CCN consisted of numerous individuals and entities that were associated in fact and employed by the various entities. These people and entities included, among others, Daniel E. Carpenter, Jack E. Robinson, Wayne Bursey, Donald Trudeau, Carpenter Financial Group, the Charter Oak Trust, Grist Mill Capital, Grist Mill Holdings, Grist Mill Trust, Hanover Trust, and Nova. The undisputed facts provide overwhelming evidence of both a formal and informal "ongoing organization,"—centered around Daniel Carpenter and BASI—which "functioned as a continuing unit." *Welch*, 53 F.3d at 441-42.

Specifically, the CCN met the three structural features articulated in *Boyle*: a purpose, relationships between associates, and longevity. 556 U.S. at 946. The undisputed facts show that Carpenter, Robinson, and others worked together formally with a clear purpose—first to procure the STOLI policies, and later to defalcate and conceal the Spencer Proceeds. CCN members regularly communicated, and clearly possessed close relationships and friendships with each other. (*See* Last Will and Testament of Jack E. Robinson III, Ex. 70, at 3, 10 (Robinson expressing reverence for Carpenter and calling Carpenter his "trustworthy friend and partner.").) The enterprise also lasted long enough for its associates to pursue its purpose, with Carpenter, Robinson, Trudeau, Bursey, and the shell companies and sham entities, including COT, Nova, Avon, and others continuously working in concert to defraud insurance companies, conceal evidence of wrongdoing through coordinated bad faith litigation tactics, and the illegal movement of money between entities affiliated with the CCN.

2. **The CCN's members engaged in racketeering activity through the commission of multiple crimes that serve as predicate acts under the RICO statute.**

For the purposes of this case, there are several crimes committed by various members of the CCN that constitute predicate acts for a RICO violation under 18 U.S.C. § 1961. These include wire fraud in violation of 18 U.S.C. § 1343; mail fraud in violation of 18 U.S.C. § 1341; money laundering in violation of 18 U.S.C. § 1956; and illegal monetary transactions in violation of 18 U.S.C. § 1957. Each of these will be discussed in turn.

> i. *The CCN committed multiple counts of Wire Fraud in regards to acquiring STOLI policies and concealing the defalcation of the Spencer proceeds by the CCN.*

To sustain a conviction for wire fraud under 18 U.S.C. § 1343 (2024), the following elements must be proven: there must be (1) "a scheme to defraud," (2) the accused must knowingly and willfully participate in the scheme with the intent to defraud, and (3) the accused must use "interstate or foreign wire communications to further that scheme." *United States v. DiRosa*, 761 F.3d 144, 150 (1st Cir. 2014); *see also United States v. Carpenter*, 190 F. Supp. 3d 260, 297-99 (D. Conn. 2016). The undisputed facts demonstrate that Daniel Carpenter was guilty of mail and wire fraud because there existed a scheme to defraud, money or property was the object of the scheme, and wires and mails crossed state lines. The undisputed facts prove that Carpenter was in fact convicted of mail and wire fraud, and that his conviction was upheld by the United States Court of Appeals for the Second Circuit. *United States v. Bursey*, 801 F. App'x 1 (2d Cir. 2020)

Even if this Court does not accept as indisputable fact that Carpenter's numerous convictions for mail and wire fraud constitute RICO predicate crimes and a pattern of racketeering activity, sufficient indisputable facts exist in the record to support such a finding. First, there was a scheme to defraud insurance providers into providing STOLI policies by using material misrepresentations to those insurance companies to induce the insurance companies to provide

policies on the lives of the straw insured. (Ex. 8, 787:1-803:1.) The members of the CCN provided materially false information on the applications, namely that no third-party was paying the premiums and that no discussions had occurred regarding the resale of the policies. Moreover, the object of the scheme was indisputably money or property because the CCN intended to resale the policies for cash on the secondary market. Finally, because the undisputed facts demonstrate that various members of the CCN used emails and facsimiles, including Robinson, which are considered wires, to send, *inter alia*, the fraudulent applications, they last element of interstate wire transmissions has been proven. *See Carpenter*, 190 F.3d at 297-98.

There also existed a scheme to defraud Universitas by concealing the defalcation of the proceeds and their transfer out of the COT. Carpenter, Robinson, and other members of the CCN were aware that Universitas was the sole, irrevocable beneficiary of the Spencer life insurance policies in the COT, and that Nova was the trustee of COT. Despite knowing of the trustee-beneficiary relationship, Nova, through Robinson and Bursey, engaged in a concerted effort to deny those benefits to Universitas using materially false information. Here, that materially false information included, *inter alia*, Robinson's letter asserting that the Spencer proceeds were subject to a twenty-percent holdback provision, when in fact that provision was not written until after Spencer's death, (Ex. 34), and was not a valid provision since the Insurance Trustee did not authorize this change. This letter, as well as other similar letters were sent by fax and email from Robinson's offices in Connecticut to Universitas and Loeb & Loeb's offices, both of which were in New York. (Ex. 24 (providing address for Loeb and Universitas); (Ex. 29 (providing address for Robinson).) The object of the scheme to defalcate and conceal the taking of the proceeds were the insurance proceeds themselves, which are money. As such, there exists no genuine dispute that the CCN was involved in a scheme to defraud, either the insurance companies or Universitas, with the

requisite intent to do so; that the misrepresentations made by the CCN were material; that the object of the schemes were money, property, or another protected right; or that electronic wires were used and crossed state lines in furtherance of the scheme. As such, there exists no genuine dispute that the CCN, or members thereof, committed wire fraud.

> ii.   *Robinson himself committed multiple counts of Mail Fraud in its scheme to conceal the defalcation of the Spencer proceeds by the CCN.*

The crime of mail fraud under 18 U.S.C. § 1341 (2024) has three elements: "(1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the use of interstate mail . . . communications in furtherance of that scheme." *United States v. Soto*, 799 F.3d 68, 92 (1st Cir. 2015) (quoting *United States v. Hebshie*, 549 F.3d 30, 35 (1st Cir. 2008)). The analytical framework for the first two elements is identical to that of wire fraud, explained in Argument Sec. B.2.i, *supra*. Mail and wire fraud differ only in the instrumentality of interstate commerce employed by the accused. For mail fraud, the mailing element has two parts: first, the accused must "cause the use of mails, which includes reasonably foreseeable mailing, and second, the accused must "use the mails for the purpose, or in furtherance, of executing the scheme to defraud." *Soto*, 799 F.3d at 92 (internal quotation omitted). Similar to wire fraud, the mailing need not be done by the accused himself; it is only necessary to prove that the accused "caused the mailing by doing some act from which it is reasonably foreseeable that the mails would be used." *Id.* (quoting *United States v. Pimental*, 380 F.3d 575, 584 (1st Cir. 2004) (internal quotations omitted). As long as there exists a relationship or connection between the mailing and the fraudulent scheme, and the mailing was "part of the execution of the scheme," the mailing is "in furtherance" of the scheme. *Hebshie*, 549 F.3d at 36.

Here, the scheme to defraud alleged is the exact same as the scheme alleged in Argument Sec. B.2.i, *supra*, namely the scheme to defraud the insurance carriers and the scheme to defraud Universitas. The undisputed material facts make clear that no genuine dispute can exist that the information sent through the mails by Robinson was material, as it had the a "a natural tendency to influence . . . the decisions[]" *DiRosa*, 761 F.3d at 151, of Universitas. First, Robinson communicated that the twenty percent holdback position was in effect in separate letters, (Exs. 15 & 42), which was materially false because the provision was never included until after Spencer's death. This misrepresentation was material because it could have induced Universitas to make a decision to accept less than the total death benefit they were owed, and it did induce Universitas to accept a lower judgment from the Arbitrator, as described *supra.* In addition, Robinson authored a letter denying Universitas' claim alleging that GMC had a competing claim to the proceeds, and that Spencer had authorized a settlement in which Universitas would only get $1.8 million. (Ex. 24.) The undisputed facts make clear that no such agreement ever existed and that the allegation in the letter was completely false. (*See* Ex. 23, 2505:16-2506:12.)

The first letter denying the benefit based on the twenty-percent holdback provision and the Robinson letter purporting to deny Universitas's claim based on the competing "claim" of GMC explicitly state that they were sent via Federal Express, and they crossed state lines because they originated in Connecticut and went to New York. (Ex. 24 & 25). Letters sent across state lines by Federal Express satisfy the mailing requirement. *See United States v. Chua*, 16 F. App'x 737, 739 (9th Cir. 2001) (finding that Federal Express was an interstate carrier for purposes of mail fraud under § 1341). Additionally, the second letter sent by Robinson purporting to deny Universitas based on the holdback provision was sent by First Class Mail by the United States Post Office from Connecticut to New York. Thus, the undisputed facts support a finding on summary judgment

31

that Robinson committed mail fraud at least twice—a predicate crime that constitutes racketeering activity.

> iii. *Carpenter Committed Money Laundering by ordering others in the CCN to illegally move money.*

Under 18 U.S.C. § 1956(a)(1) (2024), it is a crime to launder money. The statute makes it a crime to "engage in a 'financial transaction' involving 'the proceeds of specified unlawful activity' with either the intent to 'promote the carrying on' of that activity, or to 'conceal or disguise' the proceeds of that activity. *United States v. Adorno-Molina*, 774 F.3d 116, 123 (1st Cir. 2014) (quoting § 1956(a)). Section 1956(c)(7) defines "specified unlawful activity" as a "any act or activity constituting an offense listed" as a predicate act of the RICO statute under 18 U.S.C. § 1961(1). Mail and wire fraud, which are violations of 18 U.S.C. § 1341 & 1343, respectively, are listed as predicate acts under § 1961(1).

A "financial transaction" is defined under § 1956(c)(4)(B) as, *inter alia*, "a transaction involving the use of a financial institution which is engaged in . . . interstate or foreign commerce in any way or degree." Pursuant to § 1956(c)(6), a financial institution is defined by 31 U.S.C. § 5312(a)(2) (2024) and includes banks—whether federally insured or commercial—and trust companies. If the transactions "of laundered funds . . . promot[ed] continued illegal activity or [were] essential to the completion of the scheme," then those transactions promoted the carrying on of the specified unlawful activity. *Carpenter*, 190 F. Supp. 3d at 300 (quoting *United States v. Thorn*, 317 F.3d 107, 133 (2d Cir. 2003)).

Here, the undisputed facts make clear that the Spencer Proceeds constitute the proceeds of a specified unlawful activity. The United States District Court for the District of Connecticut has already found that Carpenter committed multiple counts of money laundering beyond a reasonable doubt, which were obtained by unlawful wire fraud against the insurance carriers. *Carpenter*, 190

F. Supp. 3d. at 299-300; *see* Argument, Sec. b.2.i, *supra*. The Spencer policies' death benefits were the proceeds of the fraudulently obtained policies, and these proceeds were retained after more instances of mail and wire fraud against Universitas. *See* Argument, Sec. b.2.i-ii, *supra.* The undisputed facts also support a finding that numerous further "financial transactions" occurred when the Spencer Proceeds were wired from the COT bank account to the GMC bank account, and then distributed to various other bank accounts affiliated with CCN shell companies. (Ex. 58, at 1.)

It is also indisputable that Carpenter ordered and used the CCN and its members, including Robinson, to conceal these transactions and use them in furtherance of the CCN scheme. These transfers were made to prevent Universitas from being able to locate the fraudulently obtained proceeds, demonstrated by the pains that CCN members, including Robinson, went through to avoid producing bank records and other discovery. (Ex. 146.) The CCN then used these proceeds to not only pay back Ridgewood in an attempt to attain a new line of financing to pay for more policies, (Ex. 23, 2509:9-20); (Ex. 20); *Carpenter,* 190 F. Supp. 3d at 299-300, but also to use Avon Capital as a vessel through which to purchase more life insurance policies for resale on the secondary market from other insurance policy holding companies. (Order dated Nov. 2, 2017, No. 11-cv-01590 (S.D.N.Y.), Ex. 71 (noting continuing restraining orders against numerous insurance companies.) Thus, the undisputed material facts support a finding on summary judgment that all of the elements of money laundering were met, which constitutes predicate crimes and a finding of racketeering activity.

> iv.   *Carpenter Commanded the Commission of Illegal Monetary Transactions*

Under 18 U.S.C. § 1957(a) (2018) it is a crime to (1) "knowingly" (2) "engage in a monetary transaction" (3) in "property of a value greater than $10,000" (4) "that is also derived

from specified unlawful activity." *United States v. George*, 761 F.3d 42, 48 (1st Cir. 2014) (internal

citation omitted). Section 1957(f)(3) defines "specified unlawful activity" in the same way as §

1956, and this definition includes mail and wire fraud. *See George*, 761 F.3d at 48. Under § 1957,

a monetary transaction is defined as a "deposit, withdrawal, or exchange, in or affecting interstate

or foreign commerce of funds . . . by, through, or to a financial institution." § 1957(f)(1) (noting

that any transaction that would be a financial transaction under § 1956(c)(4)(B) is also a financial

transaction for the purposes of § 1957). "Criminally derived property" constitutes any property

derived from proceeds obtained from the commission of a criminal offense. § 1957(f)(2).[8]

Here, it is also indisputable that Carpenter ordered Bursey and others in the CCN to commit

illegal monetary transactions and was convicted for doing so. The United States District Court for

the District of Connecticut found that Carpenter had committed multiple violations of § 1957

through wire transfer transaction related to the purchase of a vacation home in Rhode Island using

the proceeds from the Spencer policies. *Carpenter*, 190 F. Supp. 3d at 300.  Carpenter ordered

Bursey to transfer money out of the COT account and into the GMC account, and from there, the

money was distributed among various CCN sham companies—culminating in the purchase of a

vacation home for Carpenter and his family. (*See e.g.*, 41, at 1-11; November 2013 Turnover

Decision.) As explained, *supra*, the Spencer Proceeds stolen from Universitas were the proceeds

of mail and wire fraud and the wires between banks were financial transactions. The undisputed

---

[8] There is a Circuit split as to whether the funds which are the proceeds of a criminal offense must
be traced if they are commingled with "clean" funds in order to satisfy the elements of illegal
monetary transactions under § 1957. *Carpenter*, 190 F. Supp. 3d at 300. No such requirement exists
to prove a violation under § 1956. The First Circuit has found that when there is overwhelming
evidence in the record that only criminally derived proceeds were used to make purchases, there
is no need to determine if legitimately acquired funds were comingled with the criminally derived
property. *See United States v. Rivera-Izquierdo*, 850 F.3d 38, 48 (1st Cir. 2017).  This is the case
here, as no legitimately acquired funds were ever present in the bank accounts at issue—only funds
fraudulently obtained from Universitas.

facts prove that the wire transfers, including the $19.8 million transfer from COT bank accounts to GMC bank accounts, were all greater than $10,000 and therefore rise above the statutory threshold for a violation of § 1957. Finally, Carpenter knew that the Spencer Proceeds were a proceed of frauds directed by him, and that the monetary transactions were undertaken with those proceeds. Thus, the undisputed facts support a finding that illegal monetary transaction was committed and further demonstrate a pattern of racketeering activity.

### 3. The Undisputed Material Facts Prove that the CCN enterprise and its members engaged in a pattern of continuous racketeering activity.

To demonstrate the existence of a "pattern" of racketeering activity, a plaintiff must show two predicate acts of racketeering activity. *E.g. Massaro*, 192 F. Supp. 3d at 268. Here, the undisputed facts prove that various members of the CCN enterprise, including Robinson, committed at least three different predicate acts of racketeering activity, and that some of these predicate acts were committed numerous times

The undisputed facts also support a finding on summary judgment that these predicate acts are "related, and that they amount to or pose a threat of continued criminal activity," or, in other words, that the pattern is continuous. *Id*. Universitas proves the continuity requirement under the "closed" approach, by demonstrating that the CCN enterprise engaged in a "closed period of repeated conduct that amounted to . . . continued criminal activity." *Home Orthopedics* 781 F.3d at 528. Specifically, Universitas proves that between 2006 and 2012, the CCN enterprise engaged in multiple predicate acts of racketeering activity in furtherance of a scheme to defraud insurance companies into providing STOLI policies, and then, after receiving the death benefit from one such policy, used money laundering, illegal money transactions, and wire fraud to conceal the location of the proceeds. *See* Argument, Sec. b.2.i, *supra*. The District Court for the District of Connecticut found that Carpenter alone was guilty of over twenty individual RICO crimes. *See*

*Carpenter*, 190 F. Supp. 3d 260. Thus, the undisputed facts demonstrate that the CCN enterprise repeatedly engaged in conduct constituting continuous criminal and racketeering activity.

4. **There is no genuine dispute that the CCN enterprise's and Robinson's RICO violations caused Universitas' harm.**

Finally, there exists no genuine dispute that the criminal activity of the CCN resulted in damages of at least $30,677,276.85 million to Universitas. The undisputed facts also show that Robinson was a member of the enterprise and liable for its criminal activity pursuant to 18 U.S.C. § 1962(c) If the CCN enterprise, and members thereof, had not committed fraud, money laundering, and illegal money transactions, Universitas would have received the death benefit from the Spencer policies to which it was entitled. The undisputed facts prove a coordinated campaign of fraud attempting to improperly deny Universitas' claims to the death benefits, as well as illegally launder and conceal the Spencer Proceeds, which ultimately caused Universitas harm by depriving them of those Spencer Proceeds. As such, Universitas has proved under the summary judgment standard that Robinson violated RICO, that Universitas incurred actual damages in the amount of $30,677,276.85 million because Robinson's violations of RICO as part of the CCN enterprise, and is entitled to treble damages of $92,031,830.55 under the statute. 18 U.S.C. § 1964(c).

C. **Summary Judgment is Appropriate on the Breach of Fiduciary Duty Claim because there is no Genuine Issue of Material Fact that Defendant Robinson had a Fiduciary Relationship with Universitas and that he Breached his Duty under that Relationship.**

Under New York law, the elements of a cause of action to recover damages for a breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct. *Baldeo v. Majeed*, 150 A.D.3d 942, 945 (N.Y. App. Div. 2017) (citing *Deblinger v Sani-Pine Prods. Co., Inc.*, 107 A.D.3d 659, 660 (N.Y. App. Div. 2013)).

36

While Courts often look to a statute or contractual relationship to determine whether the fiduciary relationship exists, a fiduciary relationship also "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *EBC I, Inc. v. Goldman Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005) (quoting Restatement (Second) of Torts § 874, Comment a) (finding that a breach of fiduciary duty claim survived summary judgment where an advisory relationship independent of an underwriting agreement created a relationship of higher trust than that created in the agreement alone). While courts "should not ordinarily transport [parties] to the higher realm of relationship and fashion the stricter duty for them," *Northeast Gen. Corp. v. Wellington Adv.*, 624 N.E.2d 129, 131 (N.Y. 1993), liability can still be found in the absence of a contractual relation between a fiduciary and a beneficiary. *EBC I*, 832 N.E.2d at 31. This is a fact-intensive inquiry.

Certain types of relationships automatically give rise to a fiduciary duty. One such relationship is that between a trustee and a beneficiary of a trust. *Milea v. Hugunin*, 890 N.Y.S. 2d 369 (N.Y. Sup. Ct. Jun. 1, 2009) ("A trustee is under a duty to the beneficiary to administer the trust solely to the interest of the beneficiary, and cannot compete with the beneficiaries for the benefits of the trust corpus.") (citing *In re Wallens*, 877 N.E.2d 960, 962 (N.Y. 2007)). A trustee has a duty of undivided loyalty, which prevents the trustee from "even placing himself in a position of potential conflict with his or her duty to the trust." *Milea*, 890 N.Y.S.2d at 369 (citing *Sankel v. Spector*, 33A.D.3d 167, 171-72 (N.Y. App. Div. 2006)). Indeed, all trustees are prohibited from self-dealing or favoring one beneficiary over another, and they owe an undivided duty of loyalty to beneficiaries. *Id.* (citing *Flaum v. Birnbaum*, 120 A.D.2d 183, 196 (N.Y. App. Div. 1986)).

It is "elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect. *Birnbaum v. Birnbaum*, 539 N.E.2d 574, 576 (N.Y.

1989). "This rule is sensitive and inflexible," *Milea*, 890 N.Y.S. 2d 369 (quoting *Birnbaum*, 539 N.E.2d at 576), and not only bars self-dealing, but also requires a fiduciary not to allow his or her own personal interests to conflict with the interests of those to whom he or she owes a fiduciary duty. *Id.*

To show damages, a plaintiff must establish that the defendant's "misconduct [was] the direct and proximate cause of the losses claimed." *Northbay Const. Co., Inc. v. Bauco Constr. Corp.* 38 A.D.3d 737, 738 (N.Y. App. Div. 2007). Where a breach of fiduciary duty extends beyond mere negligence and involves self-dealing with the trust's property, compensatory damages are appropriate. *See In re Estate of Rothko*, 372 N.E.2d 291, 297-99 (N.Y. 1977) (finding that it was appropriate to take appreciation of trust property after improper sale into accounting of damages where fiduciary's misconduct consisted of deliberate self-dealing with trust property).

### 1. The indisputable facts prove that Robinson owed Universitas a fiduciary duty.

In the present case, there is no genuine dispute that Defendant Robinson owed Plaintiff Universitas a fiduciary duty. New York courts have explicitly held that a trustee owes duty to beneficiary of trust. *E.g. Milea*, 890 N.Y.S. 2d 369. Nova was the trustee of COT at all relevant times. (Ex. 49 ¶ 3.) Universitas was beneficiary of COT, and, pursuant to Sash Spencer's explicit instruction, was to be the sole, irrevocable beneficiary of the insurance proceeds from the policies on his life. (Ex. 16.) Nova routinely acknowledged that it had fiduciary duty to Universitas. (*See e.g.*, Ex. 18, at ("We have a fiduciary responsibility and legal obligation to carry out Mr. Spencer's wishes as he intended in a timely fashion to pay those death proceeds to a charity that he established prior to his death.").) Robinson was, at various times, Vice-President of Nova, (Ex. 25) and Assistant Secretary for Nova (Ex. 12). Robinson also served as Nova's corporate representative throughout the Arbitration between Universitas and Nova, (Ex. 47 at 3), and in that capacity, he

not only submitted a declaration on behalf of Nova alleging knowledge of COT's finances, (Ex. 50), but also testified on behalf of Nova in the arbitration. (Ex. 4.) Robinson was subsequently found in contempt for Nova's noncompliance with court-ordered discovery because the court found that "[t]he evidence demonstrates that Mr. Robinson also functioned as a corporate officer of Nova Group such that he can be held responsible for [Nova's] conduct." *Universitas Educ., LLC*, 2013 U.S. Dist. LEXIS 99957 at *29-*30. Taken together, Robinson's intimate association with Nova, means that he was effectively acting as an officer, agent and representative of the Trustee of the COT. None of these facts can be genuinely disputed, especially considering that Robinson held himself out as the representative of Nova on so many occasions. Ultimately, Robinson's position as an officer and agent of Nova also imparted upon him a fiduciary duty to Universitas. *See, e.g.*, *Jenkins v. Macatawa Bank Corp.*, Nos. 1:03-CV-321, 1:05-CV-460, 1:05-CV-499, 2006 U.S. Dist. LEXIS 81658, 2006 WL 3253305 at *11 (W.D. Mich. Nov. 9, 2006) ("[defendant] was a fiduciary in his capacity as a trust officer . . ."); *Jo Ann Howard & Assocs., P.C. v. Cassity*, No. 4:09CV01252 ERW, 2014 U.S. Dist. LEXIS 178072, at *32 (E.D. Mo. Dec. 29, 2014) (finding that under a fact intensive inquiry, it was possible to impute a fiduciary duty onto a trust officer).

Moreover, there can be no dispute that the relationship between Robinson and Universitas gave rise to a fiduciary duty independent of the duty conferred upon Robinson by virtue of his position as an officer and agent of Nova. New York courts have held that a fiduciary duty can exist "between two [parties] when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *EBC I*, 832 N.E.2d at 31. As a general counsel and an officer of Nova, the Trustee of the COT, Robinson had a duty to act for and provide information and advice to Universitas, the COT's beneficiary, on matters within the scope of their

relationship, specifically the payout of the Spencer Policies. In *ECBI I*, the New York Court of Appeals found that parties that entered into an advisory relationship with each other separate from a regular commercial contract could have a duty to each other. *Id.* Here, Robinson undertook an affirmative advisory role to Universitas by being the point of contact for Universitas and its counsel in Universitas's efforts to collect the proceeds of the Spencer Policies. This relationship between Robinson and Universitas was far more involved than the advisory relationship in *ECBI I* and was predicated on a Trustee-Beneficiary relationship instead of a simple commercial contract. There can be no genuine dispute that Robinson took on this role, and that, as a representative of the Trustee, Robinson had a duty to provide honest information to Universitas and act on Universitas' behalf. As such, the undisputed facts prove that Robinson owed Universitas a fiduciary duty.

2. **There exists no genuine dispute that Robinson engaged in misconduct by self-dealing and aiding Nova in their efforts to improperly deny the Spencer insurance proceeds to Universitas.**

Robinson was intimately involved in Nova's improper denial of Universitas' claim. (Ex. 37, 964:11-965:20.) Robinson created the finalized version of COT document in January 2007, and distributed the document to relevant persons, including Carpenter and Bursey, throughout the CCN. (Ex. 4, 499:9-17, 519:16-520:3; Chernow Decl., Ex. 23, 2495:24-2500:22.) The indisputable facts show that Robinson, with the aid of other members of the CCN, altered the original COT agreement to include the twenty-percent holdback provision in Section 6.01. (Ex. 23, 2495:5-2496:17.) He then claimed in his correspondence to Universitas that this provision had existed since before Spencer's death, and that the provision was in effect in the Spencer Policies, (*see* Ex. 31 ("We flatly reject you letter's rendition of the facts [asserting that the twenty percent holdback provision was not included in the COT Declaration of Trust when Mr. Spencer joined COT].")) and designated inquiries regarding the provision to be threats of litigation warranting

termination from COT. (Ex. 31 (Robinson designating letter a threat of litigation).) Robinson falsely testified at the arbitration that the twenty-percent holdback provision was included in the COT document attached to his January 2007 email. (Ex. 4, 536:23-537:13, 541:22-524:4, 588:3-20; Ex. 37, 1065:4-20, 1185:19-23.) In reality, Robinson added the twenty-percent holdback provision after the death of Spencer and was on an email chain that was altered for discovery purposes to conceal the date of the change. (Ex. 23, 2495:5-2496:17.) These indisputable facts show that Robinson lied about the twenty-percent holdback provision being a part of the COT agreement. A fiduciary owes an "undivided and undiluted duty of loyalty" to those whose interests the fiduciary protects. *Birnbaum*, 539 N.E.2d at 576. This "inflexible" duty prohibits a fiduciary from engaging in self-dealing or putting his own interests ahead of those to whom the fiduciary has a duty. *Milea*, 890 N.Y.S. 2d 369. Ultimately, Robinson's fraudulent claims regarding the applicability of the twenty-percent holdback provision were self-serving, as they were intended to conceal the theft of the proceeds and help Nova, the Trustee of the Charter Oak Trust, improperly retain the Spencer Proceeds rightfully owed to Universitas

Moreover, Robinson wrote numerous letters to Universitas on behalf of BASI, Nova, and Nova Benefit Plans, LLC, alleging a variety of false and improper reasons for the denial of Universitas' claim to the Spencer death benefits. The entirety of the Spencer Proceeds was defalcated from COT's account on October 27, 2009, (Ex. 60), yet Nova and/or COT did not reject Universitas' claim until February 9, 2010. (Ex. 46.) Given that the proceeds at issue were disbursed elsewhere, Nova and/or COT clearly did not give Universitas' appeal good faith consideration. Robinson nonetheless later sought to justify the bases for the rejection of Universitas' appeal. (Ex. 72.) For instance, Robinson alleged that the claim had to be denied for lack of a proper claims form, despite nobody from COT or any of its affiliates ever informing Universitas it was required

to submit a claim form or provided Universitas with a claim form. (Ex. 4 453:6-16.) Robinson's arbitration testimony that claims forms were needed, (Ex. 4, 680:20-683:23; Ex. 37, 1101:2-1102:18, 1108:17-1109:16), was flatly rejected and found to be untrue by the Arbitrator, (Ex. 53 at 5). Robinson also alleged that Universitas' claim was superseded by a confidential agreement between Spencer and GMC, (Ex. 34 at 4-5), which was not only false but constituted a basis for obstruction of justice when repeated by Carpenter. (Ex. 21 at 64.)

Robinson further authored a letter saying that the Universitas' claim was denied because of the settlement agreement between Universitas and Mary Spencer. (Ex. 35), despite the fact that Robinson had previously edited and approved this same settlement agreement and found no problems with its provisions. (Ex. 28.) The arbitrator found that the termination of the settlement agreement was completely valid and that Robinson's allegation that the termination was fabricated to be improper. (Ex. 53.)

The undisputed facts prove that Robinson took all of the aforementioned actions. The inescapable conclusion is that Robinson took all of these action in an attempt to aid Nova, which had a fiduciary duty to Universitas, in improperly denying Universitas the Spencer Proceeds. Again, there exists no genuine dispute that it was in Robinson's personal interest for Nova to deny the benefits to Universitas, and to instead take the money for itself, pay Robinson and use the rest of the proceeds in furtherance of the Carpenter criminal network's attempts to make money on the secondary insurance market. Therefore, Robinson breached his fiduciary duty to Universitas.

**3. The undisputed facts show that Universitas was proximately injured by Robinson's breach of fiduciary duty and that compensatory damages are appropriate.**

If Robinson had not breached his fiduciary duty to Universitas and took steps to improperly deny Universitas the Spencer insurance proceeds, Universitas would have received the proceeds, or at least learned of their defalcation at a much earlier stage—particularly in light of the fact that

Robinson's letter-writing campaign spanned a course of nearly a year and a half. Instead, Robinson's numerous actions in breach of his fiduciary duty caused Universitas to lose the $30 million rightfully owed to them, as well as to expend millions of dollars in legal fees and costs in an attempt to recover the proceeds. When a fiduciary's conduct is found to consist of deliberate self-dealing and faithless transfers of trust property, *Rothko*, 372 N.E.2d at 297-98, compensatory damages are appropriate. Here, such deliberate self-dealing and faithless transfer of trust property is indisputable, particularly in light of the fact that the Carpenter criminal network compensated Robinson with at least $770,000 that was directly tied to the stolen Spencer Proceeds. (Exs. 58-69.) As such, Robinson remains liable for the entire injury to Universitas, and an entry of judgment against him for the entire value of the Spencer policies' death benefit, as confirmed by the Southern District of New York, in the amount of $30,677,276.85, is appropriate.

**D. Summary Judgment in Favor of the Plaintiffs is Appropriate on the Aiding and Abetting Breach of Fiduciary Duty Claim Because there is No Genuine Issue of Material Fact that Defendant Aided Wayne Bursey and Nova in Breaching their Fiduciary Duty to Universitas.**

To prove a claim for aiding and abetting a breach of fiduciary duty, a plaintiff is required to prove (1) "a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Katz v. Beil*, 142 A.D.3d 957, 963 (N.Y. App. Div. 2016) (quoting *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (N.Y. App. Div. 2003)) (internal quotations omitted). The standard for proving the first element, a breach of fiduciary duty, is the same as that described in Argument Sec. C.1., *supra*.

As to the second element, a plaintiff is not required to allege that the person aiding and abetting the breach of fiduciary duty had an intent to harm. *Kaufman*, 307 A.D.2d at 125. However, a plaintiff must show that the defendant aider or abettor had actual knowledge of the breach. *See*

43

*id.* Constructive knowledge is legally insufficient to impose aiding and abetting liability. *Id.* (citing *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996), *aff'd* 152 F.3d 918 (2d Cir. 1998)). Knowingly participating in a breach of fiduciary duty requires that a person provide "substantial assistance" to the primary violator. *Id.* at 126 (citing *DePinto v Ashley Scott, Inc.*, 222 A.D.2d 288, 290 (N.Y. App. Div. 1995)). "Substantial assistance occurs where a defendant affirmatively assists, helps conceal" or fails to act when required to do so, thereby enabling the breach to occur. *Kolbeck*, 939 F. Supp. at 247. Mere inaction by a defendant constitutes substantial assistance "only if the defendant owes a fiduciary duty directly to the plaintiff." *Id.*

A plaintiff must prove that it suffered damage as a result of the breach of fiduciary duty. As described, in Argument Sec. C.3, *supra*, the damages must be directly and proximately caused by the breach of fiduciary duty. Money damages are an appropriate remedy for aiding and abetting a breach of fiduciary duty. *Torrance Constr., Inc. v. Jacques*, 127 A.D.3d 1261, 1265-66 (N.Y. App. Div. 2015).

1. **There is no genuine dispute of material fact that Nova breached its fiduciary duty to Universitas.**

The undisputed facts prove that Nova was the Trustee of the COT and Universitas was the irrevocable beneficiary of the COT. Because of the trustee-beneficiary relationship between Nova and Universitas, Nova was "under a duty to the beneficiary to administer the trust solely to the interest of the beneficiary," and could not "compete with the beneficiaries for the benefits of the trust corpus." *Milea*, 890 N.Y.S. 2d 369. Nova, at the direction of Carpenter, removed the Spencer Proceeds from the COT and transferred them to other Carpenter-controlled shell companies, instead of giving those proceeds to Universitas. This action was a breach of Nova's duty to administer the trust solely to the interest of the beneficiary, and this transaction indisputably benefitted Nova, Bursey (as the main officer of Nova), and the rest of the Carpenter criminal

network. The United States District Court for the Southern District of New York found that Nova's improper use of Universitas' money was also a distinct breach of fiduciary duty. *See Universitas Educ. LLC*, 2013 U.S. Dist. LEXIS 165803 at *32-*33. The undisputed facts demonstrate that Nova, through Bursey, coordinated with Robinson to provide Universitas with frivolous and entirely false pretenses for the denial of the Spencer proceeds, described in detail in Argument Sec. C.2, *supra*. This self-serving denial of Universitas' claim similarly constituted a breach of fiduciary duty by Bursey. (Ex. 53 at 2-3.)

2. **Robinson knowingly participated in the breach of fiduciary duty by Bursey and Nova by offering substantial assistance to Bursey and Nova to conceal the theft of the insurance proceeds.**

Robinson authored the final version of the COT document in January 2007, (Ex. 4, 499:9-17, 519:16-520:3; Ex. 23, 2495:24-2500:22,) and thus had actual knowledge that the document did not contain a twenty-percent holdback provision. He nonetheless repeatedly claimed throughout his letters that the provision was valid, (*see e.g.* Ex. 25), and testified at the arbitration that the provision was valid and included in the January 2007 version of the COT document. (Ex. 4, 536:23-537:13, 541:22-524:4, 588:3-20; Ex. 37, 1065:4-20, 1185:19-23.) Because Robinson knew that this provision was not applicable to the Spencer proceeds, Robinson had knowledge that using this provision as a pretext to deny Universitas the Spencer proceeds was a breach of fiduciary duty by Bursey and Nova. The action to rewrite the COT agreement and cite it in his correspondence to Universitas was indisputably affirmatively taken by Robinson, and it assisted Bursey and Nova's breaches of fiduciary duty by providing a reason to deny Universitas the Spencer proceeds to conceal that they had already been removed from the COT by Bursey.

Moreover, Robinson did not take action to prevent Bursey and Nova's breaches of fiduciary duty. Inaction can only constitute "substantial assistance" if the party failing to act owes a duty to

45

the plaintiff. *Kaufman*, 307 A.D.2d at 126. Here, Robinson indisputably owed a fiduciary duty to Universitas, as described in detail *supra*, Argument Sec. C.1. Robinson was thus required to take action to either stop Bursey and Nova's breach of fiduciary duty, or to inform Universitas that a breach had occurred and that the Spencer Proceeds rightfully owed to Universitas had been removed from the COT. Robinson, however, failed to act when required to do so, thereby providing substantial assistance that enabled the breach to occur. *See Kolbeck*, 939 F. Supp. at 247.

Robinson also provided "substantial assistance" to Bursey and Nova's breach of fiduciary duty by affirmatively helping to conceal Nova's breach of its fiduciary duty. Robinson repeatedly provided dishonest and demonstrably false testimony throughout the arbitration in an effort to conceal and justify Nova's wrongful actions and breach of fiduciary duty. (*See, e.g.*, Ex. 4, 752:11-756:05.) Robinson also submitted a declaration on Nova's behalf in the arbitration stating, *inter alia*, that Nova had the ability to satisfy a $30 million judgment. (Ex. 50.) Robinson later acknowledged in sworn testimony he did not have the proper knowledge to make the determination as to Nova's ability to satisfy a judgment. (Ex. 54, 164:11-165:24, 176:5-177:25, 240:19-242:22, 288:4-20.) The purpose of this declaration was to prevent subsequent actions that would reveal Nova's improper use of Universitas' money by assuaging the arbitrator's fears that the money had already been removed. (Ex. 50 ¶ 2.) Robinson additionally informed Nova's outside counsel in the arbitration that the outside counsel would never learn the location of the Spencer proceeds and that outside counsel should make no further inquiries regarding the location of the proceeds. (Ex. 6, 72:16-78:25, 97:3-98:25, 243:2-16, 297:6-21.) He did this to preclude the possibility that the attorney could not reveal the location of the Spencer death benefits. (Ex. 52, 243:2-16.) The undisputed facts demonstrate that Robinson knew of the breach of the fiduciary duty, took all of these affirmative actions, and that these actions all had the purpose and effect of concealing the

breach of fiduciary duty by Bursey and Nova. Therefore, these actions also provided "substantial assistance" to Bursey and Nova's breach of fiduciary duty.

### 3. The undisputed facts demonstrate that the breach of fiduciary duty by Bursey and Nova proximately caused Universitas injury.

If Bursey and Nova—with the aid of Robinson—had not breached their fiduciary duty to Universitas and took steps to improperly deny Universitas the Spencer insurance proceeds, Universitas would have received the proceeds, or at least learned of their defalcation at a much earlier stage. The damages Universitas suffered—specifically the denial of money rightfully owed to it and the attorneys' fees and expenses it has expended trying to recover that money—were reasonably foreseeable by Bursey, Nova, and Robinson when they took steps to wrongfully deny Universitas the proceeds and conceal the theft of those proceeds. Thus, the undisputed facts support a finding on summary judgment that Universitas suffered damages in the amount of at least $30,677,276.85, the amount owed to it by COT, and an entry of judgment against Robinson for that amount is appropriate for his role in aiding Bursey and Nova in their breach of duty is proper.

### E. Robinson is Liable for Negligent Misrepresentation and Opinion because the Undisputed Material Facts Prove that Robinson Imparted Incorrect Information to Universitas and that Universitas Reasonably Relied on the Incorrect Information, Leading to Damages.

To prove a claim for negligent misrepresentation or opinion, the plaintiff must prove "(1) the existence of a special or privity-like relationship imposing a duty on defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *J.A.O. Acquisition Corp. v. Stavitsky*, 863 N.E.2d 585, 587 (N.Y. 2007) (citing *Murphy v. Kuhn*, 682 N.E.2d 972, 974 (N.Y. 1997)); *see also Crossland Sav. FSB v. Rockwood Ins. Co*., 700 F. Supp. 1274, 1280-83 (S.D.N.Y. 1988) (collapsing the analysis for negligent misrepresentation and negligent opinion into a single inquiry).

"[L]iability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*, 958 N.E.2d 77, 84 (N.Y. 2011) (quoting *Kimmell v. Schaefer*, 675 N.E.2d 450, 453 (N.Y. 1996)). Courts have found that "professionals, such as lawyers and engineers," may have a special relationship of trust and confidence with their clients by virtue of their expertise that requires them to speak with care. *Murphy*, 682 N.E. at 974 (quoting *Kimmell*, 675 N.E.2d at 454). However, even in the absence of an obligation by the speaker arising from their professional status, liability for negligent misrepresentation may still be imposed if there exits an "identifiable source of a special duty of care." *Id.* (quoting *Kimmell*, 675 N.E.2d at 454). The existence of such a special relationship may give rise to an "exceptional duty regarding commercial speech and justifiable reliance on such speech." *Kimmell*, 675 N.E. 2d at 454. Whether or not the relationship rises to this level and permits recovery for the justifiable reliance of a negligent misrepresentation is an issue of fact. *Id.* To determine whether justifiable reliance exists, courts should examine "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Id.*

Courts in New York have recognized special relationships in commercial controversies that involved no "generally recognized professional relationship. *See Kimmell*, 675 N.E.2d at 454-55 (finding that a defendant, who was the chief financial officer and chairman of the corporation, and who induced plaintiffs into joining a joint venture by representing that he had expertise and information regarding the venture, could be held liable for negligent misrepresentation despite the

lack of a recognized special relationship). *But see Greenberg*, 958 N.E.2d at 84-86 (finding no special relationship between a defendant bank and a plaintiff depositor because there was no special relationship and the bank only had a duty to act with ordinary care).

In rare instances, the issue of reasonable reliance can be resolved at the stage of summary judgment. *Global Mins. & Metal Corp. v. Holmes*, 35. A.D.3d 93, 99 (N.Y. App. Div. 2006); *see also Stavitsky* 863 N.E.2d at 587 (finding no reasonable reliance as a matter of law in a stock purchase because the plaintiff conducted its own due diligence). The reasonableness of a party's reliance is measured in the context of circumstances. *Gomez-Jimenez v. New York Law School*, 2012 N.Y. Misc. LEXIS 1225, at *49 (N.Y. S. Ct. Mar. 21, 2012). When a party to whom a misrepresentation detects "hints of falsity," New York law requires the party undertake a heightened degree of diligence and to conduct additional inquiry. *Id.* If it fails to do so, then the reliance cannot be reasonable. *Id.* (citing *Keywell Corp. v Weinstein*, 33 F3d 159, 164 (2d Cir. 1994)). Similarly, if the plaintiff has the "means to discover the true nature of a transaction by the exercise of ordinary intelligence" and fails to do so, the plaintiff's reliance cannot be reasonable. *Arfa v. Zamir*, 76 A.D.3d 56, 59 (N.Y. App. Div. 2010), *aff'd* 952 N.E.2d 1003 (N.Y. 2011).

1. **There exists no genuine dispute of material facts that Robinson had a special relationship with Universitas.**

As detailed extensively, *supra*, Robinson possessed a fiduciary relationship with Universitas because Robinson was an agent and officer of Nova, the trustee of the COT, of which Universitas was the beneficiary. Argument Sec. C.1. Even absent a clear fiduciary duty, Robinson had a special relationship with Universitas because he held himself out to be the point of contact for Nova and for resolving issues related to the payment of the Spencer proceeds. (Ex. 39.) Robinson made clear that he was a lawyer, which means that he possessed "unique or specialized expertise." *Murphy*, 682 N.E. at 974. Robinson also placed indisputably himself in a special

position of confidence with Universitas because he communicated with Universitas on behalf of Nova, which had a duty to administer the trust in the best interests of Universitas. Thus, the undisputed facts make clear that in addition to a fiduciary duty, Robinson also had a special relationship to Universitas under *Kimmell* because of his expertise, his relationship of confidence with Universitas, and the fact that he knew how Universitas would use his statements, such as his false arbitration declaration that Nova could satisfy a judgment against it. *See* 675 N.E. 2d at 454.

2. **There is no genuine dispute of material fact that the statement and/or opinion that Nova could satisfy a judgment was incorrect and negligently made because when Robinson made the statement, Nova had literally no assets, and Robinson never actually examined COT's or Nova's assets.**

Robinson stated in his declaration that he was familiar with COT's "operations, assets, liabilities and financial condition . . . ." (Ex. 50 ¶ 2.) In a sworn deposition, Robinson later admitted that he lied about his familiarity with COT, and that he actually possessed no knowledge of COT's assets, liabilities, and financial condition when he submitted this declaration. (Ex. 54, 164:11-165:24, 176:5-177:25, 240:19-242:22, 288:4-20.) Robinson stated that the COT had the ability to satisfy a judgment of $30 million. (Ex. 50 ¶ 2.) There is no dispute that this information was patently incorrect, as COT had disbursed all of the Spencer death benefits prior to Robinson submitting his declaration, (*see* Ex. 22, 36:12-23), closed its bank account on June 9, 2010, (Ex. 51), and had no assets to pay the judgement when Robinson submitted his declaration in November of 2010. Nova likewise closed its bank account on June 9, 2010, (Ex. 51), and had no assets to pay the judgement when Robinson submitted his declaration. Robinson later claimed that COT could satisfy this judgement by borrowing against the policies acquired through the Ridgewood deal. (Ex. 54, 147:9-151:22.) This statement was also patently incorrect, as Ridgewood foreclosed on September 30, 2010 and took all the policies it financed from COT. (Ex. 10.) Thus, these policies were no longer in COT, Nova, or GMC's possession, and could not be borrowed against to satisfy

any judgment. Robinson knew this, as he received the default notice, (Letter from Shmuel Vasser dated July 27, 2010, Re: Second Notice of Default, Ex. 73), and he negotiated the settlement with Ridgewood. As such, the undisputed facts prove that the representations and opinions made in Robinson's declaration and his letters were clearly incorrect.

3. **There can be no genuine dispute that Universitas reasonably relied on the statements in the Robinson's declaration.**

Here, it is appropriate to find that reasonable reliance can be found on summary judgment because there exists ample evidence to show that there is no genuine dispute that Universitas justifiably relied to its detriment on Robinson's negligent misrepresentations. Universitas took no action to protect itself because it believed, as did the Arbitrator, that COT and Nova could satisfy any arbitration judgment rendered against it in favor of Universitas. As such, Universitas pursued the Arbitration to the end, then confirmed the award in the District Court for the Southern District of New York, all because they believed that upon receiving and confirming judgments against Nova and COT, that those judgments could be satisfied. Had Universitas, or the Arbitrator, been apprised of the fact that all the Spencer Proceeds had already been defalcated, both could have acted accordingly to protect their interests. Universitas engaged in all possible diligence it could to confirm the veracity of the statements made by Robinson, including issuing multiple subpoenas to TD Bank. Notwithstanding its diligence, Universitas did not find out that the Spencer proceeds had been taken out of COT until 2012. Notably, as described in Argument Section C, *supra*, Robinson and the rest of the Carpenter criminal network went to great lengths to prevent Universitas from discovering that Robinson's statements were incorrect and that the money was long gone. The Arbitrator relied upon the information in Robinson's declaration in its denial of Universitas' request for a preliminary injunction. (Order dated Nov. 24, 2010, AAA 13-195-Y-001-558-10, Ex. 74 ¶ 2.) Consequently, Universitas' was precluded from taking further action to

determine whether COT and Nova had the ability to satisfy a judgment. Therefore, it is indisputable that Universitas—as well as the Arbitrator—reasonably relied on Robinson's negligent misrepresentations regarding Nova's and COT's ability to satisfy a judgment, (*See* Siebert Aff., ¶ 14, September 4, 2019,) and they were damaged in the amount of $30,677,276.85 as a result of that reliance.

### F.   Defendant is Liable to Universitas for Unjust Enrichment because there is No Genuine Dispute of Material Fact that Defendant was Inequitably Enriched at Universitas' Expense.

Unjust enrichment permits a plaintiff to recover from a defendant in cases in which the defendant has unfairly benefitted from the plaintiff's efforts without compensation. To prove a claim of unjust enrichment under New York law, a plaintiff must prove that "(1) the [defendant] was enriched, (2) at [the plaintiff]'s expense, and (3) that it is against equity and good conscience to permit the [defendant] to retain what is sought to be recovered. *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (quoting *Citibank, N.A. v. Walker*, 12 A.D.3d 480, 481 (N.Y. App. Div. 2004)) (internal quotations omitted). Ultimately, "[t]he essential inquiry in any action for unjust enrichment . . . is whether" the third element has been met. *Id.*

A successful unjust enrichment claim does not require privity between parties, but a claim will fail if the relationship between parties is "too attenuated." *Id.* (citing *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007) (finding that the "connection between the purchaser of tires and the producers of the chemicals used in the rubber-making process is simply too attenuated to support [a claim for unjust enrichment]")). A plaintiff must prove a relationship between the parties, or at least an awareness "by the defendant of the plaintiff's existence." *Wildenstein*, 944 N.E.2d at 1111. This awareness requires more than mere knowledge of the plaintiff's existence. *See Georgia Malone Co., Inc. v. Rieder*, 973 N.E.2d 743, 747-48 (N.Y. 2012) (finding that a

relationship between two parties was too attenuated to support a claim for unjust enrichment because the parties had no dealings with each other). Moreover, this relationship must be such that a plaintiff could reasonably rely on or be induced by the information provided by the defendant. *Xaleron Pharms, Inc. v. Actvais, Inc.*, 2016 N.Y. Misc. LEXIS 3271, at *11 (N.Y. Sup. Ct. Sept. 12, 2016).

If all the aforementioned elements and requirements of an unjust enrichment claim are satisfied, a court must still be persuaded that it is against equity to allow the defendant to receive a benefit at the expense of a plaintiff. *See Mohammed v. Juno*, No. 656428/2017, 2019 NYLJ LEXIS 912, at *26 (N.Y. Sup. Ct. Jan. 24, 2019) (finding that it was "highly unlikely and illogical to conclude that [p]laintiffs are entitled to receive no benefit" for helping the defendant company map out routes for its ridesharing phone application).

   1. **The undisputed facts prove that Robinson was enriched as a result of the illegal transfers of the Spencer proceeds that were rightfully owed to Universitas because Robinson received over a $1 million from funds directly traceable to the Spencer proceeds.**

As described in detail, *supra*, after Bursey transferred the Spencer insurance proceeds out of the COT bank account, and the proceeds were transferred to TD Bank accounts in the name of GMC. This GMC bank account possessed no funds other than those from the proceeds of the Spencer life insurance policies. As described, *supra*, $11,140,000 of the funds in the GMC bank account were later transferred to a bank account in the name of Carpenter Financial Group. The CCN then transferred at least $770,000 from the Carpenter Financial Group account directly into the personal JP Morgan Chase bank account of Robinson. (Ex. 65.) The undisputed facts show that these funds originated from COT, and the undisputed facts also show that Robinson never paid these funds back to Universitas. As such, there can be no genuine dispute that Robinson was enriched by his participation in the scheme to steal the Spencer proceeds.

**2. There is no genuine dispute of material fact that Robinson's enrichment came at Universitas' expense because the funds paid to Robinson were part of the Spencer proceeds, which rightfully belonged to Universitas.**

As stated in detail *supra*, the Spencer proceeds rightfully belonged to Universitas because Spencer named Universitas as the sole, irrevocable beneficiary of the policies taken out on his life. (Ex. 16.) Universitas was entitled to the $30 million in proceeds, less certain expenses. By virtue of the fact that Robinson received at least $770,000 in funds from accounts which held the stolen Spencer Proceeds, which he indisputably never returned, Universitas did not receive funds to which it was entitled. Therefore, there can be no genuine dispute that any enrichment of Robinson through the receipt of funds rightfully belonging to Universitas came at the expense of Universitas.

**3. The undisputed facts show that Robinson had a sufficient relationship with Universitas to find that he was unjustly enriched at Universitas' expense.**

A claim for unjust enrichment requires proof that a defendant had an awareness of the plaintiff, and that this awareness constituted more than mere knowledge of plaintiff's existence. *See Wildenstein*, 944 N.E.2d at 1110. Here, the undisputed facts prove that this element is met. Robinson not only knew of Universitas' existence, *see supra* Argument Sec. C.1, but he engaged in a letter-writing campaign with Universitas in an attempt to create a pretext to deprive Universitas of the Spencer proceeds. (*See e.g.* Ex. 15.) Universitas relied on the information provided by Robinson in his capacity as a representative of Nova, and the information provided by Robinson clearly induced Universitas into certain actions, such as disavowing the contract between Universitas and Mary Spencer, providing a claims form, and continuing the Arbitration under the belief that COT and Nova could satisfy a judgment. *See supra*, Argument Sec. D.2.

**4. The undisputed facts overwhelmingly prove that it is against equity and good conscience to allow Robinson to retain the funds he received from the Spencer proceeds.**

Here, there exists overwhelming evidence that it would be "against equity and good

conscience" to permit Robinson to retain the funds he received from the Spencer proceeds. *Wildenstein*, 944 N.E.2d at 1110. As described at length, *supra*, Robinson breached his fiduciary duty to Universitas when taking actions to deprive Universitas of the Spencer proceeds; he made multiple material representations to help conceal multiple crimes committed by the Carpenter criminal network through the unlawful transfer of those funds between Carpenter shell companies, as well as to keep Universitas in the dark as to the location of the funds; and he was paid handsomely with the very funds he was supposed to ensure were held in trust for the benefit of Universitas. The evidence further clearly proves that Robinson engaged in those actions in furtherance of the commission of crimes on behalf of the CCN in violation of the RICO Act, and it would shock the conscience to allow Robinson to keep funds acquired in this manner, especially when those funds rightfully belong to Universitas. In *Juno*, 2019 NYLJ LEXIS 912 at *26, the New York Supreme Court found that it would "be highly unlikely and illogical to conclude that the plaintiffs" would be "entitled to no benefit for helping a ride-sharing application map out routes around New York." There, the defendant failed to provide stock equity to these drivers when they sold the application in a private transaction instead of taking the company public. *Id.* Here, the inequitable conduct is far more egregious than merely reneging on a promise to make a public offering of the company, as Robinson helped to deny, in bad faith and through criminal means, about $30 million to Universitas. In the present case it would even more "unlikely and illogical" to conclude that Universitas is entitled to nothing. Therefore, there can be no genuine dispute that equity favors a finding that Robinson was unjustly enriched at the expense of Universitas, and a judgment should be entered against him in an amount of no less than the $770,000 directly traceable to the Spencer Proceeds that Robinson received.

**G.** **Defendant is Liable to Universitas for Aiding and Abetting Fraud because there is No Genuine Dispute of Material Facts that Defendant knew of the Underlying Fraud Committed by Nova, Bursey, and Carpenter and that he Substantially Assisted in Perpetrating that Underlying Fraud.**

**1.** **The indisputable facts prove that Bursey, Nova, and Carpenter committed fraud against Universitas.**

To prove a fraud claim under New York law, a plaintiff must prove (1) "a misrepresentation or a material omission of fact" (2) "which was false and known to be false by defendant," (3) "made for the purpose of inducing the other party to rely upon it," (4) justifiable reliance of the other party on the misrepresentation or material omission, and" (5) "injury." *William Doyle Galleries, Inc. v. Stettner*, 167 A.D.3d 501, 503 (N.Y. App. Div. 2018) (quoting *Genger v. Genger*, 152 A.D.3d 444, 445 (N.Y. App. Div. 2017)); *see also Spearhead Inc. v. Spearhead Consultants*, No. 6248-02, 2005 N.Y. Misc. LEXIS 3550, at *8 (N.Y. Sup. Ct. Dec. 13, 2005) ("The elements of common law fraud are misrepresentation of a material existing fact, falsity, scienter, deception and injury") (internal citations and quotations omitted).

A material fact is one that, if known to the plaintiff at the time the plaintiff made the decision, it could have affected the plaintiff's decision. *See Black's Law Dictionary* (10th ed. 2014). The misrepresentation must be of a "present and existing fact." *Stettner*, 167 A.D. 3d at 503 (finding that a pleading regarding the defendant's bank's balances was false at the time it was made supported a claim for fraud, even though the defendant qualified that the account balance could fluctuate). A defendant must have actual knowledge that the statement was false when it was made. *See Shareholder Representative Servs. LLC v. Sandoz Inc.*, No. 653506/2013, 2015 N.Y. Misc. LEXIS 740, at *19-20 (N.Y. S. Ct. Mar. 16, 2015). Statements of opinion or mere puffery are not misrepresentations of material fact and cannot form the basis for an actionable fraud claim. *Id.* at *16. Moreover, a failure to disclose can only form the basis of an actionable claim for fraud by

omission if there is a relationship "akin to a fiduciary duty" between the parties. *Id.* at *17. However, a duty to disclose an omitted fact can also be imposed under the "special facts" doctrine, which would require proving that the material fact was "peculiarly within the knowledge of the defendant," and the information could not have been discovered by the plaintiff through the exercise of "ordinary intelligence." *Id.* at *18. (quoting *Jana L. v. W. 129th St. Realty Corp.*, 22 A.D.3d 274, 278 (N.Y. App. Div. 2005).

As described in detail in Argument, Sec. E., *supra*, a court can resolve the issue of reasonable reliance at the summary judgment stage. *See, e.g.*, *Stavitsky*,18 A.D.3d at 391 (finding it appropriate to dismiss a claim for fraudulent misrepresentation because there was no evidence at all of reasonable reliance by the plaintiff). The reasonableness of the reliance is a fact intensive inquiry, and the ability of the plaintiff to discover misrepresented facts may preclude a finding of justifiable reliance.

As to damages, the appropriate measure of damages under a fraud claim is "indemnity for the actual pecuniary loss sustained as the direct result of the wrong," which is known as the "out-of-pocket rule." *McSpedon v. Levine*, No. 61202/2014, 2015 N.Y. Misc. LEXIS 5342, at *16-*17 (N.Y. Sup. Ct. Apr. 12, 2015). Damages are calculated to compensate plaintiff for what they lost because of the fraud. *Id.* at *17.

> i.   *The undisputed facts prove that Bursey and other CCN parties made material misrepresentations and omissions of fact to Universitas, and that they knew that such omissions were false.*

As an initial matter, Carpenter was actually convicted of mail and wire fraud for his role in the theft of the Universitas proceeds. Further, there can be no genuine dispute that various members of the CCN provided materially false information to Universitas or omitted material facts that they were under a duty to disclose. These representations were demonstrably false at the time they were

made. Specifically, Bursey had a duty to disclose that he had removed the Spencer proceeds from

the COT at Carpenter's instruction and that the COT no longer had any funds to satisfy a judgment.

These are both material facts because the knowledge that the funds were gone would have greatly

affected how Universitas attempted to recover those funds, and Bursey knew these facts at all

relevant times, as he was the one who transferred the money out of COT. (*See e.g.*, Ex. 58, at 16.)

It is undisputed that Bursey was the principal of the Nova, the Trustee, and therefore had a fiduciary

duty to Universitas, which imposed upon him a duty to disclose material facts. *Sandoz*, 2015 N.Y.

Misc. LEXIS 740 at *17. This knowledge was "particularly" within Bursey's purview because he

was the one who ordered the transfer, and the exercise of "ordinary intelligence" could not reveal

that fact, especially in light of the extensive campaign by Bursey, Robinson and the rest of the

CCN to conceal the defalcation of the proceeds. *See id.* at 18.

> ii.   *It is clear that this omission of fact was made with the intent that*
>       *Universitas rely on it, and that Universitas actually did rely on it.*

The intent of the omission by Bursey, at the direction of Carpenter was clear. It was meant

to induce Universitas into believing that the Spencer Proceeds were still being held in trust at the

COT. There can be no other purpose for Bursey, the principal of the trustee, to not reveal that

information. Universitas also clearly justifiably relied on this omitted fact. Operating under the

belief that the COT had money to satisfy a judgment and that the money was still held in trust,

Universitas engaged in Arbitration first, and then confirmed that Arbitration in the SDNY Court to

get a judgment. Universitas spent three years trying to get a judgment in reliance on the omission

that induced them to believe that COT still had the ability to satisfy a judgment. Universitas finally

discovered that the money had been transferred in 2012, by which time that money had long been

spent, or was virtually untraceable, meaning that it would be much harder for Universitas to ever

recover. Universitas utilized its best efforts to get discovery and find out whether the money had

been moved, but they were impeded by the CCN at every turn. Indeed, the fact that Universitas is still trying to recover the funds demonstrates the damage that their reliance on the omission caused.

iii. <em>Universitas suffered damages directly as a result of the fraudulent material omission.</em>

Finally, Universitas suffered significant damages as a result of Bursey's fraudulent omission. Universitas was entitled to the $30 million in Spencer proceeds, minus certain expenses, held in the COT. Bursey moved those funds, and then fraudulently failed to disclose that information to Universitas and then helped conceal the defalcation, forcing Universitas to undergo extremely costly legal proceedings in an attempt to recover the funds, which were mostly dissipated by the time Universitas discovered and confirmed that the funds had been moved. As such, they are entitled to compensation under the "out-of-pocket" rule for the value of the proceeds that they were improperly denied as a result of the fraud, or $30,677,276.85. *See Levine*, 2015 N.Y. Misc. LEXIS 5342 at *16-*17.

## 2. The Indisputable Facts Prove that Defendant Aided and Abetted Carpenter's, Bursey's and Nova's Fraud.

To prove that a defendant aided and abetted fraud, a plaintiff must prove "the underlying fraud, actual knowledge of the fraud, and substantial assistance." *Stettner*, 167 A.D. 3d at 50; *MBIA Ins. Co. v. Royal Bank of Can.*, No. 12238/09, 2010 N.Y. Misc. LEXIS 3958, at *84 (N.Y. Sup. Ct. Aug. 19, 2010). The actual knowledge requirement for a claim of aiding and abetting fraud is distinct from the scienter—knowledge of the falsity of a fact and intent to induce—of the underlying fraud. *In re Agape Litig. v. Cosmo*, 773 F. Supp. 2d 298, 308 (E.D.N.Y. 2011). Applying New York law, courts have found that it is not enough to prove that a defendant should have known of the underlying fraud to prove aiding and abetting, *id.*, but that a showing of conscious

avoidance—a failure to confirm a fraud for the purpose of later denying knowledge— on the part of the defendant, can prove the knowledge requirement. *Id.*

A plaintiff must demonstrate substantial assistance in aiding and abetting fraud by proving that a defendant affirmatively assisted, helped conceal, or failed to act when under a duty to act and by proving that the assistance was a proximate cause of plaintiff's harm. A plaintiff must prove more than mere inaction or silence on the part of the defendant to prove that the defendant provided substantial assistance, unless the defendant owes an independent duty to the plaintiff. *MBIA Ins.*, 2010 N.Y. Misc. LEXIS 3958, at *85.

> i. *Robinson knew about the underlying fraud.*

Robinson knew about the fraud perpetrated by Bursey in transferring the Spencer Proceeds rightfully belonging to Universitas, Bursey's material omissions regarding the fact that Bursey had transferred the money, and the attempts to conceal this transfer.

> ii. *Robinson provided substantial assistance to Bursey to assist and conceal Bursey's breach of fiduciary duty.*

Robinson took many undisputed affirmative actions to assist or conceal Bursey's fraud. Robinson submitted his declaration to the Arbitrator, which, as described *supra*, contained many misrepresentations of fact that prevented closer scrutiny into the COT's finances. This declaration had the effect of helping to conceal Bursey's fraud by preventing further inquiry into the location of the Spencer Proceeds. This is in addition to all the other steps Robinson took, including his campaign of letters—including those he drafted on Bursey's behalf—pretextually denying Universitas's claims to the proceeds, which is described at great length, *supra*. Therefore, Robinson is also liable for Bursey's breach of fiduciary duty as an aider and abettor, and it is appropriate to enter summary judgment against Robinson for $30,677,276.85.

**H. Defendant is Liable for Conspiracy to Commit Fraud and Conspiracy to Commit Breach of Fiduciary Duty because there is no Genuine Dispute of Material Fact that Defendant Took Overt Action in the Carpenter Conspiracy to Steal the Universitas Insurance Proceeds.**

New York does not recognize an independent civil conspiracy action to commit a tort. *Abacas Fed. Sav. Bank v. Lim*, 75 A.D.3d 472, 474 (N.Y. App. Div. 2010); *see also Alexander & Alexander, Inc. v. Fritzen*, 503 N.E.2d 102, 103 (N.Y. 1986) ("Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort."). Under New York law, to prove a civil conspiracy, the plaintiff must demonstrate four elements in addition to the primary tort. *Abacus*, 75 A.D.3d at 474. The four elements comprising the conspiracy aspect are: "(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in furtherance of a plan or purpose; and (4) resulting damage or injury. *Id.* (quoting *World Wrestling Fed'n Entm't v. Bozell*, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001)). New York courts have held that an "allegation of conspiracy carries no greater burden . . . than to assert adequately common action for a common purpose by common agreement or understanding among a group . . . ." *Goldstein v. Siegel*, 19 A.D.2d 489, 493 (N.Y. App. Div. 1963).

While New York court decisions have not expounded on the definition of an overt act in the civil conspiracy context, New York courts have defined an overt act extensively in the context of criminal conspiracy. The explanations of an overt act in the criminal context are instructive. "Virtually any act will satisfy the overt act requirement," if the agreement to commit a crime—or in this case an intentional tort—has "been established but the object has not been attained. *People v. Menaches*, 98 A.D.2d 335, 337 (N.Y. App. Div. 1983). An overt act may be committed by any of the conspirators, and it need not be unlawful itself, as long as the act constitutes a "step towards the execution of the conspiracy." *Id.*; *see also (Chrysler Capital Corp. v. Century Power Corp.*,

778 F. Supp. 1260, 1267-68 (S.D.N.Y. 1991) (applying New York state civil conspiracy requirements to find that a letter sent by one of the alleged conspirators with material omissions to keep investors in the dark about potential litigation constituted an overt act for pleading requirements).

In interpreting the requirement that the parties intentionally participate in the conspiracy under New York law, courts have found that participation in the agreement with knowledge of the plan or purpose serve to establish an intent to participate in that conspiracy. *See id.* at 1268.

1. **There is no genuine dispute that there existed an agreement between Robinson and other members of the Carpenter criminal network to improperly deprive Universitas of the Spencer Proceeds.**

Universitas has already demonstrated with the undisputed facts in the record that members of the Carpenter criminal network, including Robinson, committed breaches of fiduciary duty and fraud against Universitas, for which Carpenter was eventually convicted. As such, Universitas turns to substantive aspects of the conspiracy claim. There can be no dispute that on or about August 25, 2009, COT had an "executive board meeting" to discuss the Spencer death benefits and the benefits payable to Universitas. (Ex. 38.) Robinson was included in this executive board meeting. (Ex. 38.) The purpose of the meeting was for everyone "to be on the same page" concerning these issues. (Ex. 38.) Robinson further computed that a twenty-percent holdback would be necessary to refund all the related expenses, be profitable, and generate a return for the insured participant. (Ex. 1.) This holdback term was then retroactively and fraudulently added to the COT agreement, indicating that the Carpenter criminal network had made an agreement to improperly deny Universitas the total benefit from the Spencer proceeds that it was due. It is also clear that this agreement persisted by the continuous contact between Robinson, Bursey, Trudeau, and Carpenter, as reflected in, *inter alia*, the communication from Carpenter telling Robinson to

tell Universitas to "eat s*** and die" when Universitas requested that the Spencer proceeds be paid out to them. (Ex. 23, 2501:8-2502:10.)

2. **The Undisputed Evidence Proves that Robinson committed a plethora of overt acts in furtherance of the conspiracy to defraud Universitas of the Spencer Proceeds.**

The undisputed facts demonstrate that Robinson committed many overt acts in furtherance of the conspiracy to defraud Universitas of the Spencer proceeds. An overt act can be "any act" and it does not have to be unlawful itself, as long as the act constitutes "step towards the execution of the conspiracy." *Menaches*, 98 A.D.2d at 337. Each of the letters that Robinson sent to Universitas alleging pretextual and dilatory reasons for not paying out Universitas' claim, including the letter wrongfully denying Universitas' claim on October 2, 2009, constituted an overt act in furtherance of the conspiracy. (Ex. 24.) In *Chrysler Capital Corp.*, the court found that the sending of a letter that contained material omissions intended to conceal relevant information from investors by one of the alleged conspirators constituted an overt act for purposes of pleading a civil conspiracy under New York law. 778 F. Supp. at 1267-68. Robinson took precisely the same action, and he did so on numerous occasions, with all of his letters containing material omissions or outright falsehoods as described at length, *supra.* Thus, it cannot be disputed that Robinson committed an overt act to further the conspiracy.[9]

---

[9] Notably, the letter writing campaign constituted only one set of many different overt acts committed by Robinson in furtherance of the conspiracy to defraud Universitas. Robinson also spoliated discovery by producing a fraudulent and altered version of the COT agreement as part of discovery order in the Arbitration. (Chernow Decl., Ex. 23 at 2495:9-2500:22, Ex. 75.)

3. **Robinson intentionally participated in the conspiracy's purpose because he took actions in furtherance of the conspiracy with knowledge of the purpose of the conspiracy.**

Robinson indisputably had knowledge of the plan or purpose of the conspiracy. He attended the meeting in which the agreement and purpose of the conspiracy was discussed. The evidence overwhelmingly proves that Robinson was intimately involved in Nova's improper denial of Universitas' claim, which was one of the crucial aspects of the conspiracy. (Ex. 37, 964:11-965:20;) Robinson also wrote numerous letters to Universitas on behalf of BASI, Nova, and Nova Benefit Plans, LLC and alleging a variety of false and improper reasons for the denial of Universitas' claim to the Spencer death benefits; and Robinsons also asserted the fraudulently included Section 6.01 of the COT agreement as basis for withholding Universitas' money. (Ex. 15.) Robinson then falsely testified at the arbitration that the twenty percent holdback provision was included in the COT document attached to his January 2007 email. (Ex. 4, 536:23-537:13, 541:22-524:4, 588:3-20; Ex. 37, 1065:4-20, 1185:19-23.)

Robinson wrote letters to Universitas concerning GMC's alleged "claim" to Spencer death benefits, (Ex. 23), despite the fact Robinson knew that no such agreement existed or was ever consummated. Robinson then testified at the arbitration about the validity of the non-existent deal between GMC and Spencer. (Ex. 4, 757:12-758:25; Ex. 37, 922:15-23, 931:18-936:25, 992:11-994:20.) At all times, he indisputably knew that the purpose of the conspiracy was to fraudulently and wrongfully deny the Spencer proceeds to Universitas. As such, these actions, in conjunction with his knowledge, prove that there is no genuine dispute that Robinson intentionally participated in the conspiracy to defraud Universitas.

**4.   The Undisputed Facts Prove that Universitas was damaged by this conspiracy.**

The conspiracy to defraud Universitas and deny Universitas the Spencer proceeds indisputably injured Universitas. If the conspiracy had not accomplished its purpose, Universitas would have received the proceeds, which they were entitled to as the beneficiary of the COT. Robinson knowingly participated in the conspiracy, and is therefore liable for all breaches of fiduciary duty and fraud committed by Bursey, Nova, and other members of the CCN, and this Court should enter a judgment in the amount of $30,677,276.85 against Robinson.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant Plaintiff Universitas' Motion for Summary Judgment and enter summary judgment for Universitas on Counts One, Two, Three, Four, Seven, Eight, and Ten of the Complaint, and find that Robinson be liable for $92,031,830.55 in damages, plus attorney's fees for violations of RICO; $30,677,276.85 in compensatory damages; and order that restitution in the amount of $770,000 for Robinson's unjust enrichment at the expense of Universitas.

Dated: August 22, 2024

Respectfully submitted,


*/s/ Joseph L. Manson III*

Admitted *Pro Hac Vice*
Law Offices of Joseph L. Manson III
600 Cameron Street
Alexandria, VA 22314
Telephone: 202-674-1450
jmanson@jmansonlaw.com


*Counsel for Universitas Education, LLC*

65

## CERTIFICATE OF SERVICE

I, Joseph L. Manson III, hereby certify that a true and accurate copy of the foregoing Memorandum in Support of the Motion for Summary Judgment of Plaintiff Universitas Education, LLC was filed and served on all counsel of record through the ECF system on August 22, 2024.

*/s/ Joseph L. Manson III*